UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MASHPEE WAMPANOAG TRIBE**,<br>483 Great Neck Road South<br>Mashpee, MA 02649<br><br>   Plaintiffs,<br><br> v.<br><br>**RYAN ZINKE**, in his official capacity as<br>Secretary of the Interior,<br>1849 C Street, N.W.,<br>Washington, D.C.  20240<br><br>  and<br><br>**U.S. DEPARTMENT OF THE INTERIOR**,<br>1849 C Street, N.W.,<br>Washington, D.C. 20240<br><br>   Defendants. | Civil Action No. _____ |

## COMPLAINT

Plaintiff Mashpee Wampanoag Tribe ("Tribe") files this Complaint against Defendants, Ryan Zinke, in his official capacity as Secretary of the Interior, and the U.S. Department of the Interior, and alleges as follows.

1. Plaintiff seeks review of the September 7, 2018, Record of Decision (Decision) issued by the Secretary of the Interior through his designee, Assistant Secretary-Indian Affairs Tara Sweeney, relating to the Tribe's reservation.  In its Decision, the Department failed to apply established law, contorting some of the relevant facts and ignoring others to engineer a negative decision.  As a result the Department's decision is arbitrary, capricious and contrary to law, and if left unaddressed, will have a devastating impact on the Tribe.

2. In its Decision, the Department refused to acknowledge that the Tribe was "under federal jurisdiction" when the Indian Reorganization Act ("IRA") 25 U.S.C. §§ 5101 *et seq.*, was enacted in 1934, and improperly refused to exercise the authority Congress delegated to it under the IRA to confirm the federally-protected status of the Tribe's reservation land.

3. Under the IRA, Congress delegated to the Secretary of Interior authority to accept trust title ("take land in trust") for Indian tribes, and to proclaim such lands to be a tribe's reservation. In *Carcieri v. Salazar*, 555 U.S. 379 (2009), the Supreme Court instructed that the Secretary may only exercise his authority to take land in trust for an Indian tribe if the tribe meets one of the statute's three definitions of "Indian." *Id*. at 387-88. The Court further instructed that to meet the first definition of "Indian," a tribe must have been "under federal jurisdiction" in 1934 when the IRA was enacted. *Id*. at 391. The Department erroneously determined in its Decision that the Tribe was not "under federal jurisdiction" in 1934.

4. The Department's September 7, 2018, Decision indefensibly reverses course from the "under federal jurisdiction" administrative decisions it has made for other tribes. It also indefensibly deviates from the language and spirit of its own "M Opinion," *i.e.*, its own general legal opinion that is supposed to govern its implementation of the "under federal jurisdiction" question. Finally, the Department's 2018 Decision baldly ignores case law interpreting the "under federal jurisdiction" requirement. The Department's Decision is arbitrary, capricious, and contrary to law. The Department's failure to properly exercise its delegated authority under the IRA is concerning when viewed in the context of the Department's general trust obligations to the Tribe. The Mashpee Tribe therefore files this complaint to challenge the Department's 2018 Decision and correct the Department's arbitrary, capricious and unlawful action.

## NATURE OF THE ACTION

5. Mashpee seeks declaratory and injunctive relief under the laws of the United States, including but not limited to 5 U.S.C. §§ 701-706 and 28 U.S.C. §§ 2201-2202. This action arises under federal law, including but not limited to the IRA. 25 U.S.C. § 5108.

6. The Department, among other things, erroneously determined that the Mashpee Tribe was not "under federal jurisdiction" in 1934 within the meaning of the IRA. The Department's action is final agency action that is arbitrary, capricious, and otherwise not in accordance with law.

## PARTIES

7. Plaintiff the Mashpee Wampanoag Tribes is a federally recognized Indian tribe with a reservation in southeastern Massachusetts.

8. Defendant Ryan Zinke, the Secretary of the United States Department of the Interior ("Department"), is sued in his official capacity. The Secretary is the official to whom Congress delegated authority to acquire land in trust for Indian tribes under the IRA. The Secretary has delegated this authority to the Assistant Secretary-Indian Affairs. The Secretary has direct line authority over the Assistant Secretary-Indian Affairs and is responsible for the Assistant Secretary's decisions. Secretary Zinke is the federal official responsible for implementing and honoring the United States' trust responsibility to Indian tribes. Secretary Zinke is responsible for the arbitrary, capricious, and unlawful conduct described in this Complaint.

