# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MASHPEE WAMPANOAG TRIBE,

        Plaintiff,

   v.

DAVID L. BERNHARDT, in his official capacity as Secretary of the Interior, and UNITED STATES DEPARTMENT OF THE INTERIOR,

        Federal Defendants,

   v.

DAVID LITTLEFIELD, *et al.*,

        Intervenor-Defendants.

Case No. 1:18-cv-2242-RMC

# FEDERAL DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Introduction ................................................................................................. 1

Background .................................................................................................. 2

    I.    Legal Background ................................................................... 2

        A.    The Indian Reorganization Act of 1934 ...................... 2

        B.    Interior's test for determining whether a tribe was "under Federal jurisdiction" in 1934 ........................................... 3

    II.    Factual Background .................................................................. 5

        A.    The Tribe's trust acquisition request and Interior's 2015 decision ....................................................................... 5

        B.    Challenge to Interior's 2015 ROD ............................... 6

        C.    Interior's consideration of whether the Tribe was under Federal jurisdiction in 1934 ....................................... 7

        D.    The Tribe's complaint and the current litigation ......... 9

Standard of Review ..................................................................................... 10

    I.    Disposition by summary judgment ........................................ 10

    II.    Statutory interpretation ........................................................ 11

Argument ..................................................................................................... 12

    I.    A narrow and deferential standard of review is applied to Interior's determination that the Tribe was not under Federal jurisdiction in 1934 ................................................... 12

    II.    Interior's decision that the Tribe was not under Federal jurisdiction in 1934 is fully supported by the administrative record. ................................................................................... 14

        A.    The Tribe did not come under Federal jurisdiction before 1934 by operation of law ................................. 15

        B.    Massachusetts' history of exercising authority over the Tribe does not show that the Tribe was under Federal jurisdiction in 1934. ................................................... 17

C. Interior reasonably concluded that the Tribe's evidence did not show that it was under Federal jurisdiction in 1934. .......... 18

 1. The Federal census rolls were insufficient to show that the Tribe was under Federal jurisdiction in 1934. ................................................................................ 19

 2. None of the reports cited by the Tribe provide evidence of any exercises of Federal authority over the Tribe. ......................................................................... 21

 3. Attendance at Carlisle Indian School, by itself, is insufficient to show that the Tribe was under Federal jurisdiction in 1934. ........................................... 25

 4. The Tribe did not show that Federal officials took any affirmative action to protect the Tribe's lands. ........ 27

 5. Interior did not depart from prior precedent. .................. 28

III. Interior properly evaluated the evidence submitted by the Tribe. ...... 32

IV. The Remand Decision did not violate the Indian canon of construction or any trust obligations. .................................................... 34

Conclusion ............................................................................................... 37

# TABLE OF AUTHORITIES

## Cases

*Abington Crest Nursing & Rehab. Ctr. v. Sebelius,*
  575 F.3d 717 (D.C. Cir. 2009) ................................................................. 12

*Am. Paper Inst., Inc., v. Am. Elec. Power Serv. Corp.,*
  461 U.S. 402 (1983) ................................................................................ 13

*Cal. Valley Miwok Tribe v. United States,*
  515 F.3d 1262 (D.C. Cir. 2008) .............................................................. 34

*Carcieri v. Salazar,*
  555 U.S. 379 (2009) .................................................................................. 3

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ................................................................................ 10

*\*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
  467 U.S. 837 (1984) .......................................................................... 11, 12

*City of Arlington v. FCC,*
  569 U.S. 290 (2013) ................................................................................ 11

*\*Confederated Tribes of the Grand Ronde Cmty. of Or. v. Jewell,*
  75 F. Supp. 3d 387 (D.D.C. 2014) ............................ 12, 13, 14, 19, 33

*\*Confederated Tribes of the Grand Ronde Cmty. of Or. v. Jewell,*
  830 F.3d 552 (D.C. Cir. 2016) .............................................. 4, 12, 30, 35

*\*Cty. of Amador v. U.S. Dep't of the Interior,*
  872 F.3d 1012 (9th Cir. 2017) ................................................. 4, 31, 35

*Ernest K. Lehmann & Assocs. of Mont., Inc. v. Salazar,*
  602 F. Supp. 2d 146 (D.D.C. 2009) ....................................................... 10

*Fla. Power & Light Co. v. Lorion,*
  470 U.S. 729 (1985) ................................................................................ 11

*Joint Tribal Council of Passamaquoddy Tribe v. Morton,*
  528 F.2d 370 (1st Cir. 1975)............................................................ 17, 18

*Littlefield v. U.S. Dep't of the Interior,*
  199 F. Supp. 3d 391 (D. Mass. 2016) ...................................................... 6

*Lombard v. United States,*
  690 F.2d 215 (D.C. Cir. 1982) ............................................................... 10

*Marsh v. Or. Nat. Def. Council,*
  490 U.S. 360 (1999) ................................................................................ 33

*McIntyre v. District of Columbia,*
  716 F. Supp. 2d 7 (D.D.C. 2010) ............................................................ 10

*Miami Nation of Indians of Ind., Inc. v. Babbitt,*
  112 F. Supp. 2d 742 (N.D. Ind. 2000) ..................................................... 33

*Mine Safety and Health Admin. v. Fed. Mine Safety & Health Review Comm'n,*
  111 F.3d 913 (D.C. Cir. 1997) ................................................................ 19

*Minnesota v. Mille Lacs Band of Chippewa,*
  526 U.S. 172 (1999) ................................................................................. 7

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ................................................................................... 13

*Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana,*
  472 U.S. 237 (1985) ................................................................................. 35

*Muwekma Ohlone Tribe v. Salazar,*
  813 F. Supp. 2d 170 (D.D.C. 2011) ................................................... 13, 25

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
  545 U.S. 967 (2005) ................................................................................. 12

*\*Pawnee v. United States,*
  830 F.2d 187 (Fed. Cir. 1987) ................................................................ 36

*Pub. Citizen, Inc. v. FAA,*
  988 F.2d 186 (D.C. Cir. 1993) ................................................................ 13

*Reading v. United States,*
  506 F. Supp. 2d 13 (D.D.C. 2007) .......................................................... 10

*Shawano Cty. v. Acting Midwest Reg'l Dir.,*
  53 IBIA 62 (2011) ................................................................................... 31

*\*Shoshone-Bannock Tribes v. Reno,*
  56 F.3d 1476 (D.C. Cir. 1995) ................................................................ 36

*U.S. Postal Serv. v. Gregory,*
  534 U.S. 1 (2001) ..................................................................................... 13

*United States v. Jicarilla Apache Nation,*
  564 U.S. 162 (2011) ................................................................................. 36

*United States v. John,*
  437 U.S. 634 (1978) ................................................................................. 31

*United States v. Morgan,*
  313 U.S. 409 (1941) ................................................................................. 33

*Verizon v. FCC,*
   740 F.3d 623 (D.C. Cir. 2014) ................................................................. 19

*Village of Hobart v. Midwest Reg'l Dir.,*
   57 IBIA 4 (2013) .................................................................................... 31

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council,*
   435 U.S. 519 (1978) ............................................................................... 11

*W. Shoshone Nat'l Council v. United States,*
   408 F. Supp. 2d 1040 (D. Nev. 2005) ..................................................... 10

**Statutes**

5 U.S.C. §§ 701-706 ....................................................................... 10, 12

25 U.S.C. § 2701 ..................................................................................... 5

25 U.S.C. § 5108 ................................................................................. 1, 2

25 U.S.C. § 5110 ..................................................................................... 3

25 U.S.C. § 5129 ................................................................................. 2, 5

28 U.S.C. § 1331 ................................................................................... 10

28 U.S.C. § 1362 ................................................................................... 10

**Rules**

Fed. R. Civ. P. 56(a) .............................................................................. 11

**Regulations**

25 C.F.R. § 83.2 ................................................................................ 5, 21

**Other Authorities**

Memorandum from Hillary C. Tompkins, Solicitor, U.S. Dep't of the Interior, to the
   Secretary, regarding The Meaning of "Under Federal Jurisdiction" for Purposes of
   the Indian Reorganization Act (Mar. 12, 2014) (M3-37029),
   https://www.doi.gov/sites/doi.opengov.ibmcloud.com/files/uploads/M-37029.pdf
   (last visited Sept. 13, 2019)............................................................ *passim*

U.S. Dep't of the Interior, Departmental Manual Pt. 209, Ch. 3, § 3.2A(11).............. 4

## INTRODUCTION

The Mashpee Wampanoag Tribe (Plaintiff or Tribe) requested that the Interior Department take land in Mashpee and Taunton, Massachusetts into trust under the Indian Reorganization Act of 1934 (IRA), 25 U.S.C. § 5108.  Initially, Interior concluded that the Tribe was eligible for trust acquisition under the IRA's second definition of "Indian," and therefore the agency found no need to consider if the Tribe was "under Federal jurisdiction" in 1934.  But the United States District Court for the District of Massachusetts ruled against Interior and remanded the matter to the agency.

