UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MASHPEE WAMPANOAG TRIBE, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| RYAN ZINKE, in his official capacity as Secretary of the Interior, | ) |
| | ) |
| and | )    Civil Action No. 1:18-cv-02242-RMC |
| | ) |
| U.S. DEPARTMENT OF THE INTERIOR | )    **HEARING REQUESTED** |
| | ) |
| Defendants | ) |
| and | ) |
| | ) |
| DAVID LITTLEFIELD *et al.*, | ) |
| | ) |
| Intervenor-Defendants. | ) |
| | ) |
| | ) |

INTERVENOR-DEFENDANTS *LITTLEFIELD* PLAINTIFFS'
REPLY MEMORANDUM IN SUPPORT OF THEIR
CROSS-MOTION FOR SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

INTRODUCTION ..........................................................................................................................1

ARGUMENT .................................................................................................................................1

I.      *CARCIERI* COMPELS THE DENIAL OF THE MASHPEES' APPLICATION
        TO TAKE LAND INTO TRUST...................................................................................1

II.     THE MASHPEES CANNOT DISTINGUISH THEMSELVES FROM THE
        NARRAGANSETTS—BOTH HAVE ALWAYS BEEN UNDER THE
        JURISDICTION OF THEIR RESPECTIVE STATE, RATHER THAN THE
        FEDERAL GOVERNMENT. ........................................................................................5

III.    THE TRIBE DOES NOT "CORRECT" INTERVENOR-DEFENDANTS'
        TRIBE-BY-TRIBE COMPARISON CHART, BUT INSTEAD INJECTS ERROR
        INTO IT........................................................................................................................7

        A.      The Mashpees misrepresent the Cowlitz decision by understating the
                evidence presented by that tribe.......................................................................9

        B.      The Mashpees misrepresent and overstate their own evidence....................13

IV.     THE INDIAN CANON OF CONSTRUCTION HAS NO ROLE TO PLAY..................16

CONCLUSION..............................................................................................................................18

# TABLE OF AUTHORITIES

**CASES**

*Bottomly v. Passamaquoddy Tribe,*
   599 F.2d 1061 (1st Cir. 1979) ................................................................................................ 2

*Carcieri v. Salazar,*
   555 U.S. 379 (2009) .............................................................................................. *passim*

*Chickasaw Nation v. United States,*
   534 U.S. 84 (2001) ................................................................................................ 17

*Confederated Tribes of the Grand Ronde Cmty. of Or. v. Jewell,*
   75 F. Supp. 3d 387 (D.D.C. 2014) ........................................................................ 10

*Confederated Tribes of the Grand Ronde Comty. of Or. v. Jewell,*
   830 F.3d 552 (D.C. Cir. 2016) ................................................................. 9, 10, 11, 12

*Corley v. United States,*
   556 U.S. 303 (2009) .............................................................................................. 17

*Dillmon v. Nat'l Transp. Safety Bd.,*
   588 F.3d 1085 (D.C. Cir. 2009) ............................................................................ 9

*Elk v. Wilkins,*
   112 U.S. 94 (1884) ................................................................................................ 2

*Freeman v. U.S. Dep't of the Interior,*
   37 F. Supp. 3d 313 (D.D.C. 2014) ........................................................................ 9

*James v. U.S. Dep't of Health & Human Servs.,*
   824 F.2d 1132 (D.C. Cir. 1987) ............................................................................ 2

*Koi Nation of N. Cal. v. U.S. Dep't of the Interior,*
   361 F. Supp. 3d 14 (D.D.C. 2019) ........................................................................ 17

*Mashpee Tribe v. Hodel,*
   1986 U.S. Dist. LEXIS 25183 (D. Mass. May 22, 1986) ...................................... 2

*Mashpee Tribe v. Sec'y of the Interior,*
   820 F.2d 480 (1st Cir. 1987) .............................................................................. 2, 4

*Mashpee Tribe v. Town of Mashpee,*
   447 F. Supp. 940 (D. Mass. 1978) ........................................................................ 2

*Penobscot Nation v. Mills,*
  861 F.3d 324 (1st Cir. 2017) .................................................................................................17

*South Carolina v. Catawba Indian Tribe, Inc.,*
  476 U.S. 498 (1986) ............................................................................................................17

*Stand Up for Cal. v. U.S. Dep't of the Interior,*
  879 F.3d 1177 (D.C. Cir. 2018) ...........................................................................................9

*Woodhull Freedom Found. v. United States,*
  334 F. Supp. 3d 185 (D.D.C. 2018) ....................................................................................17

## STATUTES

25 U.S.C. § 465 ..........................................................................................................................3

## OTHER AUTHORITIES

M-37029, Memorandum on the Meaning of "Under Federal Jurisdiction" for
  Purposes of the Indian Reorganization Act (Mar. 12, 2014) .............................................1

NW Regional Director's Letter to The Honorable Tom Wooten, Chairman, Samish
  Indian Nation re: Trust Acquisition of Campbell Lake South Property,
  Attachment 1, NW Regional Director's Analysis of Whether Samish Were Under
  Federal Jurisdiction in 1934 (Nov. 9, 2018) ....................................................................13

**INTRODUCTION**

The Mashpees go to extraordinary lengths to avoid comparison to the Narragansett Tribe—realizing that *Carcieri*'s treatment of the Narragansetts forecloses any possibility of demonstrating error by the Secretary. After all, if the result here is required by Supreme Court precedent—as it is by the *Carcieri* decision—the question of whether the Secretary correctly weighed the historical evidence under the Department's M-Opinion[1] is almost beside the point. The Secretary's evaluation of the Mashpees' evidence is undoubtedly correct given the historical record tying the Mashpees to the Narragansetts as two East Coast tribes completely estranged from the federal government—two outliers unlike every other tribe that has been found eligible for trust land under the IRA. *See* Memorandum of Law in Support of Intervenor-Defendants Cross-Motion for Summary Judgment (ECF No. 33-1) ("Int. Br.") at 17-18; *see also* ECF No. 33-2 (a tribe-by-tribe Comparison Chart, with explanatory comments and record citations). Under the deferential standard of review applicable here, which requires nothing more than a plausible interpretation of the evidence, the Secretary's decision must be affirmed.

