## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MASHPEE WAMPANOAG TRIBE, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| RYAN ZINKE, in his official capacity as Secretary of the Interior, | ) ) ) |
| and | ) ) |
| U.S. DEPARTMENT OF THE INTERIOR | ) ) ) |
| Defendants | ) ) |
| and | ) ) ) |
| DAVID LITTLEFIELD; MICHELLE LITTLEFIELD; TRACY ACORD; DEBORAH CANARY; VERONICA CASEY; PATRICIA COLBERT, VIVIAN COURCY; DONNA DEFARIA; KIM DORSEY; FRANCIS LAGACE; WILL COURCY; ANTONIO DEFARIA; KELLY DORSEY; JILL LAGACE; DAVID LEWRY; KATHLEEN LEWRY; ROBERT LINCOLN; CHRISTINA MCMAHON; CAROL MURPHY; DOROTHY PEIRCE; DAVID PURDY; LOUISE SILVIA; FRANCIS CANARY, JR.; MICHELLE LEWRY; RICHARD LEWRY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Civil Action No. 1:18-cv-02242-PLF |
| Intervenor-Defendants. | ) ) ) |

**DECLARATION OF THE HONORABLE CEDRIC CROMWELL, CHAIRMAN, MASHPEE WAMPANOAG TRIBE, IN SUPPORT OF PLAINTIFF MASHPEE WAMPANOAG TRIBE'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION**

I, Cedric Cromwell, declare as follows:

US_Active\114523696\V-7

1. I am the Chairman of the Mashpee Wampanoag Tribe ("Tribe"), duly elected in accordance with the Constitution of the Tribe.  I make this Declaration in support of the Tribe's Emergency Motion for a Temporary Restraining Order and a Preliminary Injunction seeking to prevent the U.S. Department of the Interior (Department or Secretary) from taking action to revoke the trust and reservation status of the Mashpee Wampanoag Tribe's land, although it is unclear he has authority to do so.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would testify competently thereto.

2. As Chairman of the Tribe, I serve as coordinator over all Tribal Government activities.  I have general knowledge of and receive information regarding the Tribe's land status, as well as economic development and other tribal government projects.

3. The Tribe has inhabited what is now southeast Massachusetts for more than 12,000 years. In 2007, the Department of the Interior formally acknowledged Mashpee's status as a federally recognized Indian tribe under 25 C.F.R. Part 83 (which requires a showing of continuous tribal existence since 1900); the Tribe immediately thereafter sought to rebuild its land base to support its tribal government and community.

4. In November 2015, the Tribe conveyed its fee title to approximately 170 acres of land in the Town of Mashpee and approximately 151 acres in the City of Taunton (together "the trust land" or "Reservation") to the United States to be held in trust for the benefit of the Tribe, and the United States subsequently accepted trust title.

5. On December 30, 2015, the Department issued a Reservation Proclamation designating the trust land as the Tribe's Reservation.  81 Fed. Reg. 948 (Jan. 8, 2016).

6. The Tribe's Reservation encompasses a portion (albeit a very small portion) of the Tribe's aboriginal territory, where it has lived since time immemorial, and as such the Tribe has strong spiritual and cultural connections to its Reservation.  It is on this Reservation that the Tribe administers its government, provides services and employment

2

to its people, including constructing affordable housing, and plans to engage in economic development to help fund these services and provide additional employment.

7.  The Tribe also has a substantial financial interest at stake in its Reservation. The Reservation is key to developing a functional tribal economy, and the Tribe has incurred debts related to the extensive costs associated with the trust land process (for which no public funds are available) and its planned economic development. Revenue from such economic development is crucial to the Tribe's ability to adequately fund its governmental functions. Further, a wide variety of governmental programs that assist Indians are tied to having a Reservation.

8.  The portion of the Reservation located near the Town of Mashpee provides governmental, cultural and historical services to the Tribe. The Tribal Government Center houses over twenty departments, including, but not limited to, Tribal Health, Education, Natural Resources, Tribal Court, Tribal Housing, Elder Services, Employment and Tribal Police. Unfortunately, as a result of the continued litigation and uncertainty over the Reservation's status, the Tribe currently is in a dire economic situation and has had to lay off most of the Tribal employees who worked in these departments. This part of the Reservation also includes several sacred sites, including burial and ceremonial grounds that are fundamental to the Tribe's cultural and spiritual traditions. Located on the Reservation is the Tribe's historic Indian Meetinghouse, which serves as a center for the cultural, physical, mental and religious health of the Tribe, and allows Tribal traditional and spiritual leadership to continue to preserve culture and traditions. In addition, the Tribe has nearly completed construction of a $12 million affordable housing project for tribal members on the Reservation, relying on low-income housing tax credits, and expects that tribal members will be able to move in during late summer or fall.

