## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MASHPEE WAMPANOAG TRIBE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 1:18-cv-02242-PLF |
| | ) |
| DAVID BERNHARDT, Secretary, in his | ) |
| official capacity as Secretary of the Interior, | ) |
| *et al.*, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| DAVID LITTLEFIED, *et al.*, | ) |
| | ) |
| Defendant-Intervenors. | ) |
| | ) |

**BRIEF OF UNITED SOUTH AND EASTERN TRIBES SOVEREIGNTY
PROTECTION FUND AS *AMICUS CURIAE* IN SUPPORT OF
PLAINTIFF'S SUPPLEMENTAL BRIEF IN RESPONSE TO COURT'S
MAY 1, 2020 ORDER**

Kaitlyn E. Klass (D.C. Bar No. 1032219)
Elliott A. Milhollin (D.C. Bar No. 477322)
Hobbs, Straus, Dean & Walker, LLP
1899 L Street NW, Suite 1200
Washington, DC 20037
Phone: (202) 822-8282
kklass@hobbsstraus.com
emilhollin@hobbsstraus.com

May 11, 2020                    *Counsel for Amicus Curiae*

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................. ii

**CORPORATE DISCLOSURE STATEMENT** .................................... vii

**INTEREST OF *AMICUS*** ...................................................................1

**SUMMARY OF ARGUMENT** ...........................................................3

**BACKGROUND** ..................................................................................4

**ARGUMENT** ......................................................................................6

   **I.**    **NO REASONED EXPLANATION FOR CHANGED POSITION** ... 6

      A.   There is no legal impetus for DOI's changed position, as every court to examine the legal analysis set forth in the 2014 M-Opinion upheld it as reasonable ........................................................................6

      B.   Tribal Nations' significant reliance interests counsel against DOI's changed position ..................................................................................11

  **II.**    **NO TRIBAL CONSULTATION** ..........................................................13

      A.   DOI has a duty to consult with Tribal Nations that grows from Tribal Nations' status as sovereign governments and the trust obligations owed to us ...........................................................................13

      B.   DOI's duty to consult with Tribal Nations extends to revocation of the 2014 M-Opinion and promulgation of new guidance interpreting the IRA's first definition of "Indian" ......................................................18

      C.   DOI consulted on the 2014 M-Opinion because it was required to do so....................................................................................................22

      D.   DOI must employ the same procedures it utilized when issuing the 2014 M-Opinion when revoking or changing the 2014 M-Opinion ...23

**CONCLUSION**.....................................................................................24

# TABLE OF AUTHORITIES

## CASES

*Carcieri v. Salazar*,
   555 U.S. 379 (2009)..................................................................*passim*

*Cent. N.Y. Fair Bus. Ass'n v. Jewell*,
   No. 6:08-cv-0660, 2015 WL 1400384 (N.D.N.Y. Mar. 26, 2015)..................7, 8

*Cherokee Nation v. Georgia*,
   30 U.S. 1 (1831)..........................................................................13, 15

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,
   467 U.S. 837 (1984).................................................................7, 8, 9, 24

*Christensen v. Harris Cty.*,
   529 U.S. 576 (2000)........................................................................9

*Citizens Exposing Truth About Casinos v. Kempthorne*,
   492 F.3d 460 (D.C. Cir. 2007)...........................................................24

*Citizens for a Better Way v. U.S. Dep't of Interior*, No. 2:12-cv-3021-TLN-AC,
   2015 WL 5648925 (E.D. Cal. Sep. 24, 2015), *aff'd sub. nom. Cachil Dehe Band
   of Wintun Indians v. Zinke*, 889 F.3d 584 (9th Cir. 2018).....................7

*City of Sherrill, N.Y. v. Oneida Indian Nation of New York*,
   544 U.S. 197 (2005)....................................................................19, 20

*Columbia Falls Aluminum Co. v. E.P.A.*,
   139 F.3d 914 (D.C. Cir. 1998).........................................................23

*Confederated Tribes of the Grand Ronde Community of Oregon v. Jewell*,
   75 F. Supp. 3d 387 (D.D.C. 2014), *aff'd*, 830 F.3d 552 (D.C. Cir. 2016) .......... 8

*Cty. of Amador, Cal. v. U.S. Dep't of Interior*,
   136 F. Supp. 3d 1193 (E.D. Cal. 2015), *aff'd*, 872 F.3d 1012 (9th Cir. 2017),
   *cert. denied*, 139 S. Ct. 64 (2018)...................................................8, 9

*Cty. of Oneida v. Oneida Indian Nation,*
    470 U.S. 226 (1985)........................................................................................10

*Encino Motorcars, LLC v. Navarro,*
    136 S. Ct. 2117 (2016)............................................................................6, 7, 11

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009)...................................................................................7, 11

*Johnson v. M'Intosh,*
    21 U.S. 543 (1823)........................................................................................13

*Mescalero Apache Tribe v. Jones,*
    411 U.S. 145 (1973)......................................................................................19

*Montana v. Blackfeet Tribe,*
    471 U.S. 759 (1985)..................................................................................... 10

*Morton v. Mancari,*
    417 U.S. 535 (1974)........................................................................15, 18, 19

*Nat'l Cable & Telecomms. Ass'n. v. Brand X Internet Servs.,*
    545 U.S. 967 (2005).........................................................................................6

*No Casino in Plymouth v. Jewell*, 136 F. Supp. 3d 1166 (E.D. Cal. 2015),
    *vacated on other grounds and remanded sub. nom.*,
    *No Casino in Plymouth v. Zinke*, 698 F. App'x 531 (9th Cir. 2017)...............8, 9

*Rocky Mountain Oil & Gas Ass'n v. Andrus,*
    500 F. Supp. 1338 (D. Wyo. 1980), *rev'd on other grounds and remanded,*
    696 F.2d 734 (10th Cir. 1982) ......................................................................24

*Romeiro de Silva v. Smith,*
    773 F.2d 1021 (9th Cir. 1985) ..................................................................... 23

*Seminole Nation v. United States,*
    316 U.S. 286 (1942)..................................................................................... 15