9. Defendant, the United States Department of the Interior, is an administrative agency of the United States. Within the Department is the Bureau of Indian Affairs (BIA), the federal office most directly responsible for implementing the United States' trust responsibility

for Indian tribes. The Assistant Secretary-Indian Affairs is responsible for overall management of the BIA and responsible for its actions. The Assistant Secretary-Indian Affairs reports to the Secretary of the Interior, and acted on his and the Department's behalf when she signed the Department's Decision.

## JURISDICTION AND VENUE

10. This Court has jurisdiction under 28 U.S.C. § 1331 because this matter arises under the laws of the United States and under 28 U.S.C. § 1362 because this is a civil action by a tribe arising under the Constitution, laws or treaties of the United States.

11. This suit alleges that the Department and Secretary have failed to act in accordance with the IRA and its trust obligations to tribes. Defendants have consented to suit under the Administrative Procedure Act, 5 U.S.C. § 702. The requested relief is available under the Administrative Procedure Act, 5 U.S.C. §§ 701-706 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

12. Venue is proper in this district under 28 U.S.C. § 1391(e) because (a) a substantial part of the events, actions, and/or omissions giving rise to the claims in this Complaint occurred in this judicial district and/or (b) because Defendants reside in this judicial district.

## STATUTORY AND REGULATORY BACKGROUND

13. The Indian Reorganization Act of 1934 (the "IRA") was landmark legislation enacted to reverse the disastrous effects of earlier federal laws and policies which caused the loss of over 90 million acres of Indian lands during the previous half century. The IRA was intended "to rehabilitate the Indian's economic life" and to "develop the initiative destroyed by a century of oppression and paternalism." H.R. Rep. No.73-1804, at 6 (1934). One of the key purposes of the IRA was to provide the Secretary of the Interior with a mechanism to acquire land in trust for tribes that did not already benefit from the possession of federally-held lands. *See* S. Rep. No.

73-1080, at 1 (1934) (declaring that one of the "purposes of this bill" was to "provide for the acquisition, through purchase, of land for Indians, now landless, who are anxious and fitted to make a living on such land"); H. R. Rep. No.73-1804, at 6 (1934) (noting that the IRA would help to "make many of the now pauperized, landless Indians self-supporting"); *see also* FELIX S. COHEN, HANDBOOK OF FEDERAL INDIAN LAW 84 (1942).

14.     Section 5 of the IRA, 25 U.S.C. § 5108, authorizes the Secretary to take land in trust for Indian tribes, protecting the land from future alienation absent congressional consent. Section 7 of the IRA, 25 U.S.C. § 5110, additionally authorizes the Secretary to create new tribal reservations.

15.     In *Carcieri v. Salazar*, 555 U.S. 379, 387-88 (2009), the Supreme Court directed that the Secretary's authority under Section 5 to take land in trust for an Indian tribe must be informed by whether the tribe meets the IRA's definition of "Indian," found in Section 19. Section 19 includes three definitions of Indian: "The term 'Indian' as used in this Act shall include all persons of Indian descent [1] who are members of any recognized Indian tribe now under Federal jurisdiction, and [2] all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation, and shall further include [3] all other persons of one-half or more Indian blood." 25 U.S.C. § 5129.

16.     Regarding the first definition, the Court also directed that "*now* under federal jurisdiction" means that the tribe must have been "under federal jurisdiction" in 1934 when the IRA was enacted.

17.     The Department has issued formal legal guidance on what evidence is needed to show whether a tribe was "under federal jurisdiction" in 1934 for the purposes of the IRA's first definition of Indian.  The Department's M Opinion (M-37029, Memorandum on the Meaning of

5

"Under Federal Jurisdiction" for Purposes of the Indian Reorganization Act (Mar. 12, 2014)) established a two-part test for determining that a tribe was under federal jurisdiction. The first prong requires Interior to consider:

> whether there is a sufficient showing in the tribe's history, at or before 1934, that it was under federal jurisdiction, *i.e.,* whether the United States had in 1934 or at some point in the tribe's history prior to 1934, taken an action or series of actions — through a course of dealings or other relevant acts for or on behalf of the tribe or in some instance tribal members — that are sufficient to establish, or that generally reflect federal obligations, duties, responsibility for or authority over the tribe by the Federal Government.