Following the remand, Interior undertook a rigorous examination to determine if the Tribe was "under Federal jurisdiction" in 1934 and thus can be eligible for trust acquisition under the IRA.  After reviewing hundreds of pages of arguments and thousands of pages of exhibits submitted by the Tribe and third parties, in keeping with its prior interpretation of "under Federal jurisdiction," Interior concluded that the Tribe could not make the required showing.  Interior found that the evidence did not establish any significant contacts between the Tribe and United States through treaty, legislation, or Federal administrative action. There was "little if any evidence demonstrating that the United States took any actions establishing or reflecting Federal obligations, duties, responsibilities for or authority over the Tribe in or before 1934."  AR 5115 (September 7, 2018, Record of Decision, hereinafter Remand Decision at 28).

Now, the Tribe challenges Interior's evaluation of the Tribe's evidentiary submissions and argues that Interior should have interpreted the Tribe's submissions in a more favorable light.  But Federal Defendants are entitled to summary judgment on the Tribe's cause of action.  Interior's reading of "under Federal jurisdiction" has been recognized as the best interpretation of the statute, and its conclusions are entitled to deference.  Interior carefully and properly reviewed all of the submissions made by the Tribe and other parties.  Employing the agency's specialized expertise in Indian affairs and the authority delegated to it through the IRA, Interior concluded that the Tribe could not make a "sufficient showing" that it was "under Federal jurisdiction" in 1934.  This conclusion is well-supported in the administrative record, and the Tribe cannot meet its burden of showing that Interior's decision was arbitrary or capricious.

## BACKGROUND

I. **Legal Background**

A. **The Indian Reorganization Act of 1934**

Under the Indian Reorganization Act of 1934, the Secretary of the Interior may take land into trust for "Indians," 25 U.S.C. § 5108.  The IRA defines "Indian" to include:

> [1] all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction, and [2] all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation, and . . . [3] all other persons of one-half or more Indian blood.

25 U.S.C. § 5129.

The IRA's first definition of "Indian" was addressed by the Supreme Court in *Carcieri v. Salazar*, 555 U.S. 379 (2009), a case that involved a decision of the Secretary of the Interior to acquire land and hold it in trust for the Narragansett Tribe of Rhode Island.  At issue was whether the Narragansett Tribe was a "recognized Indian tribe now under Federal jurisdiction" within the meaning of what is now Section 5129.  The Secretary had determined that the phrase "'*now* under Federal jurisdiction'" meant the tribe must be under Federal jurisdiction "at the time that the land is accepted into trust." *Id*. at 382 (emphasis added; citation omitted).  But based primarily on "the ordinary meaning of the word 'now'" and "the natural reading of the word with the context of the IRA," *id*. at 388, 389, the Supreme Court held that "the term 'now under Federal jurisdiction' in [Section 5129] unambiguously refers to those tribes that were under the federal jurisdiction of the United States when the IRA was enacted in 1934," *id*. at 395.

In addition to authorizing the Secretary to accept land into trust for "Indians," the IRA also authorizes the Secretary "to proclaim new Indian reservations on lands acquired pursuant to any authority conferred by [the] Act, or to add such lands to existing reservations."  25 U.S.C. § 5110.

## B.   Interior's test for determining whether a tribe was "under Federal jurisdiction" in 1934

The IRA does not define "under Federal jurisdiction," nor does it describe what type of evidence Interior may consider in making that analysis.  Following *Carcieri*, Interior articulated a two-part test for determining when an Indian tribe

was under Federal jurisdiction in 1934. The test was formalized in a 2014 "M-Opinion" issued by the Solicitor of the Interior.[1]

The M-Opinion rejected the argument that Congress' constitutional plenary authority over Indian tribes may be sufficient to show that a tribe was "under Federal jurisdiction." *Id*. at 17-18. It concluded that *Carcieri* requires some "indicia of federal authority beyond the general principle of plenary authority." *Id*. at 18. That test asks: (1) whether, in or before 1934, the United States took an "action or series of actions" establishing or reflecting "federal obligations, duties[,] responsibility for or authority over the tribe by the Federal Government," *id*. at 19; and (2) whether such tribe's jurisdictional status "remained intact in 1934," *id*.

Both the D.C. Circuit and the Ninth Circuit have reviewed the test set forth in the M-Opinion and concluded that it properly interpreted the IRA. *Confederated Tribes of the Grand Ronde Cmty. of Or. v. Jewell*, 830 F.3d 552, 564-65 (D.C. Cir. 2016); *Cty. of Amador v. U.S. Dep't of the Interior*, 872 F.3d 1012, 1027 (9th Cir. 2017).

---

[1] *See* Memorandum from Hillary C. Tompkins, Solicitor, U.S. Dep't of the Interior, to the Secretary, regarding The Meaning of "Under Federal Jurisdiction" for Purposes of the Indian Reorganization Act (Mar. 12, 2014) (M3-37029), https://www.doi.gov/sites/doi.opengov.ibmcloud.com/files/uploads/M-37029.pdf (last visited Sept. 13, 2019). M-Opinions are binding on Interior unless overturned by the Solicitor, Secretary, or Deputy Secretary. *See* U.S. Dep't of the Interior, Departmental Manual Pt. 209, Ch. 3, § 3.2A(11).

## II.     Factual Background

### A.     The Tribe's trust acquisition request and Interior's 2015 decision

Interior has a formal "procedure and policy for acknowledging that certain American Indian groups exist as tribes." 25 C.F.R. § 83.2; *see generally* 25 C.F.R. pt. 83. In 2007, pursuant to the Part 83 procedure, Interior formally acknowledged the Tribe.[2] Shortly after its acknowledgment, the Tribe asked Interior to acquire land in trust for the Tribe's benefit pursuant to the IRA and to conduct gaming pursuant to the Indian Gaming Regulatory Act, 25 U.S.C. § 2701. AR 5229 (September 18, 2015, Record of Decision, hereinafter Interior's 2015 ROD at 4). The property is composed of approximately 170 acres in Mashpee, Massachusetts and 150 acres near the City of Taunton, Massachusetts. *Id*.

On September 18, 2015, Interior issued a record of decision to acquire the Mashpee and Taunton parcels in trust for the Tribe. AR 5223-5362 (Interior's 2015 ROD). Interior determined that it had statutory authority to acquire the lands in trust under the IRA's second definition of "Indian," which includes "all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation." 25 U.S.C. § 5129; AR 5304-5326 (Interior's 2015 ROD at 79-101). As a result, Interior did not decide whether the Tribe could also qualify under the IRA's first definition of "Indian" pursuant to

---

[2] *See* Final Determination for Federal Acknowledgement of the Mashpee Wampanoag Indian Tribal Council, Inc. of Massachusetts, 72 Fed. Reg. 8007 (Feb. 22, 2007).

*Carcieri*, which was handed down while the Tribe's application was pending. AR 5090 (Remand Decision at 3). In the 2015 ROD, Interior also analyzed whether the Tribe occupied a "reservation" for purposes of the IRA. AR 5345 (Interior's 2015 ROD at 120).

### B. Challenge to Interior's 2015 ROD

In 2016, several residents of the City of Taunton, Massachusetts (together, Intervenor-Defendants) challenged Interior's 2015 ROD in the United States District Court for the District of Massachusetts. *Littlefield v. U.S. Dep't of the Interior*, No. C-16-10184 (D. Mass. 2016). Among their claims, Intervenor-Defendants challenged Interior's application of the IRA's second definition of "Indian." *Littlefield*, 199 F. Supp. 3d 391, 394 (D. Mass. 2016).