**ARGUMENT**

I.   ***CARCIERI* COMPELS THE DENIAL OF THE MASHPEES' APPLICATION TO TAKE LAND INTO TRUST.**

The Mashpees and Narragansetts share nearly identical histories of early colonization in the 1600s and assimilation as state citizens in the 1800s, without any involvement by the federal government. *See* Citizens' Group Submission on Remand (2/13/17), AR6799, AR6804-6807, AR6858-6860 (comparing Mashpee and Narragansett histories). These and other East Coast tribes were "and always had been, under the jurisdiction of the New England States, rather than the Federal

---

[1] M-37029, Memorandum on the Meaning of "Under Federal Jurisdiction" for Purposes of the Indian Reorganization Act (Mar. 12, 2014).

Government." *Carcieri v. Salazar*, 555 U.S. 379, 384 (2009).  No other tribe seeking trust land has come

forward with so little evidence of federal contacts as the Mashpees, with the exception of the

Narragansetts.   See ECF No. 31-1, at 2-3 (summarizing Mashpee and Narragansett historical

evidence).[2]  As Justice Breyer observed, "both the State and Federal Governments considered the

Narragansett Tribe as under *state* but not *federal* jurisdiction in 1934."  544 U.S. at 399 (emphasis in

original).   The Secretary could not have found the Mashpees eligible under the IRA without

---

[2]  As a matter of undisputed historical fact, the Federal Government viewed the tribal remnants on
the East Coast as under the control of the states, including when Congress enacted the IRA in 1934.
This was true in the case of the Narragansetts in Rhode Island (555 U.S. at 384) and is equally true
with respect to the Mashpees in Massachusetts, as documented in numerous contemporary statements
by the Department. *See, e.g.*, AR6897-6901.  The Tribe claims these contemporary statements should
be ignored (Pl. Reply Br. at 13 n.16) even though the Supreme Court specifically credited such
historical evidence in *Carcieri.*  555 U.S. at 384, 395-396.  The Federal Government's contemporaneous
position (*i.e.*, its position in 1934) with respect to the Massachusetts tribal remnants being "under the
jurisdiction of the New England States, rather than the Federal Government" was (and is) directly
supported by decisions from the Supreme Court, the courts of appeals, and various district courts.
See *Elk v. Wilkins*, 112 U.S. 94, 108 (1884); *Mashpee Tribe v. Sec'y of the Interior*, 820 F.2d 480, 483-484
(1st Cir. 1987) (citing *Elk*); *Mashpee Tribe v. Town of Mashpee*, 447 F. Supp. 940, 945-46, 949 (D. Mass.
1978), *aff'd sub nom. Mashpee Tribe v. New Seabury Corp.*, 592 F.2d 575, 587-588 (1st Cir. 1979); *Mashpee
Tribe v. Hodel*, 1986 U.S. Dist. LEXIS 25183, at *9 (D. Mass. May 22, 1986) ("the Supreme Court has
distinguished the Massachusetts Indians from tribal Indians, referring to the former as "remnants of
tribes never recognized by the treaties or legislative or executive acts of the United States as distinct
political communities" (quoting *Elk*)); *see also James v. U.S. Dep't of Health & Human Servs.*, 824 F.2d
1132, 1134 (D.C. Cir. 1987) (finding that the Gay Head Wampanoag Indians were long subject to the
Commonwealth's jurisdictional control which included establishing Gay Head as an Indian District;
extending full citizenship to the Indians in 1869 and incorporating Gay Head as a township in 1870);
*see generally Bottomly v. Passamaquoddy Tribe*, 599 F.2d 1061, 1064 (1st Cir. 1979) (noting "well-
documented" history that " 'remnants' of tribes, such as the Passamaquoddy who dwelt along the East
Coast and who, largely ignored by the central government, fell within the protection of individual
states or colonies").  Because the Mashpees have never been wards of the Federal Government, just
like the Narragansetts and other East Coast Indians, they are ineligible under the IRA just as the
Narragansetts were found to be.  Int. Br. at 7.  The Mashpees never address the overwhelming
historical evidence documenting the estrangement of the federal government from East Coast tribes,
and instead (Pl. Reply Br. at 8-9) mischaracterize the Intervenor-Defendants' position.  It is not that
the federal government lacked the constitutional or statutory authority to exercise its jurisdiction over
Indian affairs in the New England states, it is the fact that it chose not to do so in those states.  The
IRA simply does not apply to a tribe that was and "always had been, under the jurisdiction of the New
England States, rather than the Federal Government" (*Carcieri*, 555 U.S. at 384), which is true of both
the Narragansetts and the Mashpees.

repudiating *Carcieri* and its treatment of the Narragansetts.  In reaching a decision compelled by the Supreme Court, the Secretary did what the law required.  He did not commit (and could not have committed) reversible error in a matter for which he enjoys considerable discretion under the statute;[3] reviewed deferentially, Interior's decision must be upheld unless arbitrary or capricious.