9.  The portion of the Reservation located near the City of Taunton is central to the Tribe's economic development plan. Here, the Tribe has planned construction of a tribal gaming facility (strongly supported by the City of Taunton's government), which will be a crucial

3

economic engine to provide jobs, tribal government income and resources to support the Tribe's government and improve the economic status of tribal members. Although the Tribe broke ground on the gaming facility project in April 2016, litigation funded by a competing commercial casino company challenging the Reservation's status forced the Tribe to suspend its economic development activities here on August 11, 2016.

10. The trust and reservation status of the Tribe's land gives the Tribe jurisdiction over that land. Tribal member activities conducted on the Reservation are subject to Tribal jurisdiction, and no longer subject to state and local jurisdiction, except to the extent provided in several intergovernmental agreements with the Town of Mashpee, City of Taunton and Barnstable County Sheriff.

11. The Tribe entered into multiple agreements with the Town of Mashpee and the City of Taunton to address the transition from local to tribal jurisdiction and to ensure the continued availability of emergency and fire protection services to the Reservation. The Tribe has Memoranda of Understanding with the Town of Mashpee and City of Taunton, Intergovernmental Agreements with the Town of Mashpee and City of Taunton, and a Memorandum of Understanding with the Barnstable County Sherriff. These agreements provide for the delivery of fire and emergency services to the Tribe's reservation land, set the terms for the shared jurisdictional roles of state and tribal law enforcement over the Tribe's reservation land, and provide for the development of the Tribe's gaming facility for the shared benefit of the City of Taunton, the Tribe, and the Commonwealth of Massachusetts, pursuant to a 2013 Tribal-State Compact between the Tribe and the Commonwealth. The agreements are premised on the fact that the Tribe's land is held in trust and proclaimed a Reservation.

**Interior Notice of Decision to Remove Land from Trust and Reservation Status**

12. At approximately 2 pm Eastern Time (ET) on March 27, 2020, I received a call from Bureau of Indian Affairs (BIA) Acting Eastern Regional Director Glenn Melville. Mr. Melville informed me that he would like me to participate in a call at 4 pm ET with him,

4

other BIA representatives and attorneys from the Department of the Interior Office of the Solicitor regarding the Tribe's ongoing litigation and the status of the Tribe's trust land. I informed Acting Regional Director Melville that I would not participate in the call without my legal counsel present, since counsel from Solicitor's Office would be participating, and requested that they be included in the 4 pm call. Acting Regional Director Melville agreed and set up the call for 4 pm.

13. At 4 pm ET on March 27, 2020, I participated in a call with Acting Regional Di-rector Melville, BIA Director Darryl LaCounte, Deputy Eastern Regional Director Kim Bouchard, Associate Solicitor-Indian Affairs Eric Shepard and Assistant Solicitor John Hay. The call also included Mashpee Vice Chairwoman Jessie Baird, Mashpee General Counsel Rebekah Salguero, and attorneys for the Tribe V. Heather Sibbison, Suzanne Schaeffer, and Rose Petoskey.

14. During the call, BIA Director LaCounte informed me that the Secretary of the Interior had ordered him to take the Tribe's reservation lands "out of trust" and revoke the Tribe's reservation proclamation. BIA Director LaCounte stated that in order to accomplish this, he will record the "court mandate" from the First Circuit to take the land out of trust.[1] Mr. LaCounte stated that this would not happen "today," but "soon." In response, Ms. Sibbison stated that the Tribe and the Department are in ongoing litigation regarding the status of the Tribe's Reservation, that it has been the longstanding policy of the Department not to alter the status of land during the pendency of litigation, that the Department specifically had committed to the Tribe that it would not take the land out of trust while litigation is pending, and that there was no court order directing the action

---

[1] The First Circuit decision says only that the Secretary misinterpreted the Indian Reorganization Act's second definition of "Indian" so that it did not have authority under that definition to take the Mashpee land in trust; there is no order to take the land out of trust. The "mandate" also says nothing about taking the land out of trust.

5

now directed by the Secretary.[2]  None of the Departmental officials offered a response to this statement.

15. I asked if Tribal leadership could meet with the Secretary by phone as soon as possible, since the Secretary had issued the directive regarding the Tribe's trust land and Reservation.  Director LaCounte committed to make that request.