*Smiley v. Citibank (S. Dakota), N.A.,*
    517 U.S. 735 (1996)......................................................................................10

*Stand Up for California! v. U.S. Dep't of Interior*,
    204 F. Supp. 3d 212 (D.D.C. 2016), *aff'd*, 879 F.3d 1177 (D.C. Cir. 2018),
    *cert. denied*, 139 S. Ct. 786 (2019) ...................................................................... 7

*U.S. v. Forty-Three Gallons of Whiskey*,
    93 U.S. 188 (1876) ........................................................................................... 13

*United States v. Jicarilla Apache Nation*,
    564 U.S. 162 (2011) .......................................................................................... 15

*United States v. Kagama*,
    118 U.S. 375 (1886) .......................................................................................... 15

*United States v. Mead Corp.*,
    533 U.S. 218 (2001) ........................................................................................ 7, 9

*Worcester v. Georgia*,
    31 U.S. 515 (1832) ............................................................................................ 13

## CONSTITUTIONAL PROVISIONS

U.S. CONST. art. I, § 2, cl. 3 ...................................................................................... 14

U.S. CONST. art. I, § 8, cl. 3 ...................................................................................... 14

U.S. CONST. art. II, § 2, cl. 2 ..................................................................................... 14

## STATUTES

18 U.S.C. § 1151 ....................................................................................................... 19

25 U.S.C. § 5108 ................................................................................................... 4, 19

25 U.S.C. § 5129 ......................................................................................................... 4

25 U.S.C. §§ 331 *et. seq* ........................................................................................... 14

## ADMINISTRATIVE DECISIONS

*Grand Traverse Cty. Bd. of Comm'rs v. Acting Midwest Reg'l Dir.*,
   61 IBIA 273 (Sept. 25, 2015) ................................................................9

*New York v. Acting E. Reg'l Dir.*,
   58 IBIA 323 (June 11, 2014) ................................................................9

*Shawano Cty. v. Acting Midwest Reg'l Dir.*,
   53 IBIA 62 (Feb. 28, 2011)..................................................................9

*Village of Hobart v. Acting Midwest Reg'l Dir.*,
   57 IBIA 4 (May 9, 2013) ......................................................................9

## OTHER AUTHORITIES

73rd Cong. Rec. 11726 (daily ed. June 15, 1934) ..................................15

65 Fed. Reg. 67249 (Nov. 9, 2000)...................................................16, 21

85 Fed. Reg. 19017 (Apr. 3, 2020) .........................................................18

85 Fed. Reg. 27417 (May 8, 2020) .........................................................17

COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 15.07[1][a] (2012 ed.) ...............15

DEP'T OF INTERIOR, Sec. Order No. 3317,
   DEPARTMENT OF THE INTERIOR POLICY ON CONSULTATION WITH
   INDIAN TRIBES (2011) ........................................................................16

DOI, M-37029, Memorandum,
   Meaning of "Under Federal Jurisdiction" for Purposes of the Indian
   Reorganization Act (2014)............................................................*passim*

DOI, Memorandum, Determining Eligibility for Land-into-Trust
   under the First Definition of "Indian" in Section 19 of the
   Indian Reorganization Act (Mar. 10, 2020) .........................................5

DOI, M-37054, Memorandum, Interpreting the Second
Definition of "Indian" in Section 19 of the
Indian Reorganization Act of 1934, at 5 (Mar. 9, 2020) ...................................11

DOI, Memorandum, Procedure for Determining Eligibility for
Land-into-Trust under the First Definition of "Indian" in
Section 19 of the Indian Reorganization Act (Mar. 10, 2020) ............................5

DOI, M-37055, Memorandum, Withdrawal of Solicitor's Opinion M-37209,
"The Meaning of 'Under Federal Jurisdiction' for Purposes of the Indian
Reorganization Act" (Mar. 9, 2020) ...........................................................5, 7, 12

DOI, Memorandum, Determining Eligibility under the First Definition of
"Indian" in Section 19 of the Indian Reorganization Act of 1934
(Mar. 5, 2020) ...............................................................................................5, 6

G.A. Res. 61/295, United Nations Declaration on the Rights of
Indigenous Peoples (Sept. 13, 2007) ..........................................................17, 18

H.R. REP. NO. 103-781 (1994) ...............................................................................14

H.R. Rep. No. 1804, 73d Cong., 2d Sess., 6 (1934) ..............................................18

Inst. for Gov't Research, The Problem of Indian Administration
(Lewis Meriam ed., Johns Hopkins Press 1928) ................................................15

# CORPORATE DISCLOSURE STATEMENT

This certificate is required by LCvR 7(o)(5) of the Local Rules of the United States District Court for the District of Columbia and Rules 26.1 and 29(a)(4)(A) of the Federal Rules of Appellate Procedure incorporated therein:

> I, the undersigned, counsel of record for the United South and Eastern Tribes Sovereignty Protection Fund, certify that to the best of my knowledge and belief, there are no parent companies, subsidiaries, affiliates, or companies which own at least 10% of the stock of the United South and Eastern Tribes Sovereignty Protection Fund which have any outstanding securities in the hands of the public.

These representations are made in order that judges of this Court may determine the need for recusal.

Kaitlyn E. Klass (D.C. Bar No. 1032219)
Elliott A. Milhollin (D.C. Bar No. 477322)
Hobbs, Straus, Dean & Walker, LLP
1899 L Street NW, Suite 1200
Washington, DC 20037
Phone: (202) 822-8282
kklass@hobbsstraus.com
emilhollin@hobbsstraus.com

May 11, 2020                    *Counsel for Amicus Curiae*

## INTEREST OF *AMICUS*[1]

*Amicus Curiae* is the United South and Eastern Tribes Sovereignty Protection Fund (USET SPF), which represents 30 federally recognized Tribal Nations from the Northeastern Woodlands to the Everglades and across the Gulf of Mexico.[2]  USET SPF was formed in 2014 as an affiliate of the United South and Eastern Tribes, Inc. to advocate on behalf of USET SPF's Tribal Nation members by upholding, protecting, and advancing their inherent sovereign authorities and rights.