M Opinion at 19. The second prong requires that Interior ascertain whether the tribe's jurisdictional status remained intact in 1934. *Id.*

18. Various court decisions, the Department's M Opinion, and other Departmental decisions have established the types of evidence that demonstrate whether a tribe is "under federal jurisdiction." Examples of these categories of evidence include, *inter alia,* the following.

a. Inclusion of tribes and their members on federal census rolls is evidence those tribes were under the federal government's jurisdiction. Multiple courts have relied on this type of evidence to establish that a tribe is under federal jurisdiction.

b. Inclusion of tribes in federal reports and surveys that address federal Indian policy and programs and acknowledge federal responsibility for such tribes is evidence that the government understood such tribes to be under federal jurisdiction.

c. The education of tribal members at federal Indian schools is probative evidence that a tribe was under federal jurisdiction.

d. Holding and controlling funds for tribal members is evidence that the tribe to which those members belong was under federal jurisdiction.

e. The federal provision of health care services to tribal members also is evidence that the tribe was under federal jurisdiction.

f. The federal government providing social services to a tribe and tribal members has been recognized as evidence demonstrating that a tribe was under federal jurisdiction. The provision of services to individual Indians is evidence of whether a tribe was under federal jurisdiction in 1934, as it is reasonable for the Secretary to consider the relationship to the part (tribal members) when trying to assess the relationship to the whole (the tribe).

19. These same court decisions and the Department's M Opinion also establish that the Department must consider all the evidence together as a whole, the "variety of actions when viewed in concert," that demonstrate whether a tribe is "under federal jurisdiction."

20. The Department must also consider the federal government's unique trust relationship with Indian tribes, and the related canon of construction that requires ambiguities to be resolved for the protection of tribes. *See Cobell v. Norton*, 240 F.3d 1081, 1088 (D.C. Cir. 2001) ("[T]he Interior Department is responsible for executing most of the federal government's trust duties [to Indian tribes]"); *Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1444-1445 (D.C. Cir. 1988) (stating that "'statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit'" and applying the canon to the Department's actions) (quoting *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985)).

## PROCEDURAL BACKGROUND

21. The Tribe has lived in what is now southeastern Massachusetts since long before any European set foot on the American continent, but over the course of time the Tribe lost its lands.

22. In 2007, the Tribe sought to address its landlessness when it petitioned the Department to acquire in trust approximately 170 acres of land in Mashpee, Massachusetts and approximately 150 acres near Taunton, Massachusetts.

23. The Tribe sought the trust land to support the needs of its members and provide land for self-determination and self-governance, housing, education and cultural preservation. The Mashpee land, which includes culturally significant and historic sites in the heart of the Tribe's historic territory (including a Mashpee burial ground used by the Tribe for centuries), is for use for tribal administrative and cultural purposes, and tribal housing. The Taunton land is for use for economic development in the form of an Indian gaming facility, with revenues intended to support the Mashpee tribal government and meet the needs of Tribal members, many of whom suffer from unemployment or incomes below poverty level.

24. On September 18, 2015, the Department issued a record of decision to acquire the Mashpee and Taunton parcels in trust, under the second definition of "Indian" in the IRA, which includes "all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation." U.S. Department of the Interior, Assistant Secretary-Indian Affairs, Record of Decision, Trust Acquisition and Reservation Proclamation for 151 Acres in the City of Taunton, Massachusetts, and 170 Acres in the Town of Mashpee, Massachusetts for the Mashpee Wampanoag Tribe (Sept. 18, 2015) at 7 (2015 ROD). In the 2015 ROD, the Department specifically did not consider whether the Tribe qualified to have land taken in trust under Definition 1 of the IRA (members of a recognized tribe "now under federal jurisdiction" in 1934).

25. In 2016, certain residents of the City of Taunton ("Littlefield Plaintiffs") challenged the 2015 ROD in the U.S. District Court for the District of Massachusetts. The

Littlefield Plaintiffs challenged, *inter alia*, the Department's interpretation of the second definition of Indian in the IRA. *Littlefield, et al. v. U.S. Dep't of the Interior,* Case No. 16-CV-10184 (D. Mass. 2016) (*Littlefield)*.

26. On July 28, 2016, the Massachusetts federal district court ruled against the Department, concluding that the second definition of Indian incorporates the prior phrase, "members of any recognized Indian tribe now under federal jurisdiction." The Court remanded the matter to the Secretary for further proceedings consistent with the opinion.