The district court ruled against Interior and concluded that the IRA's second definition of "Indian" unambiguously incorporates the "now under Federal jurisdiction" requirement from the Act's first definition of "Indian." *Id*. at 399-400. The district court entered declaratory judgment in Intervenor-Defendants' favor and remanded to Interior for further proceedings consistent with its opinion. *Id*. at 400. Because the district court's decision suggested that the Tribe was not under Federal jurisdiction in 1934, an issue Interior's 2015 ROD had expressly declined to reach, the district court later clarified that Interior could, consistent with its opinion, evaluate whether the Tribe was under Federal jurisdiction in 1934. *Littlefield*, Order of Oct. 12, 2016, ECF No. 121.

Interior and the Tribe each filed notices of appeal from the decision. *Littlefield*, No. C-16-2484 (1st Cir. 2016).  While Interior later moved for voluntary dismissal of its appeal, the Tribe's appeal remains pending before the United States Court of Appeals for the First Circuit.  On August 20, 2019, the appellate court ordered the Tribe and Intervenor-Defendants to address whether the appeal is moot in light of Interior's decision on remand, and whether the certification of the appeal was proper in light of the fact that the district court's order contained a remand to Interior.  *Littlefield*, Order of Aug. 20, 2019, Doc. No. 00117478647.

## C.    Interior's consideration of whether the Tribe was under Federal jurisdiction in 1934

The Tribe first addressed the question of its eligibility under the IRA in 2012. AR 9541-10193.  The Tribe's 2012 submissions argued that it had been under Federal jurisdiction since 1789 by operation of law because the British Crown had created "functional treaty" obligations to the Tribe to which the United States later succeeded; the Tribe exercised and maintained aboriginal and usufructuary rights;[3] and, that a Federal trust relationship had always existed by virtue of Federal common law that was later codified.  *See*, *e.g.*, AR 9737-9750.  The Tribe also argued that it remained under Federal jurisdiction in 1934 due to affirmative acts of Federal supervision from before 1934.  *See*, *e.g.*, AR 9750-9758.

---

[3] Hunting, fishing, and gathering rights were sometimes retained as usufructuary rights even after land had been ceded.  *See*, *e.g.*, *Minnesota v. Mille Lacs Band of Chippewa*, 526 U.S. 172, 175-76 (1999).

Following the district court's remand, between December 2016 and February

2017, the Tribe and Intervenor-Defendants again submitted evidence and

arguments on whether the Tribe was under Federal jurisdiction in 1934.  The Tribe

argued that Federal government officials erred in and around 1934 in claiming that

the Tribe remained under Massachusetts' jurisdiction and that the Tribe's

relationship with the state did not preclude Federal jurisdiction.  AR 5196-5220.

Largely repeating the arguments made in its 2012 submissions, the Tribe also

offered evidence that allegedly established its Federal jurisdictional status before

and in 1934.  AR 5740-5786.  In response, Intervenor-Defendants attempted to

refute the Tribe's claims and argued that Interior's test for determining when an

Indian tribe was "under Federal jurisdiction" in 1934 should be vacated.  AR 6799-

6909.  The Tribe provided a response to Intervenor-Defendants.  AR 7074-7124.

After considering these materials, Interior requested that the parties provide

additional briefing on the effect of Massachusetts' early historical exercise of

authority over the Tribe for the "under Federal jurisdiction" analysis.  AR 4714-

4857.  In the latter half of 2017, Interior received supplemental submissions from

the parties, a neighboring Indian tribe, and several towns in Connecticut.  AR 8349-

8419, AR 9483-9507 AR 9537-9539 (Tribe); AR 7126-7200; AR 9381-9427; AR 9511-

9533 (Intervenor-Defendants); AR 9374-9380 (Wampanoag Tribe of Gay Head

(Aquinnah)); AR 5194-5195 (Connecticut towns).

After reviewing the submissions made by the Tribe, Intervenor-Defendants,

and the third parties, based on the test set forth in the M-Opinion, Interior issued a

decision finding that the Tribe was not under Federal jurisdiction in 1934.
AR 5088-5115 (Remand Decision).  Interior explained that "the evidence does not show any significant contacts between the United States and the Tribe through treaty, legislation, or Federal administrative action."  AR 5107 (Remand Decision at 20).  In sum, the administrative record included "little indicia of Federal jurisdiction beyond the general principle of plenary authority, and little if any evidence demonstrating that the United States took any actions establishing or reflecting Federal obligations, duties, responsibilities for or authority over the Tribe in or before 1934."  AR 5115 (Remand Decision at 28).  Because the Tribe was not under Federal jurisdiction in 1934, the Tribe does not meet the IRA's first definition of "Indian," nor the Act's second definition as defined by the district court in *Littlefield*.  AR 5115 (Remand Decision at 28).

> ### D.     The Tribe's complaint and the current litigation

The Tribe's complaint asserts a single cause of action that alleges the Remand Decision is arbitrary, capricious, and contrary to law because Interior failed either to consider all of the relevant evidence or to consider the Tribe's evidence as a whole.  Compl. ¶¶ 61-66, ECF No. 1.  The Tribe seeks a declaration to that effect and an injunction ordering Interior to issue a new decision based on the evidence and consistent with law, regulation, and Departmental policy.  *Id*. ¶¶ 67-

68.[4]  Federal Defendants move for summary judgment to be entered in their favor
on the Tribe's cause of action.

## STANDARD OF REVIEW

## I.   Disposition by summary judgment

The Tribe brings this action under the Administrative Procedure Act (APA),
5 U.S.C. §§ 701-706.  Compl. ¶ 5.[5]  In judicial review under the APA, the Court need
not and, indeed, may not, "find" underlying facts; thus, there are no material facts
essential to the Court's resolution of this action.  *See*, *e.g.*, *Celotex Corp. v. Catrett*,
477 U.S. 317, 322 (1986).  "Summary judgment is the proper mechanism for
deciding, as a matter of law, whether an agency action is supported by the
administrative record and consistent with the APA standard of review."  *Ernest K.
Lehmann & Assocs. of Mont., Inc. v. Salazar*, 602 F. Supp. 2d 146, 153 (D.D.C. 2009)

---

[4] In the background section of the Tribe's motion, the Tribe discusses events that
are not relevant to its cause of action.  For example, the Tribe criticizes Federal
government officials for not supporting its legislative efforts requesting that
Congress confirm the status of the Tribe's reservation.  Pl.'s Mot. at 14.  The Tribe
also complains about comments made about Massachusetts senators.  *Id.* at 11.  But
the Tribe's Complaint does not allege that Remand Decision was affected by biased
decision-making and the Tribe's attempt to bring unrelated matters into this suit
should be disregarded.

[5] Plaintiff also alleges that the Court has jurisdiction pursuant to 28 U.S.C. §§ 1331
and 1362, and the Declaratory Judgment Act.  *Id.* ¶¶ 5, 10-11.  However, none of
these statutes establish "the prerequisite to a suit against the federal government—
waiver of sovereign immunity."  *Reading v. United States*, 506 F. Supp. 2d 13, 20
(D.D.C. 2007) (citing *Lombard v. United States*, 690 F.2d 215, 218 (D.C. Cir. 1982))
(§ 1331 does not waive sovereign immunity); *W. Shoshone Nat'l Council v. United
States*, 408 F. Supp. 2d 1040, 1048 (D. Nev. 2005) (§ 1362 does not waive sovereign
immunity); *McIntyre v. District of Columbia*, 716 F. Supp. 2d 7, 10–11 (D.D.C. 2010)
(Declaratory Judgment Act provides no waiver of sovereign immunity).  Here,
subject matter jurisdiction can only be conferred pursuant to the APA.

(citing *Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007)), *aff'd*, 377 F. App'x 28 (D.C. Cir. 2010); *see also* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").

Because an administrative review proceeding, such as this one, does not implicate the possibility of a trial, if the Court were to conclude from a review of the administrative record that Interior's Remand Decision was arbitrary or capricious, the remedy would be to remand the matter for agency reconsideration. *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 549 (1978); *Fla. Power and Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985).

## II.    Statutory interpretation

When reviewing an agency's construction of a statute that it administers, the Court applies the familiar test from *Chevron U.S.A., Inc. v. Nat. Resources Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984).  First, the Court must determine "whether Congress has directly spoken to the precise question at issue." *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013).  If so, the Court's inquiry ends because the Court and the agency "must give effect to the unambiguously expressed intent of Congress." *Id.*  "But 'if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.'" *Id.* (citation omitted).