The Tribe incorrectly argues (again) "that the factual record pertaining to whether the Narragansett was under federal jurisdiction in 1934 was not before the Court in *Carcieri*" (Pl. Reply Br. at 10), when the majority opinion specifically cites the Narragansett Tribe's federal acknowledgment determination that summarizes and analyzes the Narragansetts' history.  555 U.S. at 382, 384, 395-96; *id.* at 399 (Breyer, J., concurring).  Five justices signed the majority opinion and agreed with its holding that the Narragansetts were not "under federal jurisdiction" in 1934 *based on the tribe's undisputed history*, and Justice Breyer agreed the Narragansetts' history rendered that tribe ineligible under any possible interpretation of the "under federal jurisdiction" requirement.  He wrote separately to articulate the salient features of a tribe that was under federal jurisdiction in 1934:  a federal treaty in effect in 1934, a congressional appropriation in effect in 1934, or tribal enrollment with the Office of Indian Affairs ("OIA") in 1934.  *Id.* at 399 (Breyer, J., concurring).[4]  The Tribe does not claim that it can show any of the jurisdiction-conferring acts identified by Justice Breyer (or any other meaningful affirmative

---

[3]  25 U.S.C. § 465 (reclassified as § 5108 of the same title) provides in relevant part:  "The Secretary is authorized, *in his discretion*, to acquire through purchase . . . any interest in land . . . for the purpose of providing land for Indians." (emphasis added).

[4]  The Mashpees dismiss the Court's findings pertaining to the Narragansetts' history as a "few passing comments" and a "few isolated statements" (Pl. Reply Br. at 11) as if the detailed history contained in the Tribe's federal acknowledgment determination—cited by the Majority—was not before the Supreme Court.  The parties in *Carcieri* fully understood that if "now" meant "1934," the Narragansett Tribe was ineligible.  The federal government briefed the issues in *Carcieri* with the understanding that the Narragansetts' history had always placed the tribe under the State of Rhode Island rather than the federal government.  Six justices agreed that no further factual development of the record was needed in light of the Tribe's well-established historical record in its federal acknowledgment determination.  In fact, the Tribe acknowledges as much by saying the "parties had conceded [the] Narragansett was not under federal jurisdiction."  Pl. Reply Br. 13.

federal actions with respect to the Mashpees *as a tribe* that had taken place or been in effect in 1934), leaving the Mashpees no more eligible under the IRA than the Narragansetts were.

Remarkably, the Mashpees argue that the Narragansett record is not before this Court. Pl. Reply Br. at 12. Not so. The Intervenor-Defendants' remand papers cited and discussed the Department's Proposed Findings and Final Determination for the federal acknowledgment of the Narragansett Tribe (the same source cited by the majority in *Carcieri*) and argued at length that the Narragansetts' history provided the relevant benchmark against which the Mashpees' evidence of being under federal jurisdiction in 1934 should have been measured. Intervenor-Defendants specifically argued that the histories of the two tribes were nearly identical, such that *Carcieri* compelled the determination that the Mashpees were not eligible for trust land under the IRA. AR6806-AR6807.

The deficient historical record presented by the Mashpees on remand from *Littlefield*, and re-presented to this Court in this APA action, was initially presented by the Mashpees as part of their serial land claim lawsuits in federal court in Massachusetts, starting in the 1970s. *See* Int. Br. at 5. Of particular note is the First Circuit's decision in *Mashpee Tribe v. Secretary of Interior*, 820 F.2d 480, 483-84 (1987) (Breyer, J.), in which it rejected the Mashpees' argument that they should be considered a federally recognized tribe based on their sporadic contacts with the federal government. In answering that question in the negative, then-Judge Breyer and his colleagues concluded that the Tribe's evidence was "inadequate to show tribal status" as of 1870, when Mashpee lands were allegedly illegally conveyed; thus, the Tribe lacked standing to sue under the Indian Trade and Intercourse Act. *Id.* at 484. In the course of determining that the Mashpees did not have tribal status as of 1870, the First Circuit rejected many of the same historical documents submitted by Mashpees on remand here. Its opinion specifically found no probative value in the Morse Report (AR8518-AR8531) and the Schoolcraft report and statistical table (AR8499-AR8500), which the Mashpees rely on here to

demonstrate they were under federal jurisdiction in 1934.  *Id.*[5]  If the documents relied on by the Tribe

here did not establish its "tribal status" as of 1870, there is no reason why the same evidence would

establish that the Mashpee were "under federal jurisdiction" in 1934—the indicia of jurisdiction do

not change merely because a different statute requires the Tribe to establish its federal status.  And

the Tribe does not point to anything that happened between 1870 and 1934 that would have caused

it to fall under the federal government's jurisdiction in that intervening period.  Thus, the Secretary's

determination that the Mashpees were not under federal jurisdiction in 1934 is not only compelled by

the Supreme Court's decision in *Carcieri,* but also is consistent with past decisions which concluded

that the Mashpees were neither organized as a tribe nor under federal jurisdiction.[6]

## II.   THE MASHPEES CANNOT DISTINGUISH THEMSELVES FROM THE NARRAGANSETTS—BOTH HAVE ALWAYS BEEN UNDER THE JURISDICTION OF THEIR RESPECTIVE STATE, RATHER THAN THE FEDERAL GOVERNMENT.