16. Ms. Sibbison then asked whether the Department has a defined administrative process for taking land out of trust, whether it includes a time frame and opportunity to challenge the decision analogous to the Department's process for putting land in trust, and further requested that the Department inform the Tribe of that process by early the following week.  None of the officials from the Department responded to this inquiry about whether there would be a set process and opportunity provided to challenge, but BIA Director LaCounte requested Ms. Sibbison's phone number to follow up.

17. Today, Monday, March 30, Ms. Sibbison received an email from Eric Shepard, Associate Solicitor-Indian Affairs, which attached a copy of the Secretary's Memorandum to the Director and Eastern Regional Director of the Bureau of Indian Affairs.  The Memorandum states that the First Circuit's formal mandate has issued.  The Memo provides:

> With the Mandate now issued, the Department must take steps to rescind the Decision.  To ensure compliance with the First Circuit's Mandate, I direct your office to rescind the Decision whereby the BIA accepted land into trust on behalf of the Tribe, and to revoke the reservation proclamation.  In addition, clarification is necessary that removal of the Tribe's lands from trust and revocation of the reservation proclamation annul the determination that such lands are eligible for gaming under the Indian Gaming Regulatory Act (citation omitted).

---

[2] Tanner Stening, *Interior: Mashpee tribe's land remains in trust pending appeal*, Cape Cod Times (Sept. 11, 2018),  https://www.capecodtimes.com/news/20180911/interior-mashpee-tribes-land-remains-in-trust-pending-appeal (quoting Bureau of Indian Affairs spokeswoman Nedra Darling after the Department issued the September 7, 2018 Record of Decision that is the subject of this case, stating "[c]onsistent with our practices and procedures, the department will continue to hold the tribe's land in trust until a final court order is imposed.").

The Memorandum contains no further information about the process to accomplish the Secretary's direction to remove the Tribe's lands from trust and rescind the Reservation Proclamation. (attached as Exhibit 1).

**Irreparable Harm to the Tribe**

18. The acquisition of the land in trust and designation of the land as the Tribe's Reservation acknowledges and confirms the inherent right of the Tribe to govern itself and its members and provides greatly enhanced opportunities for the Tribe to protect its members in all respects: governmentally, spiritually, culturally and economically.  The importance of the Tribe's Reservation cannot be overstated:  these very lands are the lands of our ancestors, that literally hold the bones of our ancestors, and are nothing less than the Tribe's life blood.

19. Removal of the Tribe's land from trust and reservation status will have significant immediate negative consequences and visit irreparable harm on the Tribe and its members.  The most obvious harm is the loss of sovereign authority over the Tribe's historic lands, preventing the Tribe from exercising its right to self-governance and self-determination.  Such action by the Secretary disrespects and interferes with the Tribe's strong spiritual and cultural connections to its ancestral lands.  The loss of the Tribe's sovereign rights and its cultural and community connections is so fundamental to the Tribe's existence that it cannot be calculated in terms of money.

20. The Secretary's actions to remove the land from trust status raises significant jurisdictional questions, imposes further economic harm on the Tribe and its members, and potentially endangers the health and well-being of tribal members due to the loss of federal funding tied to trust and reservation status, which the Tribe can least afford during this time when the coronavirus epidemic is sweeping across the country.  These negative impacts are described in more detail below.

US_Active\114523696\V-7

21. If the Secretary removes the land from trust status, the Tribe will be responsible for paying hundreds of thousands of dollars of property taxes on the land, which it cannot afford, likely including back taxes.  Because the Tribe currently has no available revenue stream and is struggling to keep its government operating, these lands could become subject to foreclosure and the Tribe may well lose them for non-payment of taxes.  The removal of the land from trust also will negatively affect the Tribe's ability to repay its existing debt, and its ability to obtain financing for planned or alternative economic development projects.

22. If the Secretary is allowed to remove the land from trust status before a final decision on the merits is made by the courts, significant harm and confusion could result should the courts ultimately find that the Secretary had authority to take the land in trust and proclaim it a reservation all along, and therefore did not have authority to take the land "out of trust" at all.   This would create a particularly difficult scenario if the Tribe by then has lost its land to tax foreclosure and some other entity, believing it owns the land, has taken possession of it.

23. There are a host of tribal grant and funding programs only available to tribes and tribal members that have trust or reservation land.  For example, the Tribe has been approved for funding from the Administration for Children and Families Child Care Development Fund for construction of a childcare facility on the Tribe's Reservation.  The Tribe plans to begin construction this spring.  To receive this funding, the Tribe must build the facility to serve children living on or near reservation land.  Therefore, this funding likely will be revoked if the Tribe's land is taken out of trust and its Reservation disestablished.  Another example is the Mashpee Tribal Historic Preservation Office (THPO), which would be at risk if the Tribe's land is removed from trust, as federal funding eligibility for the THPO program is limited to federally recognized tribes with a reservation and/or tribal trust lands.