---

[1] No counsel for any Party authored this brief in whole or in part, no Party or Party's counsel contributed money intended to fund preparation or submission of this brief, and no other person or entity other than *Amicus*, its members, and its counsel provided any monetary contribution to fund the preparation or submission of this brief.  Plaintiff is one of the 30 member Tribal Nations of USET SPF, but Plaintiff provided no funds towards the preparation or submission of this brief.

[2] USET SPF member Tribal Nations include: Alabama-Coushatta Tribe of Texas (TX), Aroostook Band of Micmac Indians (ME), Catawba Indian Nation (SC), Cayuga Nation (NY), Chickahominy Indian Tribe (VA), Chickahominy Indian Tribe–Eastern Division (VA), Chitimacha Tribe of Louisiana (LA), Coushatta Tribe of Louisiana (LA), Eastern Band of Cherokee Indians (NC), Houlton Band of Maliseet Indians (ME), Jena Band of Choctaw Indians (LA), Mashantucket Pequot Indian Tribe (CT), Mashpee Wampanoag Tribe (MA), Miccosukee Tribe of Indians of Florida (FL), Mississippi Band of Choctaw Indians (MS), Mohegan Tribe of Indians of Connecticut (CT), Narragansett Indian Tribe (RI), Oneida Indian Nation (NY), Pamunkey Indian Tribe (VA), Passamaquoddy Tribe at Indian Township (ME), Passamaquoddy Tribe at Pleasant Point (ME), Penobscot Indian Nation (ME), Poarch Band of Creek Indians (AL), Rappahannock Tribe (VA), Saint Regis Mohawk Tribe (NY), Seminole Tribe of Florida (FL), Seneca Nation of Indians (NY), Shinnecock Indian Nation (NY), Tunica-Biloxi Tribe of Louisiana (LA), and Wampanoag Tribe of Gay Head (Aquinnah) (MA).

Tribal Nations' inherent rights necessarily include, and our sovereign authorities are directly impacted by, the restoration of our homelands—carried out in part through trust acquisitions by the Department of the Interior (DOI) pursuant to the Indian Reorganization Act (IRA).  Restoration of Tribal Nations' homelands is an issue at the heart of USET SPF's advocacy work.

In March of 2020, DOI supplanted its longstanding legal framework for taking land into trust for Tribal Nations with a new legal standard and procedure that will significantly increase Tribal Nations' burdens in the lawful restoration of our homelands.  DOI's abrupt change in policy was made without notice to Tribal Nations and failed to include any tribal consultation.  Holding DOI and other federal agencies accountable for their tribal consultation duties is a priority for USET SPF.

USET SPF thus has a strong interest in the issues presented in this litigation, especially with regard to this Court's May 1, 2020 Order.  USET SPF provides this *amicus* brief to address issues not covered in the Parties' briefs, including the following: the ways in which DOI's policy-driven changed position contradicts its duty to interpret its IRA trust acquisition authority in the broadest way possible; Indian Country's shared longstanding reliance on DOI's previous position; DOI's failure to engage in the government-to-government tribal consultation mandated by Tribal Nations' sovereign governmental status and the trust obligations owed to us;

2

and the exceedingly important issue of restoration of Tribal Nations' homelands as reflected in the congressional intent of the IRA.  Through this analysis, USET SPF believes its brief will aid the Court in determining the relevance of DOI's withdrawal of its 2014 M-Opinion and issuance of new guidance as well as the relevance of cases upholding the reasoning in the 2014 M-Opinion, including *Confederated Tribes of the Grand Ronde Community of Oregon v. Jewell*.

## SUMMARY OF ARGUMENT

DOI in March of 2020 withdrew its 2014 M-Opinion, M-37029, and in a series of documents set forth a new legal standard and procedure for determining whether a Tribal Nation is eligible to acquire land into trust under the IRA by satisfying the IRA's first definition of "Indian" in light of the Supreme Court's decision in *Carcieri v. Salazar*.  DOI provided no reasoned explanation for its change, and it had no legal impetus to do so, as every court to examine the 2014 M-Opinion upheld it as reasonable.  DOI's action disrupted a settled process and legal standard that Tribal Nations have relied upon for a decade, introducing uncertainty and increased burdens on Tribal Nations.  Additionally, although DOI engaged in tribal consultation on the 2014 M-Opinion, DOI engaged in absolutely no tribal consultation on its decision to withdraw the 2014 M-Opinion and issue new guidance, despite the significant importance to Tribal Nations of DOI's IRA trust acquisition authority.  This lack of tribal consultation is particularly egregious

3

in light of the fact that DOI's changed position is policy-based rather than legally mandated.

## BACKGROUND

The IRA authorizes DOI to acquire land "for the purpose of providing land for Indians" and provides that title to such lands "shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired."  25 U.S.C. § 5108.  The term "tribe" is defined as "any Indian tribe, organized band, pueblo, or the Indians residing on one reservation."  *Id.* § 5129. The term "Indian" is defined to include three definitions, the first of which is: "all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction."  *Id.*  Even when DOI acquires land into trust for an "Indian tribe" rather than an "individual Indian," the Tribal Nation must include individuals meeting one of the IRA's definitions of "Indian."  *See Carcieri v. Salazar*, 555 U.S. 379, 393 (2009).

In 2009, the Supreme Court in *Carcieri v. Salazar* interpreted the IRA's first definition of "Indian," concluding the term "now" refers to the 1934 enactment date of the IRA.  555 U.S. at 382.  Therefore, according to the Supreme Court, tribes seeking to meet the IRA's first definition of "Indian" must have been under federal jurisdiction in 1934.

In a 2014 M-Opinion, DOI memorialized its framework for determining whether a Tribal Nation is eligible to acquire land into trust under the IRA by satisfying the IRA's first definition of "Indian" in light of the Supreme Court's decision in *Carcieri*.  DOI, M-37029, Memorandum, Meaning of "Under Federal Jurisdiction" for Purposes of the Indian Reorganization Act (Mar. 12, 2014) [hereinafter 2014 M-Opinion].  DOI's framework is based on a searching review of the legislative history surrounding enactment of the IRA and an honest reading of the Supreme Court's decision in *Carcieri*.  It takes into account congressional intent in the IRA to facilitate Tribal Nations' self-governance, including through restoration of Tribal Nations' homelands, and the Indian canon of construction.