27. Both the Department and the Tribe filed a notice of appeal from the District Court's *Littlefield* decision in the U.S. Court of Appeals for the First Circuit. The appeal proceedings have been stayed since May 15, 2017. After Defendant Secretary Zinke took office, however, the Department dismissed its appeal (although it remains a party to the Tribe's appeal).

28. By letter dated December 6, 2016, the Department told the Tribe and the Littlefield Plaintiffs it would analyze whether the Tribe was eligible to have land taken in trust under the first definition of "Indian," and invited the parties to submit any evidence or argument that the Tribe was under federal jurisdiction in 1934.

29. On December 21, 2016 and on January 5, 2107, the Tribe submitted to the Department evidence and argument to demonstrate that the Tribe was under federal jurisdiction in 1934 and therefore eligible to have land acquired in trust under Definition 1. The Littlefield Plaintiffs filed a response on February 13, 2017, and the Tribe filed a reply on February 28, 2017, which concluded the briefing.

30. On June 30, 2017, the Department issued a draft negative decision (finding that the Tribe was not "under federal jurisdiction" in 1934). It also unilaterally requested supplemental briefing on the question of the effect of Massachusetts' exercise of authority over

the Tribe and whether it could be considered a federal surrogate for the "under federal jurisdiction" inquiry.

31. The Tribe and the Littlefield Plaintiffs simultaneously submitted supplemental evidence and arguments on August 30, 2017, and responses on October 30, 2017, regarding whether the Tribe was "under federal jurisdiction" in 1934.

32. On October 30, 2017, the Wampanoag Tribe of Gay Head (Aquinnah) was permitted to provide a response to the Department's June 30, 2017, draft decision and request for supplemental briefing. Both the Tribe and the Littlefield Plaintiffs replied on November 13, 2017.

33. On September 7, 2018, the Department issued the Decision that is the subject of this complaint, erroneously finding that the Mashpee Wampanoag Tribe was not "under federal jurisdiction" as of 1934 so did not meet IRA Section 19's first definition of "Indian."

## FACTUAL BACKGROUND

34. The Tribe submitted to the Department evidence more than sufficient to demonstrate that the Tribe was under federal jurisdiction in 1934. The evidence submitted by the Tribe is of the same type relied on by the Department and the federal courts to determine in other cases that a tribe was under federal jurisdiction in 1934, and when considered in its entirety, the only logical conclusion that can be reached is that the Tribe was under federal jurisdiction in 1934. Yet in its Decision, the Department offered little more than conclusory statements to discount or ignore Mashpee's evidence. Tellingly, the Department failed to cite to any case law to support its cramped and ungenerous interpretation of the majority of the Tribe's facts.

### Protection, Control, and Management of Indian Lands and Natural Resources

35. Mashpee submitted evidence, and the Department recognized, that the Tribe occupied the land comprising the Town of Mashpee from before European contact until modern

times, and had relationships with the British Crown and the Province of Massachusetts before the United States was founded. The Department recognized that the Tribe's relationship with its Mashpee lands was protected by the Crown, the colonial United States government, and the Commonwealth of Massachusetts, in addition to protections later enacted by the United States in the Indian Non-intercourse Act.

36. The Department acknowledged that in 1798, the U.S. Attorney for the District of Massachusetts brought an ejectment action on behalf of the Mashpee Tribe and successfully invalidated an illegal conveyance of tribal land in Mashpee, contrary to an existing restraint on the alienation of that Indian land.

37. The Department further acknowledged that, at the request of Congress, in the early 1820s the Secretary of War (the precursor to the Bureau of Indian Affairs was originally within the War Department) ordered Jedidiah Morse to prepare a report regarding the state of Indian tribes "within the jurisdiction of the United States." The Morse Report included a statistical table explaining the tribes considered within the United States' jurisdiction including the Mashpee Tribe.

38. Regarding Massachusetts tribes, the Morse Report stated that the tribes "reside on their respective Reservations at Marshpee [Mashpee], Herring Pond, Martha's Vineyard and Troy." Morse's Report and recommendation were considered by Congress, adopted by the Secretary of War, and sent to President Monroe.

39. The Department has acknowledged that the federal government considered the Tribe as inhabiting a reservation in the 1820s, and that the reservation had been set aside for the Tribe's occupation and use under the protection of the colonial court and government, and continued to exist and be occupied by Mashpee tribal members through 1934.