Under *Chevron*, if a statute is ambiguous or silent on an issue, an agency interpretation that is permissible and reasonable receives controlling weight, "even if the agency's reading differs from what the court believes is the best statutory interpretation." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005). In making this determination, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Confederated Tribes of the Grand Ronde Cmty. of Or. v. Jewell*, 75 F. Supp. 3d 387, 396 (D.D.C. 2014) (quoting *Chevron*, 467 U.S. at 844), *aff'd* 830 F.3d 552 (D.C. Cir. 2016).

## ARGUMENT

## I. A narrow and deferential standard of review is applied to Interior's determination that the Tribe was not under Federal jurisdiction in 1934.

The Tribe challenges Interior's Remand Decision pursuant to the APA. Pl.'s Mem. of P. & A. in Supp. of Pl.'s Mot. for Summ. J. at 7-8, 20-45, ECF No. 30-1 (Pl.'s Mot.); Compl. ¶¶ 61-66. The APA directs the Court to uphold Interior's decision unless it is deemed to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Tribe bears the burden of showing that Interior acted arbitrarily in concluding that the Tribe could not establish that it was under Federal jurisdiction in 1934. *Abington Crest Nursing & Rehab. Ctr. v. Sebelius*, 575 F.3d 717, 722 (D.C. Cir. 2009) (citing *City of Olmsted Falls v. FAA*, 292 F.3d 261, 271 (D.C. Cir. 2002)).

Although the inquiry must be thorough, the standard of review is narrow and highly deferential, Interior's Remand Decision is entitled to a "presumption of regularity," and the Court cannot substitute its judgment for that of the agency decision maker.  *U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001).  The Court need not find that Interior's Remand Decision "is the only reasonable one, or even that it is the result [the court] would have reached."  *Am. Paper Inst., Inc., v. Am. Elec. Power Serv. Corp.*, 461 U.S. 402, 422 (1983).

The Court must determine whether the agency:  (1) relied on factors which Congress had not intended it to consider; (2) entirely failed to consider an important aspect of the problem; (3) offered an explanation for its decision that runs counter to the evidence before the agency; or, (4) offered an explanation so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Confederated Tribes of the Grand Ronde Cmty. of Or.*, 75 F. Supp. 3d at 396.

To comply with the APA's requirements—"[n]othing more than a 'brief statement' is necessary, so long as the agency explains 'why it chose to do what it did.'"  *Muwekma Ohlone Tribe v. Salazar*, 813 F. Supp. 2d 170, 190 (D.D.C. 2011) (quoting *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001)), *aff'd*, 708 F.3d 209 (D.C. Cir. 2013).  *See also Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 190 (D.C. Cir. 1993) (if the court can reasonably discern the agency's path, it will uphold the agency's decision).

**II.      Interior's decision that the Tribe was not under Federal jurisdiction in 1934 is fully supported by the administrative record.**

Interior carefully and properly reviewed all the documents, arguments, and materials submitted by the Tribe, Intervenor-Defendants, and third parties, as well as factual and historical evidence pertinent to the question of whether the Tribe was "under Federal jurisdiction" in 1934.  Applying the standard set out in the M-Opinion, Interior concluded that:  1) the Tribe did not come under Federal jurisdiction by operation of law in the early constitutional period; 2) the Tribe's relationship with Massachusetts could not be used as evidence of Federal jurisdiction; and, 3) the affirmative acts cited by the Tribe are not sufficient to show Federal authority over the Tribe prior to 1934.

The Tribe challenges only Interior's last finding, and it fails to show that Interior's conclusion was arbitrary or capricious.  An examination of the administrative record shows that Interior fully considered all of the census rolls, historical reports, school records, deeds, and land records that the Tribe provided and then the agency explained why such evidence was insufficient to show that the Tribe was "under Federal jurisdiction" in 1934.  This is all that the APA requires. *See Confederated Tribes of the Grand Ronde Cmty*, 75 F. Supp. 3d at 408.  Interior's determination that the Tribe could not meet the applicable standard is also underscored by the cases cited by the Tribe in which Interior issued favorable "under Federal jurisdiction" findings.  Those cases involve the types of evidence of Federal authority that the Tribe here simply cannot provide.  Accordingly, Federal Defendants should be granted summary judgment.

## A.    The Tribe did not come under Federal jurisdiction before 1934 by operation of law.

First, in its Remand Decision, Interior addressed the Tribe's argument that it came under Federal jurisdiction before 1934 by operation of law in the early constitutional period.  AR 5100-5102 (Remand Decision at 13-15); Compl. ¶ 35. Interior found that the evidence did not support such a conclusion.  The Tribe argued that after the American Revolution, the United States succeeded to the British's "treaty-like" obligations to the Tribe.  AR 5100 (Remand Decision at 13). Interior concluded that this could not be used to meet the IRA's requirement because there was an "absence of any Federal action with respect to [the Tribe's] 'treaty-like' rights."  AR 5101 (Remand Decision at 14).

Second, Interior considered whether the Tribe could rely on the Indian Trade and Intercourse Act (Nonintercourse Act), first passed in 1790, to establish its jurisdictional status.  *Id*.; Act of July 22, 1790, Ch. 33, § 4, 1 Stat. 137; Compl. ¶ 35. The Tribe argued that upon adoption of the U.S. Constitution, its tribal lands came under Federal protection as a result of the common law rule requiring Federal consent to any attempt to extinguish Indian title.  *See* AR 9747 (arguing that this rule was codified in the Nonintercourse Act).  But Interior found that this statute could not be used because "the evidence shows that the Federal [g]overnment took no action to protect the Tribe's lands despite invitations to do so."  AR 5101 (Remand Decision at 14).

Third, Interior examined the seventeenth-century colonial deeds (AR Supp. 9768-9769) and the 1763 law by the Massachusetts Bay Province recognizing the

Mashpee as a self-governing Indian district, cited by the Tribe.  AR 5102 (Remand Decision at 15).  But the deeds and legislation were not comparable to treaties because they were not contracts between governments, did not provide evidence of any mutual commitments between the Tribe and the British Crown, and did not include any grant of rights from the Tribe to the Crown.  *Id*.  In addition, the 1763 law was not the result of a negotiated relationship between the Tribe and the Crown.  *Id*.  Interior did not dismiss this evidence, but instead explained that the fact there was no subsequent Federal action acknowledging or relying on the deeds or legislative acts "diminishe[d] their significance" for the purposes of the under Federal jurisdiction analysis.  *Id*.

Fourth, Interior considered the Tribe's argument that the finding in Interior's 2015 ROD that the Tribe occupied a reservation in 1934 means that the Tribe was under Federal jurisdiction at that time.  *Id*.; AR 5345 (Interior's 2015 ROD at 120); Compl. ¶ 39.  Interior rejected this argument, explaining that the analysis in its 2015 ROD did not "speak[] to whether the Tribe was under Federal jurisdiction in 1934 at all," rather it involved "only whether the Tribe occupied a 'reservation' for IRA purposes."  AR 5102 (Remand Decision at 15).  Interior's finding that the Tribe had a "reservation" as defined by the IRA was based on land that was set aside for the Tribe by an entity other than the United States.  *Id*.  So, Interior's conclusion on this point did not resolve whether the Tribe's members were "Indians," as defined by the IRA.  *Id*.

In its motion, the Tribe makes no attempt to challenge Interior's conclusions, nor does it argue that the Tribe came under Federal jurisdiction before 1934 by operation of law.  Thus, it fails to show that this portion of the Remand Decision is arbitrary or capricious.

### B.      Massachusetts' history of exercising authority over the Tribe does not show that the Tribe was under Federal jurisdiction in 1934.

Next, Interior's Remand Decision considered whether the Tribe's relationship with Massachusetts could be used as evidence of Federal jurisdiction.  AR 5103-5107 (Remand Decision at 16-20).  The administrative record demonstrated that the Tribe and Massachusetts had "significant relations;" that Massachusetts exercised authority over the Tribe; and, that the state often enacted laws for the benefit of the Tribe.  AR 5105 (Remand Decision at 18).  But "the record contains practically no evidence of any dealings with the Federal [g]overnment in that period, which [the M-Opinion] requires, and exercises of Commonwealth authority, without more, cannot in itself reflect *[F]ederal* obligations, duties, responsibilities for, or authority over the Tribe." *Id*.