As Intervenor-Defendants laid out in detail in their remand submission (AR6799) and

summarized in their initial brief here (ECF No. 33-1), neither the Narragansetts nor the Mashpees

---

[5]  The Mashpees materially misrepresent the contents of the Morse Report, stating that a table shows "the Mashpee as a tribe *within the jurisdiction of the United States.*'"  Pl. Reply Br. at 22 (emphasis added by Tribe) (citing Morse report at p. 23 (AR8524)).  The Morse Report on the same page starts discussing the "Remnants of the Tribes remaining in NEW ENGLAND" (AR8524) and begins by stating that, "These Indians are all provided for. . . ."  The Tribe omits the next page.  The Report continues "by the governments of the several states in which they reside."

(The complete Morse Report is available in text searchable form at https://babel.hathitrust.org/cgi/pt?id=uc1.$b79174&view=1up&seq=179.)

The Tribe's omission is material.  The Morse Report further documents the Mashpees' specific condition as a "remnant tribe" under the jurisdiction of the state, noting that the "State, by a Board of Overseers, exercises a guardian care over them, as to their lands, and civil rights and privileges. . . ." and noting that "[t]heir connexion with the State, and those immediately superintending their affairs, is a very happy one." (AR8528).  While the Mashpees certainly resided "within the limits of the United States" (AR8531) this evidence refutes the premise that the Tribe was "under federal jurisdiction" within the meaning of the IRA.

[6]  The history of unfavorable decisions in Massachusetts may explain the Mashpees' decision to file their APA case in the District of Columbia.

have a federal treaty, were the beneficiary of a congressional appropriation, or had their members enrolled in the Office of Indian Affairs in 1934—*i.e.*, the three signs of federal jurisdiction identified by Justice Breyer in *Carcieri*. AR6806-AR6807, AR6858-AR6860. The federal government never set aside land for the Mashpees or Narragansetts, and never superintended any lands that either tribe owned—ever. The federal government did not protect the lands of either tribe against alienation to non-Indians. When the Narragansetts and Mashpees sued under the Indian Trade and Intercourse Act to recover their lands, the federal government refused their respective pleas to join in their federal land claim litigation. AR6807 n.3, AR6860. When the Mashpees turned around and sued the federal government, the Secretary agreed with the prior federal court decisions that had rejected the Mashpees' claim to tribal status after 1869, thereby defeating the Mashpees' standing to sue. Int. Br. at 5-6; *see also* AR6854-AR6857.

For their parts, neither the Narragansetts nor the Mashpees sent tribal enrollment lists to the Office of Indian Affairs to seek services for their members. If they had done so at any time, they would have been turned down, in keeping with the Department's long-standing view (bolstered by state and federal court case law) that these "remnants" of eastern tribes had always been under the jurisdiction of the New England States rather than the federal government. Indeed, that is precisely what happened when the Narragansetts and Mashpees sought federal assistance in the 1920s and 1930s and were turned down by Interior. *See supra* note 1. No federal Indian agency existed in Massachusetts or Rhode Island (AR6884); thus, no federal Indian agents were positioned to provide services to the Mashpees or Narragansetts in those states. The OIA never recorded the Mashpees as a tribe under its jurisdiction. AR6884. The Mashpees, Narragansetts, and other tribal remnants did not show up on Indian census rolls. AR6883-AR6884.

The fact that the Narragansetts and Mashpees both sent a handful of children to an Indian boarding school in Carlisle, Pennsylvania—two decades before the IRA was enacted—does not

change the jurisdictional analysis.  The record shows about a dozen students, who self-identified as Mashpee or South Seas, attended the school from 1904 to 1918.  AR6887-6892.  As the Secretary explained, that Carlisle School evidence does not show the federal government exercising authority *over the tribe*, but rather that the federal government was willing to provide an education for children who satisfied a qualifying blood quantum level for admittance, without regard to the applicant's tribal status or affiliation.  It mattered not to the BIA school if these children were enrolled members of a tribe or were Indian youth with no tribal affiliation—provided they could establish ¼ Indian blood.  The operation of an off-reservation school like the Carlisle School did not establish federal supervision *over the tribe* wherever it was located.  In the case of the Mashpees, who lived in the Town of Mashpee on Cape Cod some 445 miles away, no federal action or jurisdiction extended to them in Massachusetts.  With no local federal Indian agency in Massachusetts, it was not even possible for the OIA to provide services to the Mashpees (and thereby extend OIA's administrative jurisdiction over them).

Moreover, because the school closed in *1918*—16 years before the IRA was enacted—the enrollment of Mashpee children at the Carlisle School could not have possibly shown that the Mashpees were under federal jurisdiction *in 1934*.  *See Carcieri*, 555 U.S. at 399 (Breyer, J., concurring) (looking to whether jurisdictional actions were either "in effect" or present "as of" 1934).

At bottom, the Tribe has offered no reason why *Carcieri*'s reasoning should not apply here: that the Mashpees, just like the Narragansetts, were and "always had been, under the jurisdiction of the New England States, rather than the Federal Government."  *Carcieri*, 555 U.S. at 384.

## III.   THE TRIBE DOES NOT "CORRECT" INTERVENOR-DEFENDANTS' TRIBE-BY-TRIBE COMPARISON CHART, BUT INSTEAD INJECTS ERROR INTO IT.