24. Other reservation or trust-land based funding programs include the: (i) Indian Business Development Program (to establish or expand Indian-owned economic enterprises on or near a reservation), (ii) Financial Assistance and Social Service Programs (federal social services for Indians on or near reservations, including Direct Assistance, Tribal Work Experience, Burial Assistance, Disaster Assistance, Emergency Assistance and Adult Care Assistance), (iii) Employment Assistance for Adult Indians (residing on or near a reservation), (iv) Vocational Training for Adult Indians (residing on or near a reservation), (v) Food Distribution Program on Indian Reservations (food assistance for low-income Indian households on a reservation), (vi) Johnson O'Malley Education Contracts (preference given to contracts that serve Indians on or near a reservation), (vii) Tribal Transportation Program (assistance for roads and bridges within exterior boundary of Indian reservations), (viii) Bureau of Justice Assistance Tribal Justice System Grants (grants to support tribal justice systems, tribes must exercise jurisdiction over Indian lands), (ix) Treatment as a State under the Clean Water Act and Clean Air Act (must have reservation or trust lands), and (x) Special Domestic Violence Criminal Jurisdiction (Tribal exercise of jurisdiction over certain non-Indians on trust land or reservation where crime occurs). The Tribe receives funding from the Social Service, Tribal Transportation, and the Bureau of Justice Assistance Programs. Should the Secretary remove our land from trust and reservation status, the Tribe and its members would no longer be eligible for these funds, and would be unable to apply for any of these funding programs.

25. One particularly important Reservation-based program in light of the COVID-19 outbreak is the Food Distribution Program on Indian Reservations program, which received additional funding in the Coronavirus Aid, Relief, and Economic Security (CARES) Act, H.R. 748, to help low-income tribal members, like those at Mashpee, who face even greater challenges in retaining their jobs and feeding their families --

US_Active\114523696\V-7

unfortunately these funds will not be available to Mashpee if its lands are no longer in trust as a reservation.

26. Removal of the land's trust and reservation status also will cause significant jurisdictional issues and confusion.  If our land is not in trust, the Tribal police will no longer have law enforcement jurisdiction over violations on the land.  Our Police Department also has several grants pending for which it will no longer qualify.  Should the Secretary take this action, it is not clear what the fate of our Police Department and its personnel will be, and the Tribe will have spent a significant amount of money to establish a law enforcement and emergency response department that cannot function.  This same kind of jurisdictional issue would arise with respect to our Tribal Courts, which no longer would have jurisdiction on the reservation.

27. Similar issues would arise in connection with the Tribe's nearly completed construction of affordable housing for tribal members on its trust land in Mashpee, which is being accomplished under tribal law and whose development and financing (including federal and state tax credits) are based on the land's status as an Indian reservation.  If the Tribe's land is removed from trust and reservation status, the land would revert to local and State jurisdiction and the housing project would not meet local zoning requirements.  Not only will this prevent Tribal members from moving into desperately-needed low-income housing in the late summer or early fall, but it would also mean that the Tribe has spent $12 million dollars, relying on low income housing tax credits, to build housing that cannot be occupied.

28. In addition, if the land is removed from trust status, the Tribe would lose BIA services related to forestry and wildfire management for the approximately 100 acres of forest land located on the Tribe's trust land.  BIA funding for the protection of the Tribe's forest resources from forest insects, disease, wildfires, and trespass also would not be available.  The Tribe would also lose BIA Natural Resources and contract support.

US_Active\114523696\V-7

29. Finally, if the land is removed from trust and reservation status, the uncertainty and loss of federal funding already described, as well as the potential loss of federal health-related funding will greatly exacerbate the extremely difficult situation in which the Tribe finds itself as we try to marshal whatever extremely limited resources we can find to protect our members from the frightening and increasing spread of the COVID-19 virus. According to the most recent figures from the Massachusetts Department of Health, Massachusetts has 4,955 confirmed cases (of 39,066 persons tested) and 48 COVID-19 deaths, including 148 confirmed COVID-19 cases in Barnstable County and 325 cases in Plymouth County, where the Tribe's Reservation is located.[3]

30. I declare, under penalty of perjury under the laws of the United States, that the foregoing is true and correct to the best of my knowledge and belief.

EXECUTED this 30th day of March, 2020 in _____, ____ .

Cedric Cromwell

---

[3] https://www.mass.gov/doc/covid-19-cases-in-massachusetts-as-of-march-29-2020/download. Site last visited on March 30, 2020.

11

US_Active\114523696\V-7