In March of 2020, without any tribal consultation or advance notice, DOI withdrew the 2014 M-Opinion, and it set forth a new legal standard and procedure that it will utilize for determining whether a Tribal Nation satisfies the IRA's first definition of "Indian."[3]  This legal standard directly contradicts the legal standard

---

[3] DOI, Memorandum, Determining Eligibility for Land-into-Trust under the First Definition of "Indian" in Section 19 of the Indian Reorganization Act (Mar. 10, 2020); DOI, Memorandum, Procedure for Determining Eligibility for Land-into-Trust under the First Definition of "Indian" in Section 19 of the Indian Reorganization Act (Mar. 10, 2020) [hereinafter DOI Procedure Memorandum]; DOI, M-37055, Memorandum, Withdrawal of Solicitor's Opinion M-37209, "The Meaning of 'Under Federal Jurisdiction' for Purposes of the Indian Reorganization Act" (Mar. 9, 2020) [hereinafter M-37055]; DOI, Memorandum, Determining Eligibility under the First Definition of "Indian" in Section 19 of the Indian

in the 2014 M-Opinion in important ways, including by adding a new requirement

that courts across the country have held was explicitly not required by the Supreme

Court in *Carcieri*: that a tribe must demonstrate it was "recognized" as that term

was understood in 1934 in addition to being "under federal jurisdiction" in 1934.[4]

## ARGUMENT

### I.     NO REASONED EXPLANATION FOR CHANGED POSITION

A. <u>There is no legal impetus for DOI's changed position, as every court to examine the legal analysis set forth in the 2014 M-Opinion upheld it as reasonable.</u>

As DOI acknowledged when issuing its decision to withdraw the 2014 M-

Opinion and provide new guidance, when an agency changes its existing policies

or positions, it must provide a "reasoned explanation" for its change. Deputy

Solicitor Memorandum at 4 (citing *Encino Motorcars, LLC v. Navarro*, 136 S. Ct.

2117, 2125 (2016), *Nat'l Cable & Telecomms. Ass'n. v. Brand X Internet Servs.*,

545 U.S. 967, 981 (2005), and other cases).  According to the Supreme Court,

when an agency changes its position, it must "show that there are good reasons for

---

Reorganization Act of 1934 (Mar. 5, 2020) [hereinafter Deputy Solicitor Memorandum].

[4] This *amicus* brief does not address in full the changes between the 2014 M-Opinion and the new guidance, the ambiguities in the new guidance, or how the legal standard and procedure encompassed in the new guidance fail to comport with and reflect the IRA, the Supreme Court's *Carcieri* decision, and the many cases that have interpreted the IRA and the *Carcieri* decision.

the new policy." *Encino Motorcars, LLC*, 136 S. Ct. at 2126 (quoting *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009)).  Changes in position that are not adequately explained receive no deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984).  *Id.* (citing *United States v. Mead Corp.,* 533 U.S. 218, 227 (2001)).

DOI did not provide a reasoned explanation for its changed interpretation of the IRA's first definition of "Indian."  In its withdrawal, it stated the 2014 M-Opinion's "interpretation of Category I is not consistent with the ordinary meaning, statutory context, legislative history, or contemporary administrative understanding of the phrase 'recognized Indian tribe now under federal jurisdiction.'"  M-37055 at 2.  But this is simply not true.  In fact, in DOI's own brief responding to this Court's May 1, 2020 Order, DOI acknowledged it "did not deem the M-Opinion contrary to law."  Federal Def.'s Suppl. Brief, 7.

The legal analysis within the 2014 M-Opinion has been upheld as reasonable by every court to review it, including the D.C. Circuit.  *See, e.g., Stand Up for California! v. U.S. Dep't of Interior*, 204 F. Supp. 3d 212, 278 (D.D.C. 2016), *aff'd*, 879 F.3d 1177, 1183–86 (D.C. Cir. 2018), *cert. denied*, 139 S. Ct. 786 (2019); *Citizens for a Better Way v. U.S. Dep't of Interior*, No. 2:12-cv-3021-TLN-AC, 2015 WL 5648925, at *21–22 (E.D. Cal. Sep. 24, 2015), *aff'd sub. nom. Cachil Dehe Band of Wintun Indians v. Zinke*, 889 F.3d 584 (9th Cir. 2018); *Cent.*

*N.Y. Fair Bus. Ass'n v. Jewell*, No. 6:08-cv-0660, 2015 WL 1400384, at *6–8, *11 (N.D.N.Y. Mar. 26, 2015); *No Casino in Plymouth v. Jewell*, 136 F. Supp. 3d 1166, 1184 (E.D. Cal. 2015), *vacated on other grounds and remanded sub. nom.*, *No Casino in Plymouth v. Zinke*, 698 F. App'x 531 (9th Cir. 2017); *Cty. of Amador, Cal. v. U.S. Dep't of Interior*, 136 F. Supp. 3d 1193, 1200, 1207–10 (E.D. Cal. 2015), *aff'd*, 872 F.3d 1012 (9th Cir. 2017), *cert. denied*, 139 S. Ct. 64 (2018); *Confederated Tribes of the Grand Ronde Community of Oregon v. Jewell*, 75 F. Supp. 3d 387, 401–05 (D.D.C. 2014), *aff'd*, 830 F.3d 552, 564, 566 (D.C. Cir. 2016).  In one such example, the court said "the Secretary's interpretation is well-reasoned and properly draws on [the Bureau of Indian Affairs'] expertise with Indian affairs," describing it as "based on the background principles of Indian law, the history of relations between the United States and tribes, the purposes of the IRA, and the Indian canons of construction."  *Cent. N.Y. Bus. Ass'n*, 2015 WL 1400384 at *7.