40. In the late 1940's, the federal government acknowledged and acquiesced in aboriginal hunting, fishing and gathering rights of the Mashpee Tribe, in a federal title report prepared by the Navy for condemnation proceedings. That report acknowledged the reserved rights of Mashpee Tribal members to cross over certain lands to gather seaweed and marsh hay.

41. Although the Department catalogued various actions taken in relation to Mashpee land and natural resources, and although a federal report commissioned by Congress expressly includes the Tribe in a list of tribes "within the jurisdiction of the United States," the Department summarily reached the self-serving conclusion that ". . . the Federal Government took no action to protect the Tribe's lands, despite invitations to do so." The Department offers no legal support for its conclusory assessment, which runs counter to the evidence, and is arbitrary, capricious and contrary to law.

Federal and Indian Office Census Rolls

42. The Department acknowledged that Mashpee Tribal members were listed as Indians in the general federal census between 1850 and 1940. Tribal members were also listed in the federal census Indian Population Schedule for 1910.

43. The Department acknowledged that in the 1884 Appropriations Act for the Indian Department, Congress directed the Department of the Interior to collect information about tribes in Indian census rolls. 23 Stat. 76, 98 (July 4, 1884). Mashpee Tribal members were included in two Indian census rolls prepared by the Indian agent at the United States Indian School in Carlisle, PA in 1911 and 1912.

44. Entirely ignoring the censuses created at the Carlisle Indian School, the Department, with no analysis, dismisses the census evidence by concluding that listing Tribal members on a Federal census, "though it may be probative of Federal jurisdiction over the Tribe,

*in and of itself* is inconclusive….." This statement contradicts the Department's prior opinions and relevant case law that census evidence is important evidence of federal jurisdiction.

45. The Department also improperly treated the census evidence in isolation, although the census evidence is only one of multiple types of evidence of federal jurisdiction submitted by the Tribe and addressed by the Department, which must be "viewed in concert" under the Department's own requirements.

46. The Department's conclusion that these census records do not demonstrate that the Tribe was under federal jurisdiction is arbitrary, capricious, and contrary to law – the federal actions accounting for and enumerating Mashpee Tribal members as Indians in federal census documents reflect federal obligations, duties, responsibility for and authority over the Tribe before and continuing through 1934, consistent with relevant case law.

<u>Federal Officials Acknowledging/Exerting Federal Authority Over Tribe</u>

47. The Department acknowledged that the Mashpee Tribe was included in multiple federal reports relating to federal Indian policy and enumerating tribes under the jurisdiction of the United States during the late 1800s through 1935. Besides the Morse Report discussed above, the Mashpee Tribe was identified in these federal reports:

- Letter from Thomas McKenney, the Director of the Office of Indian Affairs to the Secretary of War, relying on Morse's 1822 table with "the names of the Indian tribes now remaining within the limits of the different states…" (Jan. 10, 1825);

- Letter from Thomas McKenney to the Secretary of War, relying on Morses's 1822 table to show the Indian tribes "now resident within the United States…" (Dec. 5, 1828);

- A chart prepared by Indian Agent Henry Schoolcraft in 1851 in response to Congressional direction regarding trade and intercourse with Indian tribes;

- An 1888 Report by Alice Fletcher for the Department of the Interior regarding the progress of Indian education in the United States, prepared in response to a Senate Resolution;

- The 1890 annual report of the Commissioner of Indian Affairs, specifically noting that Mashpee continued to hold tribal relations and specific tracts of land (submitted to Congress); and

- A 1935 Survey of New England Tribes by Gladys Tantaquidgeon, who was hired by BIA for this task, whose report was paid for by BIA and included in a larger report to the Commissioner of Indian Affairs.

48. Although these reports were ordered by Congress and the federal government to determine federal policy regarding tribes within the United States' jurisdiction, the Department improperly concluded, with limited analysis and no legal citation, that these federal reports simply demonstrate federal "acknowledgment" of the Mashpee Tribe, that including a tribe on a federal report does not demonstrate an "exercise" of jurisdiction over the Tribe. The Department's conclusory assertions are contrary to existing law, which requires that the actions by Federal agents, directed and funded by Congress, in visiting and compiling records to make federal Indian policy and decisions pertaining to Mashpee and other tribes is an exercise of federal jurisdiction.