In reaching this conclusion, Interior rejected the Tribe's argument that Massachusetts agreed to act as an agent of the Federal government because the administrative record (which includes all of the materials submitted directly by the Tribe) did not include any explicit or implicit evidence of such an agreement.  *Id*. Interior also discussed *Joint Tribal Council of Passamaquoddy Tribe v. Morton*, 528 F.2d 370 (1st Cir. 1975), which both the Tribe and the Intervenor-Defendants relied

upon.  AR 5092 (Remand Decision at 5); AR 5106-5107 (Remand Decision at 19-20).

*Passamaquoddy* explained that when Maine separated from Massachusetts its

constitution stated that it would "assume and perform all the duties and obligations

of this Commonwealth (Massachusetts), towards the Indians within said District of

Maine." 528 F.2d at 374.  So, Interior considered whether Congress' passing of the

enabling act granting Maine statehood federalized the authority Massachusetts

exercised over the Mashpee.  AR 5106-5107 (Remand Decision at 19-20).  The

Remand Decision rejected this argument because Maine's admission into the Union

may have placed the United States on notice of the tribes of Maine, but not

Massachusetts, and regardless, the admission of Maine to the Union at most shows

an awareness of the Massachusetts Indians and the Massachusetts' regulation of

their affairs.  *Id.*

In response, the Tribe makes no serious challenging to Interior's findings.

Without addressing the Remand Decision's conclusions, the Tribe states only that

Massachusetts' actions toward the Tribe should be considered as part of the

evidence demonstrating that it was under Federal jurisdiction in 1934.  Pl.'s Mot. at

13, n.6.  The Tribe's conclusory statement fails to rebut Interior's analysis in the

Remand Decision.

## C.   Interior reasonably concluded that the Tribe's evidence did not show that it was under Federal jurisdiction in 1934.

Leaving the majority of the Remand Decision unchallenged, the Tribe focuses

its complaints on Interior's evaluation of its submissions that allegedly evidence

acts of Federal authority over the Tribe prior to 1934.  Pl.'s Mot. 20-40.  The

Remand Decision, however, thoroughly considered and rejected each of the Tribe's assertions and categories of evidence in making the determination that the Tribe was not under Federal jurisdiction in 1934. Interior's conclusions are well-reasoned, supported by the administrative record, and should be upheld. *See Confederated Tribes of the Grand Ronde Cmty.*, 75 F. Supp. 3d at 414 (citing *Verizon v. FCC*, 740 F.3d 623, 643-44 (D.C. Cir. 2014) (noting that the court must uphold the agency's "factual determinations if on the record as a whole, there is such relevant evidence as a reasonable mind might accept as adequate to support the conclusion" (internal citation omitted)); *Mine Safety and Health Admin. v. Fed. Mine Safety & Health Review Comm'n*, 111 F.3d 913, 918 (D.C. Cir. 1997) ("An agency's conclusion 'may be supported by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view.'")).

> ### 1.    The Federal census rolls were insufficient to show that the Tribe was under Federal jurisdiction in 1934.

First, the Tribe challenges Interior's consideration of Federal census rolls provided by the Tribe. Pl.'s Mot. at 20-26. But the Remand Decision analyzed these documents, weighed the evidence, and found them insufficient to show that the Tribe was under Federal jurisdiction in 1934. AR 5114-5115 (Remand Decision at 27-28). For example, the Tribe cites the listing of tribal members on the Indian Population Schedule in 1910 as evidence. Pl.'s Mot. at 21; AR 8627 (1910 schedule). The M-Opinion explains that evidence of "actions by the Office of Indian Affairs" may be used to meet the "under Federal jurisdiction" test. M-Op. at 19. Contrary

to the Tribe's initial assertion, the 1910 schedule was not prepared by the Office of Indian Affairs.  AR 5115 (Remand Decision at 28).  Instead, it was prepared by the Director of the Census.  *Id*.  And the 1910 schedule is distinguishable from the annual censuses taken by Indian agents for reservations under their charge,[6] which would provide greater evidence of Federal jurisdiction.  Similarly, Interior found the Carlisle Indian school censuses to be unpersuasive, explaining that enrollment at the school was not necessarily predicated on a jurisdictional relationship with the Tribe.  AR 5114 (Remand Decision at 27 & n.226); AR 8629-8636 (school censuses).

The Tribe also argues that Interior ignored the "general Federal censuses enumerating Mashpee tribal members in the Town of Mashpee."  Pl.'s Mot. at 22.[7] Interior, however, considered the nineteenth-century Federal reports referencing the Tribe and its lands.  AR 5115 (Remand Decision at 28).  The agency explained the listing of Tribal members on a general Federal census or in a separate schedule may be probative of Federal jurisdiction over the Tribe, but in and of itself is inconclusive.  AR 5115 (Remand Decision at 28); *id*. at n.230 (noting that the evidence was inconsistent as some Indian families in Mashpee were on the general census, not the Indian census).

---

[6] In an 1884 appropriations act, Congress directed that each Indian agent "hereafter be required in his annual report, to submit a census of the Indians at his agency or upon the reservation under his charge."  AR 8671 (Act of July 4, 1884, c. 180, § 9, 23 Stat. 76, 98).

[7] *See* AR 8625; AR 8616-8623; AR 9563; AR 9688-9692 (censuses).

The Tribe points out that Interior relied on such records when it acknowledged the Tribe.  Pl.'s Mot. at 22.  But this does not make Interior's conclusion arbitrary or capricious.  The M-Opinion explains that evidence submitted during the regulatory acknowledgment process may be relevant to the under Federal jurisdiction test.  M-Op. at 25.  Ultimately, however, there are different standards for determining whether an Indian tribe should be federally acknowledged under the Part 83 process and whether a tribe was under Federal jurisdiction in 1934.  *Compare* 25 C.F.R. § 83.2 (requiring a group to show that it has existed continuously as an Indian tribe), *with* M-Op. at 19 (requiring a tribe to show "federal obligations, duties, responsibility for or authority over the tribe by the Federal Government"); *see also* M-Op. at 23-25 (discussing "'Recognition'" versus 'Under Federal Jurisdiction'").

The Tribe further contends that more significance should have been placed on the general censuses because "in certain years [they] were based on information prepared by the Indian Office."  Pl.'s Mot. at 23.  But none of these documents indicate or express a view on whether the Tribe was under Federal jurisdiction, so Interior did not err in finding them inconclusive.

## 2.     None of the reports cited by the Tribe provide evidence of any exercises of Federal authority over the Tribe.

Next the Tribe refers to several Indian policy reports in which the Tribe was identified and argues that they are evidence that the Tribe was under Federal jurisdiction.  Pl.'s Mot. at 26-30.  Interior discussed each report in detail in the Remand Decision.  AR 5107-5112 (Remand Decision at 20-25).  The agency

concluded that while each report reflects an acknowledgment of the Tribe and its existence, none provide evidence of the exercise of Federal jurisdiction over the Tribe in 1934.

For example, the Tribe challenges Interior's analysis of the 1822 report prepared by Reverend Jedidiah Morse,[8] which was a compilation of general information about tribes in the United States.  Pl.'s Mot. at 26-27; AR 5107-5109 (Remand Decision at 20-22).  Interior extensively analyzed the report and concluded that "the Morse Report only provides evidence of Congress' awareness of its plenary authority over tribes."  AR 5108 (Remand Decision at 21).  Contrary to the Tribe's suggestion, the Morse Report did not constitute a "[F]ederal action reflecting an exercise of authority over the Tribe."  *Id.*

The Tribe relies on Congress' consideration of the Morse Report, Pl.'s Mot. at 27, but the legislative history shows that the report was used for informational purposes.  AR 5109 (Remand Decision at 22) (the report was referred so congressional members could "know something of the situation of [Indian tribes], and of their numbers" in considering proposed amendments); AR 6093-6098 (legislative history)).  The Tribe argues that Congress studied the report and "determined not to disturb the Tribe's possession of its lands, and made such

---

[8] AR 8518-8531 (excerpts from Rev. Jedidiah Morse, A Report to the Secretary of War of the United States on Indian Affairs (1822)).  The Tribe states that the Morse Report was prepared for the Commissioner of Indian Affairs.  Pl.'s Mot. at 22 n.12. But this is incorrect, the report was made to the Secretary of War.  AR 8518. Congress did not establish the Commissioner of Indian Affairs until 1832.  M-Op. at 16.

determination based on Morse's recommendation about what would be in the Tribe's best interest." Pl.'s Mot. at 28. But the Congress took no steps to remove any Indian tribes—not just Plaintiff—based on the Morse Report. AR 5108 (Remand Decision at 21). Similarly, the Tribe cites the Secretary of War and the President's transmittal of information and recommendations from the Morse Report. Pl.'s Mot. at 27. But in doing so, these officials discuss Indian tribes generally and make no mention of the Tribe. AR 5109 (Remand Decision at 22); AR 8533-8539 (discussing "the small remnants of tribes" in Massachusetts); AR 8559-8574 (broadly recommending the removal of tribes). As Interior explained, the Morse Report shows that the Federal government did little more than consider the Tribe, along with tribes across the United States, as *potentially* subject to the exercise of the Federal Indian authority. AR 5107-5109 (Remand Decision at 20-22).