The comparison chart submitted by the Citizens' Group on remand shows the Narragansetts and Mashpees to be twin outliers, linked by their nearly identical histories, and unlike any other tribe

granted land in trust.  ECF No. 33-2.  To avoid the damning comparison to the Narragansetts, the Mashpees submit a "corrected" chart (ECF No. 35-1) that jettisons their sister tribe (geographically and historically) and edits various columns and entries so as to bolster the Mashpees' entries—an exercise in which they never engaged before Interior, despite having an opportunity to do so when Intervenor-Defendants submitted the same chart to the agency.  Despite the Tribe's manipulation of Intervenor-Defendants' chart, the Mashpees cannot gather the same robust historical evidence that other tribes had used to demonstrate that they had been "under federal jurisdiction" in 1934.  In every other land-into-trust decision rendered by the Secretary, the applicant tribe demonstrated significant, ongoing affirmative actions by the federal government that supported a finding that the tribe was under federal jurisdiction in 1934, as outlined in the initial comparison chart submitted to Interior. Each tribe identified one or more of the "big three" jurisdictional-conferring acts over a tribe described by Justice Breyer (treaty, congressional act, or tribal enrollment/supervision by the Office of Indian Affairs) as well as other affirmative actions by the federal government.  *See* ECF No. 33-2. The Mashpees have demonstrated none of these things.  At best, the Mashpees' evidence may be helpful, but it is not close to sufficient.

Because the Mashpees cannot win on the same evidence that other tribes have reliably used to show federal jurisdiction, they instead make a series of demonstrably false factual claims—asserting that their evidence is the "same or analogous" to the evidence offered by other tribes.  Pl. Reply Br. at 33.  While the Tribe singles out certain evidence that Interior considered in other instances (and purportedly should have considered here), what the Tribe fails to grasp is that in those other cases, the confluence of evidence pointing toward federal jurisdiction was much greater than the Mashpees have here.

We address below the most significant overstatements of the Mashpees' evidence and understatements of the evidence marshalled by other tribes.  Ultimately it is for the Secretary to

determine the operative facts regarding each tribe's application and to determine how best to go about making appropriate case-by-case comparisons—so as to compare apples-to-apples—employing the Department's institutional knowledge and expertise in the process.  The Secretary's findings in that regard, resting on the evaluation of the jurisdictional facts pertaining to each case, are subject only to substantial evidence review.  *See Confederated Tribes of the Grand Ronde Comty. of Or. v. Jewell*, 830 F.3d 552, 558–59 (D.C. Cir. 2016); *Stand Up for Cal. v. U.S. Dep't of the Interior*, 879 F.3d 1177, 1181 (D.C. Cir. 2018) ("We accept the Department's factual findings so long as they are supported by substantial evidence in the record."); *Freeman v. U.S. Dep't of the Interior*, 37 F. Supp. 3d 313, 329 (D.D.C. 2014) ("because substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, we reverse an agency's decision only when the record is so compelling that no reasonable factfinder could fail to find to the contrary."); *Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1089 (D.C. Cir. 2009) (noting that agency's factual findings may be adopted "as conclusive if supported by substantial evidence . . . even though a plausible alternative interpretation of the evidence would support a contrary view").  Under that deferential standard, the Secretary's findings must be affirmed if there is more than a scintilla of evidence supporting them. *Stand Up for Cal.,* 879 F.3d at 1184 (substantial evidence standard "requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence" (quoting *FPL Energy Maine Hydro LLC v. FERC*, 287 F.3d 1151, 1160 (D.C. Cir. 2002))).

Indeed, the Secretary's overall assessment of a tribe's historic evidence—its weight and sufficiency—to prove that the tribe was under federal jurisdiction in 1934, is reviewed under the substantial evidence test.  *See Grand Ronde*, 830 F.3d at 568 (substantial evidence supported Secretary's determination that Cowlitz tribe had historical presence in subject area).

A.   <u>The Mashpees misrepresent the Cowlitz decision by understating the evidence presented by that tribe.</u>

The Mashpees' selective treatment of the evidence presented by the Cowlitz Tribe reveals how

they go about creating the appearance that their historical evidence is the "same or analogous" to what these other tribes submitted.  The record proves otherwise.  The Mashpees discuss the Cowlitz matter 64 times in their brief (ECF No. 35) and identify a number of factors considered by the Secretary and the courts in determining that the Cowlitz Tribe was under federal jurisdiction for purposes of the IRA.  But the Tribe skews any legitimate comparison by addressing only a few factors that overlap while ignoring the many factors that do not, including critical evidence that distinguishes the two tribes' histories and explains why the Secretary found the Cowlitz—and not the Mashpees—to be under federal jurisdiction.

The Mashpees acknowledge that the Cowlitz demonstrated that they were directly supervised by the local Indian Agency which maintained a list of the Cowlitz Indians enrolled with that agency. Pl. Reply Br. at 5, 16.  But the Mashpees omit from their reply brief the additional critical fact that the Indian Agency made allotments of land directly to the Cowlitz Indians living within the agency's jurisdiction.  That omission from the brief is significant because such allotment activity directly addresses Indian land ownership and implicates most directly the federal government's stewardship and fiduciary obligations.  In and of itself, that activity evidences a guardian-ward relationship which naturally extends federal jurisdiction over the allottee.[7]  The actions taken by the Indian agency to allot lands for the Cowlitz was not lost on the federal courts when they reviewed (and upheld) the Secretary's finding that the Cowlitz were under federal jurisdiction for purposes of the IRA.  *See Grand Ronde*, 830 F.3d at 564 (specifically listing "allotment activities" by agency); *id.* at 566 (record evidence showed the agency granting "allotments [on the Quinault Reservation] to eligible Cowlitz Indians during the period from 1905 to 1930" (quoting Joint Appendix)); *Confederated Tribes of the Grand Ronde*

---

[7]  The Mashpees address the allotment activity briefly and incompletely in Exhibit A (ECF No. 35-1), acknowledging allotments occurred while downplaying their significance saying it was for "individuals."  All allotments are to individuals.  The fact remains that the federal courts in *Grand Ronde* affirmed the propriety of the Secretary's reliance on this evidence.