In fact, many of the courts to review the 2014 M-Opinion awarded it *Chevron* deference.  *See, e.g.*, *Confederated Tribes of the Grand Ronde Community of Oregon*, 830 F.3d at 559–561 (applying two-step *Chevron* framework and deferring "to Interior's interpretation of the statute"); *No Casino in Plymouth*, 136 F. Supp. 3d at 1184 ("[T]he Court affords deference to the Department for the construction of its two-part inquiry for determining whether a tribe was under

federal jurisdiction in 1934."); *Cty. of Amador, Cal.*, 136 F. Supp. 3d at 1207–08 ("[T]he Court affords the Department deference for its promulgation of the two-part inquiry.") (citing *United States v. Mead Corp.*, 533 U.S. 218, 219 (2001). This is meaningful and reflects the legal importance of the 2014 M-Opinion, as agency opinions and memoranda are not always afforded this level of deference. *See Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000) ("Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference.").

DOI's own Interior Board of Indian Appeals has similarly upheld the legal analysis within the 2014 M-Opinion. *See, e.g., Grand Traverse Cty. Bd. of Comm'rs v. Acting Midwest Reg'l Dir.*, 61 IBIA 273, 280–81 (Sept. 25, 2015); *New York v. Acting E. Reg'l Dir.*, 58 IBIA 323, 332–34 (June 11, 2014); *Village of Hobart v. Acting Midwest Reg'l Dir.*, 57 IBIA 4, 20, 24–25 (May 9, 2013); *Shawano Cty. v. Acting Midwest Reg'l Dir.*, 53 IBIA 62, 74 (Feb. 28, 2011).

DOI's claim that it reversed its position because the 2014 M-Opinion was not consistent with the meaning of "recognized Indian tribe now under federal jurisdiction" failed to address why every court that has upheld the reasoning in the 2014 M-Opinion was wrong. Indeed, in its new guidance, DOI noted that "[t]he

9

courts to have considered it have consistently upheld [the 2014 M-Opinion's]

interpretation." Deputy Solicitor Memorandum at 7, n.61.

Thus, DOI had no legal reason to withdraw the 2014 M-Opinion. Its

decision therefore must have been guided by policy considerations, not the law.

USET SPF is concerned that DOI's change in policy is driven by a desire to

narrow its authority to take land into trust for Tribal Nations in a manner that is

inconsistent with congressional intent in the IRA to facilitate Tribal Nations' self-

governance and the reestablishment of our homelands. USET SPF is also

concerned that DOI's narrow reading does not comport with DOI's legal obligation

to interpret its trust acquisition authority under the IRA in the most expansive light

possible, required by the trust obligations owed to Tribal Nations and the Indian

canon of construction's requirement that ambiguous statues are construed in favor

of Tribal Nations.  *See, e.g., Montana v. Blackfeet Tribe,* 471 U.S. 759, 766

(1985); *Cty. of Oneida v. Oneida Indian Nation,* 470 U.S. 226, 247 (1985).

B. Tribal Nations' significant reliance interests counsel against DOI's
changed position.

A change in an agency's position is even more suspect when longstanding

policies have generated reliance interests, which DOI acknowledged in its new

guidance. Deputy Solicitor Memorandum at 4 (citing *Smiley v. Citibank (S.*

*Dakota), N.A.*, 517 U.S. 735 (1996)). According to the Supreme Court, when

explaining its changed position, "an agency must also be cognizant that

10

longstanding policies may have 'engendered serious reliance interests that must be taken into account.'"  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (quoting *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009)).

In fact, in its new March 9, 2020 M-Opinion interpreting the IRA's second definition of "Indian," DOI stated "an agency must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account."  DOI, M-37054, Memorandum, Interpreting the Second Definition of "Indian" in Section 19 of the Indian Reorganization Act of 1934, at 5 (Mar. 9, 2020) (citing *Encino Motorcars, LLC*, 136 S. Ct. at 2126).[5]  In that M-Opinion, DOI asserted that reliance interests were not present because it had only issued one decision under the IRA's second definition of "Indian" based on its previous interpretation.  *Id.*

That is not the case for the IRA's first definition of "Indian."  As DOI noted, since DOI in 2010 set forth the legal standard that was later enshrined in the 2014 M-Opinion, more than 80 Tribal Nations have received decisions regarding

---

[5] This M-Opinion pertains to DOI's interpretation of the IRA's *second* definition of "Indian" and is different from its withdrawal of the 2014 M-Opinion and issuance of new guidance interpreting the IRA's *first* definition of "Indian."

eligibility under this framework, Deputy Solicitor Memorandum at 2, and Tribal

Nations have strong reliance interests in that framework.[6]

The legal framework in the 2014 M-Opinion played an important role in

stabilizing DOI's trust acquisition process after the 2009 Supreme Court decision

in *Carcieri*.  That decision created tremendous confusion and instability across

Indian Country and made the effort to rebuild Tribal Nation homelands much more

complicated, costly, and time consuming.  The 2014 M-Opinion's framework has

reduced uncertainty and thereby reduced costs associated with trust acquisitions,

benefiting Indian Country and DOI alike.  DOI's changed interpretation 10 years

later disrupts that process, and it creates many ambiguities that will only create

more uncertainty and costs.[7]

_____

[6] As DOI recognized in its withdrawal, the 2014 M-Opinion adopted the analysis
and interpretive framework set forth in the 2010 record of decision for a trust
acquisition for the Cowlitz Indian Tribe.  M-37055 at 1 (citing U.S. Department of
Interior, Assistant Secretary – Indian Affairs, Record of Decision, Trust
Acquisition of, and Reservation Proclamation for the 151.87 acre Cowlitz Parcel in
Clark County, Washington, for the Cowlitz Indian Tribe at 77–106 (Dec. 17,
2010)); Deputy Solicitor Memorandum at 2.

[7] For example, language used to refer to the dispositive nature of evidence listed
under steps (1)-(3) is inconsistent throughout, making it unclear whether providing
only one type of evidence listed under steps (1)-(3) will be deemed sufficient and
making it unclear whether that evidence once submitted may be rebutted.  DOI
Procedure Memorandum at 1–8.  Additionally, the degree to which recognition and
under federal jurisdiction status once established are presumed to continue is
unclear for purposes of step (4).  *Id.* at 8–9.  And the very basic question of
whether Tribal Nations that have already received a determination under the 2014
M-Opinion will be required to proceed under the new guidance for future trust

## II.    NO TRIBAL CONSULTATION

A. <u>DOI has a duty to consult with Tribal Nations that grows from Tribal
Nations' status as sovereign governments and the trust obligations owed
to us.</u>

The United States has a duty to consult with Tribal Nations when

undertaking actions that affect us.  This duty is the result of Tribal Nations' status

as sovereign governments, the government-to-government relationship the United

States carries on with each Tribal Nation, and the trust obligations it owes each

Tribal Nation and Native person.