49. The Department's analysis of the import of the Morse Report is illustrative. The federal government used the Morse Report to decide which eastern tribes it would leave in place, and which eastern tribes it would force to move west. The Department's Decision perversely concludes that a decision to force a tribe to relocate to new lands shows a tribe was under federal jurisdiction, but that a decision to allow a tribe to stay within its historic homelands is not. Both are decisions profoundly affecting the future of the tribe. The Department fails to provide a reasonable explanation (let alone case law) justifying its position that a removal decision counts to show a tribe was "under federal jurisdiction" but a decision to leave a tribe in place does not.

50. The Department's dismissal of these federal reports and surveys is arbitrary, capricious, and contrary to law – the series of federal actions that resulted in the Mashpee Tribe

being included in multiple federal accountings of existing tribes and their status within the United States' jurisdiction, which were used to inform federal Indian policy, reflect federal obligations, duties, responsibility for and authority over the Tribe before and continuing through 1934.

### Tribal Members Attending Federal Indian School/Federal Education Funding

51. The Department acknowledged that a significant number of Mashpee Tribal members attended the federally-operated Carlisle Indian School between 1905 and 1918 when the school was closed. In 1928, the General Accounting Office issued a report including attendance records for every year Carlisle was in operation (1879-1918). The Report identifies Mashpee students by year, with the years 1906 and 1917 tallying over a dozen Mashpee students.

52. The Department stated that the evidence about enrollment of students "clearly demonstrate [sic] exercises of Federal authority over Indians generally and individual Indians specifically," but then inexplicably concluded that "none suffice, in isolation, to show an exercise of federal authority over the Mashpee Tribe as distinct from some of its members." Without analysis or citation to authority, the Department dismissed the Mashpee student records as being "insufficient" evidence that the Tribe was under federal jurisdiction, and refused to consider the evidence in the larger context of all the evidence in the record, contrary to what the law and Departmental legal guidance requires.

53. The Department also ignored evidence that in the 1930s (after Carlisle had closed), the Director of Education in the Office of Indian Affairs (in coordination with Gladys Tantaquidgeon, author of the federal 1935 Survey of New England Tribes) worked with the federal Public Works Administration to provide a federal PWA grant to build a new school to educate Mashpee children – another example of federal engagement and funding, and clear exercise of federal jurisdiction on behalf of Mashpee tribal members.

54.     The Department's Decision is arbitrary, capricious, and contrary to law – federal supervision over a significant number of Mashpee Tribal members at a federal Indian school, and federal coordination and funding to provide a local school for Mashpee children reflects federal obligations, duties, responsibility for and authority over the Tribe before 1934, which remained intact through 1934.

<u>Federal Indian Affairs Officials Managing Funds as Trustee for Tribal Members</u>

55.     With even less analysis, the Department dismissed the evidence that Federal officials regularly controlled and managed funds for Mashpee tribal members. The Superintendent of Carlisle Indian School controlled funds belonging to Mashpee members attending the school. In at least one case, the Carlisle Superintendent was required to seek additional approval from the Commissioner of Indian Affairs to transfer or use Mashpee members' funds. Federal officials at Carlisle also restricted Mashpee students' parents access to the students' funds.

56.     The Department improperly concluded, contrary to law, that federal control of Mashpee tribal member's funds in connection with Mashpee tribal members attending the federal Carlisle Indian School is not sufficient evidence of federal obligations, duties, responsibility for and authority over the Tribe before 1934, which remained intact through 1934, and improperly failed to consider the evidence in concert and in context with all the other evidence of federal jurisdiction.

<u>Federal Indian Affairs Officials Providing Health Care to Tribal Members</u>

57.     The Department gave only superficial attention to the evidence that Federal Indian Affairs officials exercised federal supervision over Mashpee tribal members by paying for and providing health care to Mashpee students attending the Carlisle Indian School. Federal

Carlisle officials regularly approved and provided medical care, including surgery and other significant medical procedures for Mashpee tribal members attending the school.

58. The Department concluded, contrary to existing law, including the M Opinion that specifically references health care for tribal members as evidence of federal jurisdiction, that the federal provision and control of Mashpee tribal member's health care in connection with Mashpee tribal members attending the federal Carlisle Indian School is not sufficient evidence of federal obligations, duties, responsibility for and authority over the Tribe before 1934, which remained intact through 1934.  The Department also failed to consider the evidence in concert and in context with all the other evidence of federal jurisdiction, as required by law.