The Tribe's citation to an 1851 survey of tribes in the United States, the Schoolcraft Report, is no more convincing. Pl.'s Mot. at 28 (citing AR 8499-8500). The Schoolcraft Report proposed general recommendations for Massachusetts Indians based on a Massachusetts state report. AR 5110 (Remand Decision at 23). The recommendations show that Massachusetts considered the Tribe within the State's authority, but they do not demonstrate any Federal activity, nor did the United States adopt or approve the recommendations. *Id.*

None of the other reports cited by the Tribe provide evidence of the exercise of Federal jurisdiction over the Tribe in 1934 either. *See* Pl.'s Mot. at 28-30. The 1890

Annual Report of the Commissioner of Indian Affairs notes only existence of the

Tribe's state reservation, *see* AR 8716, and it focuses on uniformly extinguishing

Indian title.  AR 5112 (Remand Decision at 25); AR 8707-8719 (excerpts from the

report).  It does not include an "acknowledgment of Federal responsibility for, or an

exercise of Federal authority over, the Tribe."  AR 5112 (Remand Decision at 25).

Contrary to the Tribe's argument, Interior did not dismiss the 1935 draft report on

New England tribes because it was unpublished.  Pl.'s Mot. at 29 (citing AR 8722-

8785).  Instead, Interior explained that the report "offers historical evidence of the

Tribe's long-standing historical use and continued occupation of Tribal lands," but

"it does not show any formal action by a Federal official determining any rights of

the Tribe."  AR 5112 (Remand Decision at 25).

    Lastly, Interior did not "summarily" dismiss the additional reports cited by

the Tribe.  Pl.'s Mot. at 30.  The agency analyzed these documents but found that

they should not be accorded the significance that the Tribe suggested.  For example,

the 1888 Fletcher report was limited to the Tribe's historical ties to its lands; the

report does not discuss the Federal government's role in establishing or maintaining

such ties.  AR 5112 (Remand Decision at 25); AR 8696-8705 (excerpts from the

report); *see also* AR 5109 (Remand Decision at 22 n.182) (discussing McKenney's

provision of statistical information about tribes in the United States); AR 8683-

8686; AR 8676-8681 (McKenney letters).  Accordingly, it is clear that Interior

thoroughly analyzed the reports provided by the Tribe and reasonably concluded

that they did not provide evidence of the requisite exercise of Federal jurisdiction.

### 3. Attendance at Carlisle Indian School, by itself, is insufficient to show that the Tribe was under Federal jurisdiction in 1934.

The Tribe also relies heavily on evidence that "over a dozen" Mashpee children attended Carlisle Indian School between 1905 and 1918.  Compl. ¶ 51; Pl.'s Mot. at 32-37; AR 8804-9030 (school records); AR 9032-9321 (GAO report on Carlisle).  The Tribe notes that the M-Opinion states that "the education of Indian students at BIA schools" is one form of evidence demonstrating that a tribe was under Federal jurisdiction.  Pl.'s Mot. at 33 (quoting M-Op. at 19).  The Remand Decision clearly acknowledges this proposition, explaining that while Carlisle school enrollment "is plainly relevant to the [M-Opinion] inquiry, without more it is insufficient to show that the Tribe was subjected to clear, [F]ederal jurisdiction." AR 5114 (Remand Decision at 27) (internal quotation marks omitted).

The Tribe argues that the "Mashpee children were eligible to attend this federal Indian school because they were members of a recognized tribe."  Pl.'s Mot. at 33.  But the Tribe does not provide any evidence to substantiate this allegation, and tribal membership was not always required to attend Bureau of Indian Affairs (BIA) schools.  *See*, *e.g.*, Nelson Act of 1905, 33 Stat. 616 (authorizing enrollment of Alaska Natives); *Muwekma Ohlone Tribe*, 813 F. Supp. 2d at 193 (attendance at a BIA boarding school did not require membership in a Federally recognized tribe). Further, the Remand Decision examined the Tribe's allegations regarding school enrollment and found that while it may demonstrate exercises of Federal authority over individual Mashpee Indians specifically, attendance at Carlisle did not, itself,

25

show an exercise of Federal authority over the Tribe as distinct from some of its

members.  AR 5114 (Remand Decision at 27).

   The Tribe also attempts to draw other inferences from the students'

attendance at Carlisle to support its claim of Federal jurisdiction.  For example, the

Tribe contends that a Carlisle school official exerted control over funds belonging to

students attending the school and that students at Carlisle received health care,

social services, and vocational training.  Pl.'s Mot. at 35-37; *see*, *e.g.*, AR 8810

(discussing funds); AR 8411-8414 (Tribe's summary of correspondence regarding

such services).  But the oversight of the students' funds and the provision of services

was a consequence of attending Carlisle and by itself, does not demonstrate a

jurisdictional relationship with the Tribe.

   In sum, the Remand Decision found that the evidence of Mashpee student

enrollment at Carlisle did not unambiguously demonstrate that enrollment was

predicated on a jurisdictional relationship with the Tribe.  AR 5114 (Remand

Decision at 27).  "Without any other evidence that the Federal [g]overnment

provided services to or otherwise assumed jurisdiction over the Tribe, the Mashpee

student records fall short of demonstrating that [the] Tribe itself came under

[F]ederal jurisdiction," the Remand Decision concluded.  *Id.*[9]

---

[9] The Tribe argues that Interior ignored additional evidence of Indian education showing the Tribe was under Federal jurisdiction in 1934.  Pl.'s Mot. at 34.  This evidence provides little support for the Tribe's argument as it concerns post-1934 funding of a local public school.  AR 8787-8797 (correspondence); AR 8801-8802 (discussing 1939 Town of Mashpee school opening); AR 8387-8390 (Tribe's characterization of the correspondence).

### 4.   The Tribe did not show that Federal officials took any affirmative action to protect the Tribe's lands.

In addition, the Tribe claims that Interior improperly discounted evidence that Federal officials took affirmative action to protect its lands.  Pl.'s Mot. at 37-40.  But the Tribe fails to show that Interior's conclusions were arbitrary or capricious.  For example, the Tribe cites to a 1798 state ejectment action brought on behalf of the Tribe under Massachusetts' state law.  Pl.'s Mot. at 37-38; AR 8431-8436 (1835 description of the state court action).  The attorney representing the Tribe's interests in that case, John Davis, also served as the United States Attorney for the District of Massachusetts.  AR 5106 (Remand Decision at 19).  The Tribe, however, has not shown that Davis was acting as a Federal official rather than as a private actor when bringing the state court suit.  *Id.* (no showing that the attorney represented any Federal interests or received authorization from the United States); AR 8435 (state overseers "employed Judge John Davis, as counsel"); AR 9410-9418 (summarizing evidence that Davis was acting in his private capacity).  After weighing the evidence, Interior reasonably concluded that the record demonstrated that Davis acted in a non-federal capacity, receiving compensation for his services from Massachusetts pursuant to state law.  AR 5106 (Remand Decision at 19) (citing legislation reimbursing the state overseers).[10]

---

[10] The Tribe also claims that the Morse Report shows that Federal officials acted affirmatively in relation to the Tribe's lands.  Pl.'s Mot. at 39.  As discussed above, Interior thoroughly considered the Morse Report and rejected any finding that it showed the Tribe was under Federal jurisdiction in 1934.