*Cmty. of Or. v. Jewell*, 75 F. Supp. 3d 387, 405 (D.D.C. 2014) (noting "Federal government issued 'public domain' allotments to some Cowlitz Indians in the late 1800s and 'took actions in support of these allotments,' such as supervising the sale of lands and protesting a tax sale of land held in trust" and "[s]ome Cowlitz Indians also received allotments due to 'the Act of March 4, 1911' which directed the Secretary to make allotments to members of tribes in the State of Washington 'who are affiliated with the Quinaielt and Quileute tribes.'").   The Mashpees' dismissive treatment of this particularly significant distinguishing feature of the Cowlitz's relationship with the federal government is no accident.   The Mashpees cannot point to any active federal supervision of their lands, much less an Indian agency superintending the allotment of land to them.

In addition to side-stepping a key historical fact that easily distinguishes the Cowlitz from them, the Mashpees also fail to address the Cowlitz Tribe's completely different experience as a western tribe residing in a federal territory, compared to the Mashpees' experience under state/colonial jurisdiction since the 17th century.   The Cowlitz Tribe dealt directly with the federal Governor of the Washington Territory (the precursor to the State of Washington) in which the tribe resided, as well as directly with "the highest levels of the Interior Department."   *See Grand Ronde*, 830 F.3d at 564-65.   It is in that completely different setting, where the Cowlitz interacted directly and exclusively with federal officials, that the Cowlitz's relationship with the federal government was formed.   The Cowlitz Tribe entered into treaty negotiations and eventually removed under pressure from the federal government.[8]   *See Grand Ronde*, 830 F.3d at 564-65 ("[T]he fact that the government

---

[8] The Mashpees claim the Cowlitz were not subjected to any federal removal policy, despite removing from their ancestral lands under pressure from federal officials, and that the Cowlitz did not benefit from public or trust lands even though they lived in the federal territory that was under the jurisdiction of the federal government.   The Tribe is splitting hairs.   The Cowlitz Tribe experienced something that the Mashpees did not:   a direct and exclusive relationship with the Office of Indian Affairs by virtue of residing in a federal territory governed by a chief executive who was both the governor of the territory and also the top Indian agent.

nevertheless took the Cowlitz land even after the tribe resisted the treaty corroborates that the government treated the Cowlitz as under its jurisdiction.").  That history explains how the Cowlitz came under, and stayed under, federal jurisdiction, with the local Indian Agency taking an active role supervising the Cowlitz Indians.  It was on account of that long-standing federal-tribal relationship that the Cowlitz Tribe presented "a large and complex record of Interior interactions with the Cowlitz for almost a century." *Id.* at 566.

The Mashpees do not address the many sharp historical differences between the Cowlitz and themselves and instead cherry pick from the Cowlitz history the fact that Cowlitz children were educated in a BIA school and Cowlitz members appeared on census rolls.  The Mashpees take those two pieces of evidence out of context and argue that the Carlisle School census rolls are no different from the Indian Agency's census in the Cowlitz case.  Pl. Reply Br. at 17.  This simply is not true.  A tribe that enrolls its members with the local Indian Agency comes under the administrative jurisdiction of the agency and receives federal services.  The enrolled Indians are enumerated by the agency and carried on the agency rolls.[9]  In contrast, as explained above, the counting of twelve children at the Carlisle School carried with it no services or benefits to the Mashpees back in Massachusetts.  These school-based headcounts were for BIA purposes with no consequence for any tribe.

Moreover, by singling out these strands of evidence from the entire Cowlitz record, the Mashpees undermine their own argument that the Secretary must consider the evidence as a whole. The problem for the Mashpees is that the Cowlitz Tribe presented a century's worth of evidence of

---

[9]  This is precisely what Justice Breyer was describing in noting that tribes "under federal jurisdiction" included tribes whose members were enrolled with the Office of Indian Affairs.  It is demonstrated in each land-into-trust case where the tribe had enrolled its members with the federal Indian agency and received services, including the Cowlitz Tribe.  The Office of Indian Affairs routinely kept the rolls of Indians under its supervision.  See AR6818 (footnote 7 and reference to Department Circular No. 3134 (Mar. 7, 1936)).

meaningful interactions with the federal government, the collective force of which was sufficient to establish, in the Secretary's judgment, that the Cowlitz tribe was under federal jurisdiction in 1934. The Mashpees evidence is nothing of the kind.

The Mashpees' reliance on the recent Samish decision[10] is similarly unavailing.  The historical evidence for that western tribe established that the Samish:  were a federal treaty tribe directly benefiting from the 1855 Treaty of Point Elliot (Samish Decision at 16-19); benefitted from congressional appropriations in 1875 (*id.* at 21-22); were under the jurisdiction of a federal Indian agency (Tulalip Agency and Swinomish Sub-agency) (*id.* at 24-26); and were subjected to the allotment provisions of the 1855 Treaty.  *Id.* at 22-23.  The Samish decision recites numerous other federal actions towards the Samish Tribe, including the Indian Agency attempting to enroll Samish Indians in the Indian agency (*id.* at 25); exercising police powers over the Samish's traditional Village (*id.* at 22); and approving attorney contracts to enable the Samish to make land claims.  *Id.* at 27.  The evidence presented by the Samish Tribe satisfies all three of Justice Breyer's jurisdictional-conferring acts (and more).  The Mashpees in contrast cannot show any of the three main indicia of federal jurisdiction and cannot even assemble a reasonable facsimile of the other historical evidence presented by the Samish.