Tribal Nations are political, sovereign entities whose status stems from the

inherent sovereignty we possess as self-governing peoples predating the founding

of the United States.  *See Worcester v. Georgia*, 31 U.S. 515 (1832); *see also*

*Cherokee Nation v. Georgia*, 30 U.S. 1 (1831); *Johnson v. M'Intosh*, 21 U.S. 543

(1823).  The Supreme Court has recognized that, "[f]rom the commencement of its

existence [and following the practice of Great Britain before the revolution], the

United States has negotiated with the Indians in their tribal condition as nations."

*U.S. v. Forty-Three Gallons of Whiskey*, 93 U.S. 188, 196 (1876).  Tribal Nation

governments are thus one of the three forms of government recognized in the

--------------------------------

acquisitions remains unanswered.  *Id.* at 2 (stating "[e]ligibility determinations . . .
remain in effect" without clarifying whether those determinations apply to all
future trust acquisitions for particular Tribal Nation).  These are but a few of the
many ambiguities Tribal Nations will be forced to resolve under the new guidance.

13

United States Constitution.  *See* U.S. CONST. art. I, § 8, cl. 3 (containing Indian

Commerce Clause); U.S. CONST. art. I, § 2, cl. 3 (containing Indian non-taxation

portion of Apportionment Clause); *see also* U.S. CONST. art. II, § 2, cl. 2

(containing Treaty Clause).  As a result, Tribal Nations carry on a government-to-

government relationship with the United States based in diplomacy between

nations.  *See* H.R. REP. NO. 103-781, at 2 (1994) (describing federal recognition as

"formal political act" that "establishes a government-to-government relationship").

Tribal Nations are also owed unique trust obligations that grow from an

exchange of resources, often involuntary, that became the basis of the strength and

wealth of the United States.  Despite Tribal Nations' inherent sovereignty, the

United States has over time sought to take our resources, limit our ability to

exercise our inherently sovereign rights and authorities, and force our assimilation.

The size of the United States is 2.3 billion acres, which was once all Indian

Country.  By 1887, within the lifetime of our grandparents, residual Tribal

Nations' landholdings, often established by treaty, had been reduced to 138 million

acres.  That year, Congress passed the General Allotment Act (GAA), 25 U.S.C. §§

331 *et. seq.*, which further reduced Tribal Nations' landholdings to 48 million acres

by 1934—a loss of an additional 90 million acres.  COHEN'S HANDBOOK OF

FEDERAL INDIAN LAW § 15.07[1][a] (2012 ed.) (citing *Readjustment of Indian*

*Affairs: Hearings on H.R. 7902 Before the H. Comm. on Indian Affairs*, 73d Cong.

2d Sess. 16 (1934) (Memorandum of John Collier, Commissioner of Indian Affairs)); *see also* 73rd Cong. Rec. 11726 (daily ed. June 15, 1934) (statement of Rep. Howard).  After taking Tribal Nations' homelands, the United States in some instances placed us on reservations, often in remote areas with little or no resources or economies, and later reduced even those reservations' land bases.

In the end, this loss of land resulted in Tribal Nations lacking the necessary jurisdictional and economic resources to care for our people and left us heavily dependent on the federal government.  Inst. for Gov't Research, The Problem of Indian Administration (Lewis Meriam ed., Johns Hopkins Press 1928).  Of course, Indian Country's dramatic loss of land had an inverse effect of providing an extraordinary gain for non-Native people and the surrounding state, county, and local jurisdictions, which took control of the land.  As a result of these and other actions, the United States has taken on unique legal and moral trust and treaty obligations to Tribal Nations and Native people.  *Morton v. Mancari*, 417 U.S. 535, 552 (1974) (acknowledging United States through treaty making and other political actions "took possession of [Tribal Nations'] lands" and in exchange "assumed the duty of furnishing . . . protection"); *see also United States v. Jicarilla Apache Nation*, 564 U.S. 162, 176 (2011) (*quoting Seminole Nation v. United States*, 316 U.S. 286, 296–97 (1942)); *United States v. Kagama,* 118 U.S. 375, 384 (1886); *Cherokee Nation v. Georgia*, 30 U.S. 1, 10 (1831).

In recognition of both the government-to-government relationship between the United States and Tribal Nations and to implement its trust obligations, the Executive Branch has taken on a duty to consult with Tribal Nations on federal policies that have tribal implications.  Executive Order 13175, titled "Consultation and Coordination with Indian Tribal Governments," was issued in 2000.  Exec. Order No. 13175, 65 Fed. Reg. 67249 (Nov. 9, 2000).  It calls on federal officials to engage in regular and meaningful consultation and collaboration with tribal officials in development of "regulations, legislative comments or proposed legislation, and other policy statements or actions that have substantial direct effects on one or more Indian tribes, on the relationship between the Federal Government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes."  *Id.* § 1(a).

DOI has complied with this presidential mandate by enacting a tribal consultation policy.  Dep't of Interior, *Department of Interior Policy on Consultation with Indian Tribes* [hereinafter DOI Tribal Consultation Policy]; *see also* DEP'T OF INTERIOR, Sec. Order No. 3317, DEPARTMENT OF THE INTERIOR POLICY ON CONSULTATION WITH INDIAN TRIBES (2011).[8]  DOI's tribal consultation

---

[8] DOI's tribal consultation policy can be found here: https://www.doi.gov/sites/doi.gov/files/migrated/cobell/upload/FINAL-Departmental-tribal-consultation-policy.pdf.

policy requires tribal consultation for "[a]ny Department regulation, rulemaking, policy, guidance, legislative proposal, grant funding formula changes, or operational activity that may have a substantial direct effect on an Indian Tribe," including in matters related to lands and cultural practices, the ability of a Tribal Nation to govern or provide services to its citizens, a Tribal Nation's formal relationship with DOI, or DOI's trust obligations.  DOI Tribal Consultation Policy at 3.