<u>Federal Indian Affairs Officials Providing Social Services<br>(Job Placement and Training) to Tribal Members</u>

59. The Office of Indian Affairs routinely expended federal funds and used federal officials to provide social services such as job training and placement to Mashpee tribal members attending Carlisle Indian School.  Mashpee students enrolled at Carlisle Indian School participated in the federal government's "outing" program where they were assigned by federal officials to work for various employers for vocational experience and training.

60. Contrary to law, including the M Opinion and federal case law that specifically references the provision of social services as being evidence of federal jurisdiction, the Department concluded that the federal funding and provision of social services to Mashpee tribal members attending the federal Carlisle Indian School is insufficient evidence of federal obligations, duties, responsibility for and authority over the Tribe before 1934, which remained intact through 1934.  The Department also failed to consider the evidence in concert and in context with all the other evidence of federal jurisdiction, as required by law.

## COUNT I

61.     Each of the above allegations is incorporated herein by reference.

62.     The Secretary improperly issued a Decision incorrectly finding that the Mashpee Tribe was not "now under federal jurisdiction," within the meaning of 25 U.S.C. § 5129.

63.     That Decision is final agency action that is arbitrary, capricious and contrary to law under 5 U.S.C. § 706(2).

64.     The evidence cited in the Decision demonstrates that the Mashpee Tribe was "under federal jurisdiction" in 1934 within the meaning of the IRA, as required by the Department's own M Opinion and relevant case law:

- The Tribe was included in federal reports and surveys, some ordered by Congress, from the 1800's through 1934 that listed the tribes, including Mashpee, that were "within the jurisdiction of the United States" and were used as the basis for federal Indian policy.

- The United States protected the Tribe in the occupation of its lands and resources in Mashpee, Massachusetts, taking action through a U.S. attorney to protect Mashpee lands illegally conveyed to non-Indians in violation of a restraint on alienation, recognized the Tribe as inhabiting a reservation in the 1820's when considering the implementation of federal removal, and recognized that the reservation had been set aside for the Tribe's occupation and use and continued to exist and be occupied by Mashpee tribal members through 1934.

- The United States took federal actions to account for and enumerate Mashpee Tribal members as Indians in federal census documents.

- The United States engaged in federal supervision over a significant number of Mashpee Tribal members attending a federal Indian school.

- The United States controlled Mashpee tribal member's funds in connection with Mashpee students attending the federal Carlisle Indian School, and required that Mashpee parents obtain federal permission to access their child's funds maintained by the federal government.

- The United States funded and provided health care to Mashpee students attending the Carlisle Indian School, and sometimes approved significant medical procedures for Mashpee students without parental permission.

- The United States funded and provided social services to Mashpee tribal members attending the federal Carlisle Indian School, including job training and placement.

65. The Department failed to consider all such evidence demonstrating the federal course of dealings with Mashpee, and did not consider all the evidence together as a whole, the "variety of actions when viewed in concert," that demonstrate that the Tribe was under federal jurisdiction, as required by the Department's M Opinion, prior Departmental decisions, and law.

66. For these reasons and others, the Decision is arbitrary, capricious and contrary to law, in violation of the APA.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that the Court grant the following relief and enter judgment as follows:

67. Declare that the Secretary's Decision that the Mashpee Tribe was not "under federal jurisdiction" within the meaning of the IRA is arbitrary, capricious, and contrary to law.

68. Order the Secretary to set aside the Decision and issue a new decision based on the evidence and consistent with law, regulation, and Departmental policy.

69. Award Plaintiff costs, attorneys' fees, and other expenses of this litigation.

70. Provide any such other relief that the Court may deem proper.

Dated:  September 27, 2018                Respectfully Submitted,

By:   s/ Tami Lyn Azorsky
DENTONS US LLP
Tami Lyn Azorsky, Bar No. 388572
tami.azorsky@dentons.com
V. Heather Sibbison, Bar No. 422632
heather.sibbison@dentons.com
Suzanne R. Schaeffer, Bar No. 429735
suzanne.schaeffer@dentons.com

19

1900 K Street, NW
Washington, District of Columbia  20006
Telephone:  (202) 496-7500
Facsimile:  (202) 408-6399

*Attorneys for Plaintiff*
*Mashpee Wampanoag Tribe*