27

The Tribe also briefly points to a 1949 title report prepared by the Navy in connection with condemnation proceedings.  Pl.'s Mot. at 39 n.24; AR 6629-6734 (title report).  The Tribe claims the deeds from the report confirm the existence of aboriginal hunting and fishing rights that are subject to Federal protection.  Pl.'s Mot. at 39 n.24.  The deeds, however, were prepared under Massachusetts state laws.  AR 5106 (Remand Decision at 26); *see, e.g.*, AR 6736 (1881 deed).  And Interior concluded that evidence of action by Massachusetts with respect to the Tribe's property under state law does not provide evidence of Federal action, either expressly or by operation of law.  AR 5106 (Remand Decision at 26).  The deeds also did not specify whether the rights at issue arose as a matter of common law property rights under state law or if the Tribe had retained aboriginal rights.  *Id.*  Thus, this evidence does not show that the Tribe was under Federal jurisdiction in 1934.

### 5. Interior did not depart from prior precedent.

The Tribe repeatedly strives to compare itself to other Indian tribes that have received favorable findings of Federal jurisdictional status in 1934, and the Tribe argues that Interior has departed from prior precedent in the Remand Decision.  *See* Pl.'s Mot. at 20, 23-24, 26, 30-39.  But an examination of such cases shows that such Indian tribes provided conclusive evidence that the Tribe cannot.  In contrast, the Tribe was only able to provide—at most—documentation that was probative of Federal jurisdiction over the Tribe, which Interior extensively examined and determined was inconclusive.

For example, the Tribe relies on Interior's 2010 decision regarding the Cowlitz Tribe.  Pl.'s Mot. at 33 n.22 ("Mashpee has provided abundant evidence . . . much of it the same as that produced in Cowlitz"); AR 5610-5727 (Cowlitz decision).  Interior discussed the Tribe's allegations in the Remand Decision, acknowledging that the provision of educational services was used to demonstrate Federal jurisdiction over other tribes, like the Cowlitz Tribe.  AR 5114 (Remand Decision at 27).  But Interior explained "[w]hile that is true, it neglects that the Cowlitz determination also relied on a wide range of other evidence covering an extended period of time." *Id*.  Such evidence "included government-to-government treaty negotiations as well as a documented history of the BIA supervising allotments, adjudicating probate proceedings, providing education services, assisting in protecting fishing activities, investigating tribal claims to aboriginal lands, and approving attorney contracts for the Cowlitz Tribe and its members . . . ." *Id*. (internal quotation marks omitted).

The Tribe cites the listing of individual Cowlitz tribal members on census rolls and argues that the Tribe has provided similar evidence.  Pl.'s Mot. at 23-24.  But Interior's decision regarding the Cowlitz Tribe makes clear that the Superintendent in the Taholah Agency repeatedly included Cowlitz Indians among those for whom he believed he had supervisory responsibilities.  AR 5709.  The Tribe cannot point to any local Indian agency representatives who made similar statements and expressed responsibility for the Tribe's supervision.  Indeed, the D.C. Circuit has confirmed that the Cowlitz had eighty years of documented Federal

29

interactions prior to 1934. *Confederated Tribes of the Grand Ronde Cmty. of Or.*, 830 F.3d at 566 ("[A]fter reviewing the record in its entirety, we are confident that the Secretary reasonably determined the contacts between the United States and the Cowlitz Indian Tribe from 1855 through 1934 satisfied part one of the two-part test, and that those contacts *remained intact* despite what was at times the agency's equivocal exercise of its authority and responsibilities."). The Tribe certainly has made no such showing here.

The Tribe also cites Interior's decision regarding the Tunica-Biloxi Tribe. Pl.'s Mot. at 24, 26, 30-31, 36, 38; AR 5524-5543 (Tunica-Biloxi decision). In the Remand Decision, Interior drew a contrast between Plaintiff and the Tunica-Biloxi Tribe, for whom the agency issued a favorable under Federal jurisdiction analysis in 2011. AR 5101 (Remand Decision at 14). Interior explained that "the absence of any Federal action with respect to [the Tribe's] 'treaty-like' rights distinguishes the Tribe from the Tunica Biloxi Tribe." *Id*. In that case, after acquiring the Louisiana Territory, the United States expressly assumed the same obligations to Indian tribes as those held by Spain, and later Federal agents affirmatively protected the Tunica-Biloxi Tribe's lands. *Id*. Here, Interior found that the Tribe could not provide such evidence. *Id*.; *see also* AR 5110 (explaining that it was significant that a Federal Indian agent defended the Tunica Biloxi Tribe's aboriginal title to its lands under the Non-Intercourse Act); AR 5535 (discussing congressional appropriation of funds to support the Tunica-Biloxi Tribe, as well as the provision of goods and services). The Tribe also argues that it resembles the Ione Band, Pl.'s

30

Mot. at 25-26, but it ignores the fact that the United States made repeated attempts to acquire land on the Ione Band's behalf for approximately 20 years leading up to 1934.  *See Cty. of Amador*, 872 F.3d at 1027-28.

The Tribe's other comparisons fare no better.  For example, the Tribe points to *Village of Hobart v. Midwest Reg'l Dir.*, 57 IBIA 4 (2013), discussing the Oneida Tribe of Indians of Wisconsin.  Pl.'s Mot. at 25, 32.  In that case, the Oneida met "one brightline test for determining whether a tribe was 'under Federal jurisdiction' in 1934," which is that Interior held a "Section 18 election," under the IRA, for the Tribe.  *Village of Hobart*, 57 IBIA at 21; *id.* at 21-24 (explaining that such elections were premised upon a determination by the Executive Branch that the tribal members were part of a recognized Indian tribe now under Federal jurisdiction in 1934); *see also* M-Op. at 20 (the Section 18 elections, held between 1934 and 1936, are "an example of unambiguous federal actions that obviate the need to examine the tribe's history prior to 1934").  The Tribe makes no claim that it can satisfy this test.  And the Tribe's attempt to liken itself to the Stockbridge-Munsee Community, Wisconsin Band fails for the same reason.  Pl.'s Mot. at 34; *Shawano Cty. v. Acting Midwest Reg'l Dir.*, 53 IBIA 62, 63 (2011) (Interior held a Section 18 election to allow the tribe "to decide whether to accept or reject other provisions of the IRA").  *United States v. John*, Pl.'s Mot. at 34, 39-40, also provides little support for the Tribe's position because it held that the Mississippi Choctaws satisfied the IRA's *third* definition of Indian, relating to persons of one-half or more Indian blood.  437 U.S. 634, 650 (1978).

The Tribe's unsuccessful attempts to compare itself to these Indian tribes serve to highlight that the Tribe cannot provide sufficient evidence to establish that it was "under Federal jurisdiction" in 1934.  Thus, the Remand Decision was not inconsistent with agency precedent or Interior's prior interpretation of this provision.  Hence, the Court should grant summary judgment to Federal Defendants.

## III.   Interior properly evaluated the evidence submitted by the Tribe.

Next, the Tribe alleges that Interior failed to consider its evidence as a whole and violated the M-Opinion and the remedial purposes of the IRA.  Pl.'s Mot. at 40-42.  These allegations are without merit.  An examination of the Remand Decision shows that Interior thoroughly considered the Tribe's evidence, applied the appropriate standard of proof as set forth in the M-Opinion, and found the Tribe's evidence insufficient.

In developing its test for determining when an Indian tribe was under Federal jurisdiction in 1934, Interior took into account the remedial purposes of the statute, as well as the text of the IRA, its legislative history, the agency's early practices, and the Indian canon of construction.  M-Op. at 19.  With such considerations in mind, the agency concluded that it was necessary to examine whether a tribe could make a "sufficient showing," at or before 1934, that the United States took an "action or series of actions—through a course of dealings or other relevant acts" establishing or reflecting "federal obligations, duties[,] responsibility for or authority over the tribe by the Federal Government."  *Id*.

The Remand Decision properly applied the M-Opinion's test to the Tribe's evidence, weighed the evidence, and found the Tribe could not make the required showing. *See*, *e.g.*, AR 5105 (Remand Decision at 18) (explaining that the administrative record contains "practically no evidence of any dealings" with the Federal government, which the M-Opinion requires); AR 5115 (Remand Decision at 28) (concluding that the record "contains little indicia of Federal jurisdiction beyond the general principle of plenary authority").

None of the evidence the Tribe cites, Pl.'s Mot. at 40-41, was dismissed; rather, all of the available evidence was evaluated and considered. AR 5100-5115 (Remand Decision at 13-28). "The Department simply required more than what the [Tribe] offered (perhaps, more than what the [Tribe] could have offered), which is inherent in any weighing of evidence. The Department is supposed to weigh the evidence." *Miami Nation of Indians of Ind., Inc. v. Babbitt*, 112 F. Supp. 2d 742, 757-58 (N.D. Ind. 2000) (rejecting the claim that Interior improperly demanded the plaintiff provide an unreasonable level of proof), *aff'd*, 255 F.3d 342 (7th Cir. 2001).