**B.     The Mashpees misrepresent and overstate their own evidence.**

The Mashpees go far afield in embellishing facts which they claim support the existence of federal jurisdiction.

---

[10]  NW Regional Director's Letter to The Honorable Tom Wooten, Chairman, Samish Indian Nation re: Trust Acquisition of Campbell Lake South Property, Attachment 1, NW Regional Director's Analysis of Whether Samish Were Under Federal Jurisdiction in 1934, at 22-23 (Nov. 9, 2018) ("Samish Decision"), *available at* https://turtletalk.files.wordpress.com/2018/11/2018-11-09-attachment-1-to-ftt-dec-samish-carcieri-analysis.

    1.    <u>Claimed aboriginal title</u>

The Tribe asserts that an "open question" exists about its so-called "aboriginal title" because Congress never extinguished it. But Indian title was long ago extinguished upon the creation of the first Praying Town in the 1600s. The lands have long been held in fee and subjected to the taxing and regulatory jurisdiction of the Commonwealth. If there is any unextinguished aboriginal title, it would come as surprise to all stakeholders in the region. It is also entirely beyond the legal capacity of anyone to litigate at this point, given the extinguishment of the Mashpees' land claim litigation. This contention is meaningless to the IRA jurisdictional analysis and does not help the Mashpees in comparison to other tribes.

    2.    <u>Claimed reservation</u>

The Mashpees have no reservation in Massachusetts, so the best the Mashpees can say on this point is that Interior has called their fee lands in the Town of Mashpee "reservation-like." Those lands fall within a Town incorporated under state law and consist of fee lands subject to the plenary taxing and regulatory authority of the Town. It is undisputed that prior to the 2015 ROD, the federal government never created a federal reservation for the Mashpees or otherwise set aside any land for them. The Tribe's claim that it might occupy a quasi-reservation under *state* law does not help in any way to demonstrate *federal* jurisdiction.

    3.    <u>Claimed BIA school attendance</u>

The Tribe places inordinate weight on the evidence that a dozen Mashpee students attended a BIA school between 1904 to 1918—arguing that the Secretary had to credit that evidence as proof of being under federal jurisdiction in 1934, even though the school closed in 1918. To be sure, the M-Opinion states that tribes may be able to show federal jurisdiction through a variety of federal interactions, including evidence of "education of Indian students at BIA schools." That one-line mention in the M-Opinion (listed among many types of federal interactions that may be considered

probative evidence) does not make that category of evidence necessary or sufficient to show federal jurisdiction. The Secretary is free to place whatever weight he thinks the evidence deserves given the overall evidence concerning the tribe's course of dealings with the federal government. Here, the undisputed evidence shows only a handful of Mashpee children attended the Carlisle school, which was shuttered sixteen years before the IRA was enacted. Sporadic contact with Mashpee children away from Massachusetts had no jurisdiction-conferring effect over the Mashpees as a tribe in 1934 or any time before. With no Indian agency in Massachusetts, the Office of Indian Affairs had no way to provide supervision over the Mashpees on Cape Cod. The overwhelming historical evidence is that the Mashpee Tribe (which was not even a tribe in 1934) was as much of stranger to the federal government as the Narragansetts were when the IRA was enacted.

4.     Claimed federal protection of Mashpee lands

Given the paucity of historical evidence showing affirmative acts by the federal government with respect to the Mashpee Tribe, the Mashpees resort to recasting state actions as federal actions. The Tribe wrongly claims that John Davis was acting as the U.S. Attorney (U.S. District Attorney) when he was hired by the Overseers to bring an ejectment action in state court against Ebenezer Crocket, a private individual. The historical record is extensively discussed in the Citizens' Group Supplemental Reply Submission dated October 30, 2017, located at AR9410-9418. The record evidence unequivocally demonstrates that John Davis was acting as a private lawyer—both as a matter of fact and law—when he was hired to bring the ejectment action in state court. That conclusion flows from the 1840 description of the case provided by Benjamin Hallett; the historical record regarding the formation of the federal courts and U.S. Attorneys' offices in 1789; a U.S. Attorney General Opinion in 1820 stating that U.S. Attorneys act as private lawyers, as a matter of law, when they appear in state court; the historical records documenting the custom and practice of U.S. Attorneys (and other prosecutors) to maintain outside private law practices; the records regarding the

15

private law practice of John Davis; and the compensation records concerning John Davis's representation in the case in question. All of these records (which are part of the remand record) confirm what is clear on the face of Hallett's historical account of the 1798 trial: John Davis was acting as a private lawyer for individual Indians and not appearing on behalf of the Federal Government.

The Secretary properly determined that this historical evidence did not demonstrate federal action. That decision rests on far more than a scintilla of evidence and must be upheld. The Secretary's factual finding in this regard eliminates the Tribe's recurring claim that the Mashpees, like other tribes, benefitted from the federal government taking action to protect their lands. Pl. Br. at 37-38; Pl. Reply Br. at 27-28 & Ex. A. Nothing could be further from the truth given the federal government's adamant refusal to support the Mashpees' land claims.

5.      Claimed federal protection of "usufructuary rights"

The Tribe likewise tries to convert its usufructuary rights, which were created exclusively under state law, into a federally protected aboriginal right because the U.S. Navy acknowledged the Tribe's state-created rights to engage in shell-fishing. This argument makes no sense. A federal agency acknowledging that state law protects usufructuary rights does not "federalize" those rights. Rather it reinforces the fact that the Mashpees were always under the jurisdiction of the state, instead of the federal government. This evidence has no probative value on the question of whether the Mashpees were under federal jurisdiction in 1934; the Secretary was right not to credit it.