Adherence to its tribal consultation duties honors the principles set forth in the United Nations Declaration on the Rights of Indigenous Peoples, to which the United States is a signatory.  G.A. Res. 61/295, United Nations Declaration on the Rights of Indigenous Peoples (Sept. 13, 2007).  The Declaration requires parties to "consult and cooperate in good faith with the indigenous peoples concerned through their own representative institutions in order to obtain their free, prior and informed consent before adopting and implementing legislative or administrative measures that may affect them."  *Id*. at art. 19.

Federal agencies now regularly engage in tribal consultation as part of their decision-making processes, including under President Trump's Administration. *See, e.g.,* 85 Fed. Reg. 27417 (May 8, 2020) (announcing Department of Health and Human Services, Administration for Children and Families' tribal

consultation); 85 Fed. Reg. 19017 (Apr. 3, 2020) (announcing Department of Interior, Bureau of Indian Affairs' tribal consultation).

B. <u>DOI's duty to consult with Tribal Nations extends to revocation of the 2014 M-Opinion and promulgation of new guidance interpreting the IRA's first definition of "Indian."</u>

DOI was required under Executive Order 13175 and its own tribal consultation policy, and in conformity with the principles of the United Nations Declaration on the Rights of Indigenous Peoples, to engage in tribal consultation when revoking and replacing the 2014 M-Opinion.

The legal standard and procedure DOI will employ when determining whether a Tribal Nation may acquire land into trust under the IRA have very serious tribal implications. The importance of the IRA and its use in restoring Tribal Nations' homelands cannot be overstated.

The IRA's main purpose was and is to facilitate Tribal Nations' self-governance, self-determination, and self-sufficiency in order to improve the lives of Native people. According to Congress, its overarching goal in enacting the IRA was "to rehabilitate the Indian's economic life and to give him a chance to develop the initiative destroyed by a century of oppression and paternalism." H.R. Rep. No. 1804, 73d Cong., 2d Sess., 6 (1934). The Supreme Court later explained that the IRA was designed with the "overriding purpose" of "establish[ing] machinery whereby Indian tribes would be able to assume a greater degree of self-

government, both politically and economically." *Morton v. Mancari*, 417 U.S. 535,

542 (1974); *see also Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 152 (1973).

Chief among the IRA's purposes was the goal to rebuild Tribal Nations'

land bases following nearly 200 years of systematic dispossession, discussed

above, from which Indian Country is still reeling.  In order to chart a new course, a

central feature of the IRA intended to strengthen Tribal Nations' self-government

and self-sufficiency was a set of provisions aimed at protecting and rebuilding

Tribal Nations' land bases, including authorizing DOI to acquire land into trust for

Tribal Nations.  25 U.S.C. § 5108.

Regaining a land base is essential to Tribal Nations' exercise of self-

government.  When the federal government holds land in trust for a Tribal Nation,

the Tribal Nation is able to exercise jurisdiction over the land, including over

individuals' actions and over taxation.  *See* 18 U.S.C. § 1151 (defining "Indian

Country").  This jurisdiction allows the Tribal Nation to protect its people and to

generate economic growth, which in turn encourages the flourishing of the Tribal

Nation's cultural practices.  United States courts have determined that, even when

a Tribal Nation uses its own funds to purchase title to land, the Tribal Nation may

not be permitted to exercise jurisdiction over the land without something more,

often taking the form of trust acquisition.  *See, e.g., City of Sherrill, N.Y. v. Oneida

Indian Nation of New York*, 544 U.S. 197 (2005) (holding based on "equitable"

19

considerations that Tribal Nation lacked jurisdiction over its fee land even within boundaries of its not-disestablished reservation).  Thus, the IRA provides Tribal Nations an avenue to gain jurisdiction over our land.  *See id.* at 221 ("[The IRA] provides the proper avenue for [the Tribal Nation] to reestablish sovereign authority. . . .").  Jurisdiction over territory is a bedrock principle of sovereignty, and Tribal Nations must exercise such jurisdiction in order to fully implement the inherent sovereignty we possess.  Just as states exercise jurisdiction over their land, Tribal Nations must also exercise jurisdiction.  Additionally, some federal programs are available only on reservation or trust lands.[9]

However, in many ways the IRA has yet to be fully implemented.  With respect to land, only a small portion of the 90 million acres that were lost following the 1887 enactment of the GAA have been repatriated: *less than 10 percent*.[10]  And

---

[9] Bureau of Indian Affairs, *Fee to Trust*, https://www.bia.gov/bia/ots/fee-to-trust (last visited May 10, 2020) (stating "[a]cquisition of land in trust is essential to tribal self-determination" and many of special programs and services federal government is obligated to provide to Tribal Nations "are available only on reservations or trust lands").

[10] According to the Bureau of Indian Affairs, approximately 56.2 million acres of land are currently held in trust by the United States for Tribal Nations and individual Native people.  Bureau of Indian Affairs FAQ, What is a federal Indian reservation?, http://www.bia.gov/FAQs/ (last visited May 10, 2020); *see also Executive Branch Authority to Acquire Trust Lands for Indian Tribes*: *Oversight Hearing Before the S. Comm. on Indian Affairs,* 111th Cong. (2009) (testimony of National Congress of American Indians).

that does not account for the countless millions of acres lost prior to 1887 under different, but equally damaging, colonial, state, and federal policies and actions.

For these reasons, DOI's interpretation of its scope of authority to acquire trust land under the IRA affects Tribal Nations greatly.  DOI's legal standard and procedure have substantial direct effects on Tribal Nations, on the relationship between the federal government and Tribal Nations, and on the distribution of power and responsibilities between the federal government and Tribal Nations, triggering tribal consultation duties under Executive Order 13175.  They also have substantial direct effects on Tribal Nations related to our lands, resources, and cultural practices, to our ability to govern and provide services to our citizens, to our relationship with DOI, and to DOI's trust obligations, triggering tribal consultation duties under DOI's tribal consultation policy.