In the end, the Tribe merely objects to the evidentiary evaluations made by Interior. The fact that the Tribe disagrees with the conclusions drawn by Interior does not make the Remand Decision arbitrary, capricious, an abuse of discretion or contrary to law. *United States v. Morgan*, 313 U.S. 409, 419-20 (1941) (the agency can attach a different significance to the data); *Marsh v. Or. Nat. Def. Council*, 490 U.S. 360, 378 (1999) (in the event of conflicting views, the agency has the discretion to rely on its own expertise); *Confederated Tribes of the Grand Ronde Cmty*, 75 F.

Supp. 3d at 408 (Interior "did all that the APA requires" when it considered the evidence regarding whether an Indian tribe was under Federal jurisdiction in 1934 and "briefly explained" the weight accorded to the evidence).

As detailed above and in the Remand Decision, Interior considered the evidence cited by the Tribe and articulated fully informed reasons for its conclusions. Because of Interior's expertise on these issues, these conclusions are entitled to deference. *Cf. Cal. Valley Miwok Tribe v. United States*, 515 F.3d 1262, 1266 (D.C. Cir. 2008) (deferring to Interior "because of the interstitial nature of the legal question and the related expertise of the Agency" (internal quotations omitted)). Thus, Federal Defendants are entitled to summary judgment.

## IV.    The Remand Decision did not violate the Indian canon of construction or any trust obligations.

Finally, the Tribe argues that the Remand Decision violates the Indian law canon of construction and Interior's trust responsibility. Pl.'s Mot. at 42-44. But the Tribe's appeal to the Indian law canon of construction is unsuccessful. Further, the Tribe does not point to any statutory obligation that requires Interior to issue a favorable "under Federal jurisdiction" determination for it or take any additional action regarding the Tribe's proposed trust acquisition. Because the Tribe fails to establish that Interior has any such duty, this argument provides no support for the Tribe's challenge to the Remand Decision.

The Indian law canon of construction cannot salvage the Tribe's challenge to the Remand Decision. With respect to statutes affecting Indians, the Supreme Court has made clear that "very great respect" should be given to federal agencies

34

constructing the statutes they administer.  *Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana*, 472 U.S. 237, 254 (1985).  Moreover, the D.C. Circuit has extensively examined Interior's interpretation of the IRA's "under Federal jurisdiction" in 1934 requirement and its test set forth in the M-Opinion and found that Interior's interpretation was reasonable.  *Confederated Tribes of the Grand Ronde Cmty. of Or.*, 830 F.3d at 564-65.  The D.C. Circuit also affirmed the district court's decision—which declined to apply the Indian canon of construction—and applied *Chevron* deference to the agency's interpretation of "recognized" as used in IRA's first definition of "Indian."  *Id.* at 559-60.

Likewise, the Ninth Circuit thoroughly examined this issue and concluded that "Interior's reading of the ambiguous phrase 'under Federal jurisdiction' is the best interpretation."  *Cty. of Amador*, 872 F.3d at 1027.  And the Tribe concedes that the M-Opinion has been "confirmed in multiple court decisions."  Pl.'s Mot. at 5 (collecting citations).  In light of this, the Tribe's blunt suggestion that due to the Indian law canon of construction Interior was obliged to accept the Tribe's own evaluation of the submitted evidence should be rejected.

The Tribe's trust responsibility argument similarly lacks merit.  The Tribe's argument is based largely on the "'principles of equitable obligations and normative rules of behavior' toward Indian tribes."  Pl.'s Mot. at 44 (quoting *Cobell v. Norton*, 240 F.3d 1081, 1101 (D.C. Cir. 2000)).  But it is insufficient for the Tribe to merely invoke the "equitable obligations" of the United States to carry out its trust relationship with Indian tribes.  That general trust relationship does not, by itself,

create legally-enforceable obligations for the United States. *See United States v. Jicarilla Apache Nation*, 564 U.S. 162, 173 (2011) (the United States is "not a private trustee" and accepts fiduciary duties only as expressly defined by statute). Instead, the Tribe must point to a treaty, statute, or regulation that imposes a specific duty on Federal Defendants with regard to the Tribe's rights. *Id.* at 177; *Shoshone-Bannock Tribes v. Reno*, 56 F.3d 1476, 1482 (D.C. Cir. 1995) ("[A]n Indian tribe cannot force the government to take a specific action unless a treaty, statute or agreement imposes, expressly or by implication, that duty.").

The Tribe argues that Interior failed to defend its 2015 ROD, provide the Tribe with a favorable "under Federal jurisdiction" determination, and support the Tribe's legislative efforts. Pl.'s Mot. at 44. The Tribe makes no attempt to identify a treaty, statute, or regulation that would impose such duties on Federal Defendants, nor could it do so. *See Shoshone Bannock Tribes*, 56 F.3d at 1481-82 (rejecting argument that Attorney General was obliged to assert claims for tribal water rights). The Tribe also cannot identify a duty that would compel Interior "to go contrary to and beyond" the IRA and approve the trust acquisition despite the Tribe's inability to meet the IRA's definition of "Indians" "in order to fulfill [the agency's] alleged fiduciary obligation." *Pawnee v. United States*, 830 F.2d 187, 191 (Fed. Cir. 1987). The Remand Decision, issued in keeping with the M-Opinion's test for determining when a tribe can show that it was under Federal jurisdiction in 1934, cannot be a breach of trust. *Id.* at 192 (when the federal government has fully complied with all applicable statutes, treaties, regulations, and contractual

provisions in dealing with Indian property interests, no judicially enforceable claim for breach of trust can be stated).

## CONCLUSION

The Tribe makes no effort to challenge the majority of the Remand Decision. The Tribe no longer argues that it came under Federal jurisdiction by operation of law in the early constitutional period, nor does it make any substantive challenge to Interior's conclusion that Massachusetts' history of exercising authority over the Tribe does not show that the Tribe was under Federal jurisdiction in 1934.

And the Tribe's efforts to discredit the remaining portions of the Remand Decision are unavailing. The IRA's "under Federal jurisdiction" requirement does not encompass all tribes within Congress' plenary authority, but only those over which the United States exercised authority in a manner establishing or reflecting Federal obligations or responsibilities. Interior thoroughly considered all of census rolls, historical reports, school records, deeds, and land records that the Tribe relies upon, weighed this evidence, and found it insufficient to show that the United States took any action to establish such obligations, duties, or responsibilities for the Tribe or authority over the Tribe in or before 1934.

The shortcomings in the Tribe's arguments are apparent when it compares itself to other Indian tribes receiving favorable "under Federal jurisdiction" findings. Unlike those tribes, the Tribe cannot provide any evidence of government-to-government treaty negotiations, BIA supervision of the Tribe's land, BIA adjudication of probate proceedings, protection of the Tribe's hunting, fishing, or

land rights, local Indian agency representatives claiming to have responsibility over tribal members, congressional appropriation of funds for the Tribe, or that an IRA-era election was held for the Tribe.

Although the Tribe disagrees with Interior's evaluation of the evidence, this does not make the Remand Decision arbitrary and capricious. Nor can the Tribe's mere objection to Interior's decision show that the agency violated the Indian law canon of construction or that a breach of trust occurred. Based on the foregoing reasons, Federal Defendants respectfully request this Court enter summary judgment in their favor on all counts.

Respectfully submitted this 13th day of September, 2019.

LAWRENCE VANDYKE
Deputy Assistant Attorney General


/s/ Sara E. Costello
SARA E. COSTELLO
Trial Attorney
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, DC 20044-7611
Tel: 202-305-0484
Fax: 202-305-0506
Email: sara.costello2@usdoj.gov

OF COUNSEL:
Robert Hitchcock
Attorney-Advisor
Branch of Environment & Lands
Office of the Solicitor, Division of Indian Affairs
U.S. Department of the Interior

38

**CERTIFICATE OF SERVICE**

I hereby certify that on September 13, 2019, a copy of the foregoing was filed through the Court's CM/ECF management system and electronically served on counsel of record.

/s/ Sara E. Costello
Sara E. Costello
Trial Attorney