## IV.      THE INDIAN CANON OF CONSTRUCTION HAS NO ROLE TO PLAY.

The Tribe attempts to tilt the scale in its favor by invoking the so-called "Indian canon" of construction. But this is not a case of statutory construction—it is a case about how to apply Interior's existing interpretations of the IRA. The Mashpees disagree with the Secretary's weighing of the historical evidence under the M-Opinion, and the Secretary's application of Department precedent

under that guidance, rather than the Secretary's construction of the IRA itself.   Under these circumstances, the Indian canon of statutory construction has no application.

Even if this case were somehow viewed as one of construction, the Indian canon has no relevance here.  That canon (like all other canons) "does not permit reliance on ambiguities that do not exist; nor does it permit disregard of the clearly expressed intent of Congress." *South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 506 (1986), *Koi Nation of N. Cal. v. U.S. Dep't of the Interior*, 361 F. Supp. 3d 14, 42 (D.D.C. 2019) (citing *Catawba Indian Tribe*, 476 U.S. at 506); *Penobscot Nation v. Mills*, 861 F.3d 324, 330 n.3 (1st Cir. 2017).  Even where it applies, the Indian canon of construction "need not be conclusive." *Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001) (citation and internal quotation marks omitted)).

To the extent the Mashpees are arguing that the "under federal jurisdiction" requirement must be construed liberally to include them, that argument "would render that language superfluous, a result forbidden by the canons of construction." *Penobscot Nation*, 861 F.3d at 332; *see generally*, *Corley v. United States*, 556 U.S. 303, 314 (2009) ("one of the most basic interpretive canons is that [a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant" (citation and internal quotation marks omitted)); *Woodhull Freedom Found. v. United States*, 334 F. Supp. 3d 185, 200 (D.D.C. 2018) ("It is an 'elementary canon of construction that a statute should be interpreted so as not to render one part inoperative.'" (quoting *Catawba Indian Tribe*, 476 U.S. at 510 n.22)).  If the Mashpees are right—and the facts on which they rely are actually indicia of jurisdiction—then every other Indian tribe would be eligible to receive IRA benefits, for any tribe can show a similar history.  In doing so, the Tribe disregards the history, purpose and meaning of the "under federal jurisdiction" (in 1934) requirement, which restricted the IRA's considerable federal benefits to "members of any recognized tribe now under federal jurisdiction."

The Mashpees never explain how they possibly could be eligible under the IRA and the

Narragansett not, or how any tribe in the United States would ever be excluded by the "under federal jurisdiction" requirement if the Mashpees are included.  In the final analysis, the Mashpees resist the "under federal jurisdiction" requirement and *Carcieri*'s application of it, but cannot escape it.

## **CONCLUSION**

The Secretary exercised his discretion under the IRA and rejected the Mashpees' application for land to be taken into trust, finding the Tribe's historical record could not support the conclusion that the Mashpees were under federal jurisdiction in 1934.  In viewing the evidence presented by the Tribe against the benchmark of the *Carcieri* opinion's treatment of the Narragansetts, and the M-Opinion guidance construing the IRA's "under federal jurisdiction" requirement, the Secretary did not act arbitrarily by deviating from precedent, but rather correctly enforced the IRA's requirement that a tribe be "under federal jurisdiction" before Interior may take land into trust.  If the Mashpees could be found under federal jurisdiction in 1934, no tribe would ever be excluded from the IRA's land into trust process.  This would be the case even though Congress expressly limited IRA benefits to tribes under federal jurisdiction in 1934, and intended to exclude tribes like the Mashpees and Narragansets that were, "and always had been, under the jurisdiction of the New England States, rather than the Federal Government."  *Carcieri*, 555 U.S. at 384.  The Mashpees have no answer to the question, "What tribes are not eligible for IRA benefits if not the Mashpees, Narragansetts and other East Coast tribes long assimilated and under state jurisdiction?"  Their answer is that no tribes are excluded, which provides its own refutation of the Tribe's argument.

The Supreme Court gave this statutory language meaning in *Carcieri*, and the Secretary properly did so too.  Accordingly, the Secretary's September 7, 2018 decision should be affirmed.

Dated:  October 15, 2019               Respectfully submitted,


                                       /s/ David H. Tennant
                                       David H. Tennant (admitted *pro hac vice*)
                                       Law Office of David Tennant PLLC
                                       3349 Monroe Avenue, Suite 345
                                       Rochester, NY 14618
                                       Tel.:  585.708.9338
                                       *david.tennant@appellatezealot.com*

                                       /s/ Andrew Kim
                                       Andrew Kim (D.C. Bar. No. 1029348)
                                       GOODWIN PROCTER LLP
                                       901 New York Avenue NW
                                       Washington, DC  20001
                                       Tel.:  202.346.4000
                                       Fax.:  202.346.4444
                                       *AndrewKim@goodwinlaw.com*

                                       *Attorneys for Intervenor-Defendants*
                                       *The Littlefield Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 15, 2019, I electronically filed the foregoing Intervenor-Defendants *Littlefield* Plaintiffs' Reply Memorandum in Support of Their Cross-Motion for Summary Judgment with the Clerk of the Court of the U.S. District Court for the District of Columbia by using the Court's CM/ECF system.  All participants in the case are registered CM/ECF users and will be served via the CM/ECF system.

/s/ Andrew Kim
Andrew Kim