Further, because DOI's changed position is clearly based on a shift in policy, tribal consultation is even more clearly required.  Exec. Order No. 13175, § 1(a), 65 Fed. Reg. 67249 (Nov. 9, 2000) (requiring tribal consultation on "policy statements or actions that have substantial direct effects"); DOI Tribal Consultation Policy at 3 (requiring tribal consultation on "policy . . . that may have a substantial direct effect").  That DOI was not acting under a legal mandate—much less a time sensitive one—makes the lack of tribal consultation even more egregious.

21

C. <u>DOI consulted on the 2014 M-Opinion because it was required to do so.</u>

In recognition of its tribal consultation duties, DOI carried out extensive tribal consultation after the Supreme Court's 2009 *Carcieri* decision and before ultimately issuing the 2014 M-Opinion.  On June 9, 2009, DOI issued a Dear Tribal Leader Letter announcing tribal consultation sessions and inviting comments, stating the consultation was "[i]n keeping with Interior's commitment on government-to-government consultation."  Letter from Larry Echo Hawk, Assistant Secretary – Indian Affairs, to Tribal Leaders (June 9, 2009).  Three consultation sessions were held in June and July of 2009, in which the Assistant Secretary – Indian Affairs, the Solicitor, the Director of the Bureau of Indian Affairs, and other high-ranking officials participated.[11]  DOI officials came to speak with USET SPF directly during this process.  *Id.* (describing USET *Carcieri* Strategy Session on May 12, 2009).  They also spoke to tribal leaders in other settings, such as during conferences.

As DOI has openly acknowledged, it did not engage in any tribal consultation ahead of revoking the 2014 M-Opinion and issuing new guidance. When USET SPF became aware of rumors that DOI might take action on the 2014

---

[11] *See* Tribal Consultations Archives, Indian Affairs, Dep't of Interior, *available at* https://www.indianaffairs.gov/as-ia/consultations/tribal-consultations-archive (providing summaries of tribal consultation sessions under heading "*Carcieri v. Salazar*").

M-Opinion, USET SPF reached out to DOI but was not provided answers.  Instead, DOI claims tribal consultation was not necessary.  That is clearly not so.

Rather, DOI revoked the 2014 M-Opinion and issued new guidance in the dead of night without so much as an announcement, let alone notice and comment or consultation.  DOI failed to provide Tribal Nations proper notice of its withdrawal of the 2014 M-Opinion and issuance of new guidance via a Dear Tribal Leader Letter, instead posting the documents on its website for Tribal Nations to find on our own.  To make matters worse, DOI chose to move forward in releasing this important and potentially devastating decision despite the COVID-19 pandemic, when Tribal Nations were devoting all of our resources to caring for the health and safety of our people.

D. <u>DOI must employ the same procedures it utilized when issuing the 2014 M-Opinion when revoking or changing the 2014 M-Opinion.</u>

When an agency engages in rulemaking, it must engage in that same rulemaking process to do away with or amend its previous position.  *See Columbia Falls Aluminum Co. v. E.P.A.*, 139 F.3d 914, 919 (D.C. Cir. 1998) (stating final agency rule may only be amended "through new rulemaking"); *see also Romeiro de Silva v. Smith*, 773 F.2d 1021, 1025 (9th Cir. 1985) (upholding agency amendment to operations instruction when agency "amend[ed] the old instruction in the same way it was originally promulgated").

M-Opinions are considered the "law of the Department." *Rocky Mountain Oil & Gas Ass'n v. Andrus*, 500 F. Supp. 1338, 1341–42 (D. Wyo. 1980), *rev'd on other grounds and remanded*, 696 F.2d 734 (10th Cir. 1982). When agency decisions are intended to have the force of the law, they are afforded *Chevron* deference. *Citizens Exposing Truth About Casinos v. Kempthorne*, 492 F.3d 460, 466–67 (D.C. Cir. 2007) (affording *Chevron* deference to DOI's gaming eligibility determination for Tribal Nation's land because determination "was intended to have the force of law, as it formed the basis for the Secretary's decision under the IRA to acquire the property in trust"). In recognition of its legal significance, as discussed above, courts have awarded *Chevron* deference to the 2014 M-Opinion, indicating that it has the force of law within DOI.

Thus, in order to undo the 2014 M-Opinion, DOI was required to engage in the same procedure—including tribal consultation—it used to create the 2014 M-Opinion.

## CONCLUSION

DOI failed to provide a reasoned explanation for its change in position, asserting incorrectly that the 2014 M-Opinion's "interpretation [of the IRA's first definition of "Indian"] is not consistent with the ordinary meaning, statutory context, legislative history, or contemporary administrative understanding of the phrase 'recognized Indian tribe now under federal jurisdiction.'" This statement

fails to address why every court that has upheld the reasoning in the 2014 M-Opinion is wrong, and it does not meet the criteria of a reasoned explanation. Tribal Nations' significant reliance interests in the decade-old framework enshrined in the 2014 M-Opinion further solidifies the inadequacy of DOI's justification.

In the course of executing its policy-driven change, DOI failed to engage in any form of tribal consultation.  The legal standard and procedure carried forth in DOI's new guidance are extremely important to Indian Country, as DOI will use them in measuring its authority to restore Tribal Nations' homelands pursuant to the IRA.  Rather than consult with and provide notice to Tribal Nations, DOI posted the potentially devastating decision to its website amid the COVID-19 pandemic with no notice to Tribal Nations.  This is simply unacceptable and does not reflect the government-to-government relationship the United States has with sovereign Tribal Nations nor the trust obligations it owes to Tribal Nations.

Respectfully Submitted,

May 11, 2020

By: /s/ Kaitlyn Klass
Kaitlyn E. Klass (D.C. Bar No. 1032219)
Elliott A. Milhollin (D.C. Bar No. 477322)
Hobbs, Straus, Dean & Walker, LLP
1899 L Street NW, Suite 1200
Washington, DC 20037

Phone: (202) 822-8282
kklass@hobbsstraus.com
emilhollin@hobbsstraus.com

*Counsel for Amicus Curiae*