## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MASHPEE WAMPANOAG TRIBE,

        Plaintiff,

        v.

DAVID L. BERNHARDT, in his official capacity as
Secretary of the Interior, and UNITED STATES
DEPARTMENT OF THE INTERIOR,

        Case No. 1:18-cv-02242-PLF

        Federal Defendants,

        v.

DAVID LITTLEFIELD, *et al.*,

        Intervenor-Defendants.

## BRIEF OF MEMBERS OF CONGRESS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF

### INTEREST OF *AMICI CURIAE*

*Amici curiae* Representatives Deb Haaland and Tom Cole, Senators Elizabeth Warren and Edward J. Markey, as well as Representatives Bill Keating, Joe Kennedy III, Betty McCollum, Ruben Gallego, Lori Trahan, Derek Kilmer, Rashida Tlaib, Ayanna Pressley, Pramila Jayapal, Susan A. Davis, Sharice L. Davids, Stephen F. Lynch, James P. McGovern, Darren Soto, Raúl M. Grijalva, Alexandria Ocasio-Cortez, Katherine M. Clark, Kendra S. Horn, Veronica Escobar, Gwen Moore, and Jared Huffman respectfully submit this brief in support of Plaintiff Mashpee Wampanoag Tribe.[1] The United States Constitution grants plenary and exclusive authority to

---

[1] No counsel for a party authored this brief in whole or in part, and no person or entity other than *amici*, their members, or their counsel made any monetary contribution toward the preparation or submission of this brief.

Congress over Indian tribes and ensures that each Branch of Government does not impede on the powers of another. *Amici* are bipartisan Members of the United States Senate and United States House of Representatives with significant interest in Indian affairs, integrity of the separation of powers, and protecting procedural safeguards guiding the tribal land into trust process, as well as safeguarding Congress' authority to directly oversee Indian affairs. Here, an Agency of the Executive Branch has infringed on the powers of Congress by attempting to exert, unlawfully, power not delegated to it by Congress. Accordingly, *Amici* submit this brief to explain the legal errors made by the Secretary.

## **INTRODUCTION**

On March 27, 2020, Secretary of the Department of Interior ("Department") David Bernhardt ("Secretary") purported to instruct the Director of the Bureau of Indian Affairs ("BIA") to "rescind the Decision whereby the BIA accepted land into trust for [the Mashpee Wampanoag] Tribe,"[2] Plaintiff here, and revoke the proclamation establishing Mashpee land as reservation land. This is a most extraordinary and disturbing act.

The entire trust process, adopted in 1934, was created by Congress to stop the shameful practice of dispossessing tribes from their homelands and to ensure tribal trust land would be protected in perpetuity. Indeed, the Department's own website proclaims, "Taking land into trust is one of the most important functions Interior undertakes on behalf of the tribes . . . . Through the protection and restoration of tribal homelands, this Administration has sought to live up to the

---

[2] Letter from David Bernhardt, Secretary of Interior, to Director, Bureau of Indian Aff. and Eastern Regional Director, Bureau of Indian Aff. (Mar. 27, 2020).

standards Congress established eight decades ago and indeed to reinvigorate the policies underlying the Indian Reorganization Act."[3]

As explained in this *amicus* brief, it is settled law that Congress, not the Executive, has authority over Indian Affairs—authority that the Supreme Court has described as not only plenary but *exclusive*. When it comes to Indian lands, congressional power is at its apex and the Executive Branch is forbidden to disturb tribal lands unless Congress has directed or permitted it in clear and unambiguous terms.

Here, however, the Secretary acted without any congressionally-delegated authority whatsoever. It is undoubtedly true that the Indian Reorganization Act delegates power to the Secretary to take land *into* trust, but nowhere does the Act so much as hint that the Secretary is empowered to *remove* land from trust status or vacate a determination to treat such lands as reservation lands. But by rescinding the order to take the Tribe's land into trust—an order issued nearly five years ago—that is precisely, in effect, what the Secretary purports to do here. Moreover, nothing in the legal proceedings in the *Littlefield v. Mashpee Wampanoag Indian Tribe* (*Littlefield II*), 951 F.3d 30 (1st Cir. 2020), empowers the Secretary to remove Mashpee land from trust status or justifies it.

Congress' exclusive role in Indian affairs is at stake. It is imperative that this Court prevent such a naked arrogation of congressional power by an Executive Branch official. Fidelity to our Constitution's conception of separation of powers requires it.

The basis for the Secretary's action demonstrates an additional and equally startling affront to congressional authority. As this *amicus* brief will discuss, the Mashpee put forward in their

---

[3] *Fee to Trust*, Bureau of Indian Aff., https://www.bia.gov/bia/ots/fee-to-trust (last visited May 18, 2020).

petition to the Secretary substantial and compelling evidence that Congress had continually viewed the Mashpee Tribe as under federal superintendency. The Secretary chose to ignore this evidence. Failing to give appropriate deference to such persuasive manifestation of congressional acknowledgement of federal jurisdiction is yet another gross and intolerable usurpation of congressional authority and prerogative.

## BACKGROUND

Following a three decades long process, the Tribe achieved formal federal recognition in 2007. *See* 72 Fed. Reg. 8007.[4], [5] Seeking to establish a reservation homeland that would be protected in perpetuity, the Tribe submitted a "fee-to-trust" application that same year requesting the Secretary place land into trust and proclaim a reservation pursuant to the Indian Reorganization Act of 1934 ("IRA"). AR0005089.[6]

Congress enacted the IRA to end the failed policy of allotment and restore land to Indian tribes. *Hodel v. Irving*, 481 U.S. 704, 708 (1987) (citing 25 U.S.C. § 5108). Through allotment, more than 90 million acres of tribal lands were lost, amounting to approximately two-thirds of the total land held by Indian tribes less than half a century before. *Brendale v. Confederated Tribes & Bands of Yakima Indian Nation*, 492 U.S. 408, 436 n.1 (1989). "Within a generation or two, it was

---

[4] *See* U.S. Dep't of the Interior, Associate Deputy Secretary, Summary under the Criteria and Evidence for Final Determination for Federal Acknowledgment of the Mashpee Wampanoag Indian Tribal Council, Inc. (Feb. 15, 2007) ("Mashpee FD"); Final Determination for Federal Acknowledgment of the Mashpee Wampanoag Indian Tribal Council, Inc. of Massachusetts, 72 Fed. Reg. 8007 (Feb. 22, 2007).

[5] The Bureau of Indian Affairs' administrative acknowledgement process is done pursuant to the Federal acknowledgment regulations (25 C.F.R. Part 83). Federal acknowledgment of a group as an Indian tribe establishes a government-to-government relationship between the United States and an Indian tribe and is a prerequisite to the protection, services, and benefits of the Federal government available to Indian tribes by virtue of their status as Indian tribes.

[6] This brief cites to the bates stamps on the documents contained in the joint appendix filed by the parties. ECF No. 39.

thought, the tribes would dissolve, their reservations would disappear, and individual Indians would be absorbed into the larger community of white settlers." *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 335 (1998). To reverse these atrocities and advance tribes toward self-governance and economic sustainability, Congress recognized that it had to restore the dramatic and massive loss of tribal homelands. *County of Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation*, 502 U.S. 251, 255 (1992). Accordingly, one key provision of the IRA was Section 5, now codified at 25 U.S.C. § 5108, providing, in pertinent part, that "[t]he Secretary of the Interior is authorized, in his discretion, to acquire . . . any interest in lands, water rights, or surface rights to lands, within or without existing reservations, including trust or otherwise restricted allotments, whether the allottee be living or deceased, for the purpose of providing land for Indians." *Id.* Additionally, "[t]itle to any lands or rights acquired pursuant to this Act . . . shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired." *Id.*

As most recently amended in November 2012, the Tribe's application requested Secretary Sally Jewell to acquire and accept into trust about 170 acres in Mashpee, Barnstable County, Massachusetts, and about 151 acres in Taunton, Bristol County, Massachusetts. AR0005230. On September 18, 2015, the Secretary issued a record of decision ("2015 ROD") finding that she had authority to grant the Tribe's application and acquire the land in trust for the Tribe because, *inter alia*, the Tribe met the IRA's second definition of "Indian" under 25 U.S.C § 5129. AR0005223-5362. On November 10, 2015, the Department acquired trust title to the lands for the benefit of the Tribe and proclaimed the land to be the Tribe's reservation shortly thereafter. *See* 81 Fed. Reg. 948 (Jan. 8, 2016).

On February 4, 2016, a group of Taunton residents (the "Littlefield Plaintiffs") challenged the Secretary's 2015 ROD in the U.S. District Court for the District of Massachusetts. *Littlefield v. U.S. Dep't of the Interior*, No. 16-CV-10184 (D. Mass. filed Feb. 4, 2016). The parties cross-moved for summary judgment, and on July 28, 2016, the district court found that the Secretary lacked authority to acquire land into trust on behalf of the Tribe under the IRA's second definition of "Indian." *Littlefield v. U.S. Dep't of the Interior* (*Littlefield I*), 199 F. Supp. 3d 391, 400 (D. Mass. 2016) (as clarified by Order dated October 12, 2016 (ECF No. 121)). However, since the Department had not determined the Tribe's eligibility under the IRA's first definition of "Indian," the court remanded the matter to the Secretary for further proceedings.

On December 6, 2016, the Department invited the parties to submit additional evidence on whether the Tribe was under federal jurisdiction in 1934, AR0005091-92, and on December 8, 2016, both the Department and the Tribe appealed the *Littlefield* decision to the United States Court of Appeals for the First Circuit. *Littlefield*, No. 16-CV-10184 (ECF 131; ECF 132). Yet on April 27, 2017, shortly after Secretary Ryan Zinke took office, the Secretary voluntarily dismissed his appeal in *Littlefield*, without providing an explanation to the court. *Littlefield II*, 951 F.3d at 34.

On September 7, 2018, the Department issued a new decision ("2018 ROD") finding that the Tribe was not under federal jurisdiction in 1934 and did not qualify to have its land taken into trust under the IRA's first definition of "Indian." AR0005088-5115. On September 27, 2018, the Tribe filed the present action challenging the Secretary's 2018 ROD and the Littlefield Plaintiffs intervened. All parties cross-moved for summary judgment.

Meanwhile, on February 27, 2020, a First Circuit panel affirmed the July 28, 2016 district court decision in *Littlefield I. Littlefield II*, 951 F.3d at 41. The Tribe did not petition for a panel

rehearing or a rehearing *en banc*, though the Tribe has until July 27, 2020 to file a petition for *certiorari*.[7]

Despite the ongoing litigation and despite the district court specifically limiting its holding to the Tribe's eligibility to have its land taken into trust under the IRA's second definition of "Indian,"[8] through a letter dated March 27, 2020, the current Secretary gave the BIA the following order: "To ensure compliance with the First Circuit's Mandate, I direct your office to rescind the Decision whereby the BIA accepted land into trust on behalf of the Tribe, and to revoke the reservation proclamation."

The Tribe filed an emergency motion for a temporary restraining order and preliminary injunction on March 30, 2020, to enjoin the Secretary from taking its land out of trust and revoking the 2015 reservation proclamation until the present action is resolved. Seeking to avoid a future where the changing of the Secretary can undo more than eight decades of Congress' actions to protect tribal lands in perpetuity through the trust process, undersigned Members of Congress submit this *amicus* brief.

## ARGUMENT

## I.     THE SECRETARY LACKS AUTHORITY TO REMOVE LAND FROM TRIBAL TRUST STATUS.

### A.     Congress' authority over Indian affairs and the determination of the land status of Indian tribes is plenary and exclusive.

---

[7] In light of the COVID-19 pandemic, the Supreme Court extended the deadline to file any petition for writ of certiorari due on or after March 19, 2020, to 150 days from the date of the lower court judgment. *See* Supreme Court Order No. 589.

[8] *See* Order, ECF No. 121 at 3 ("Having remanded this matter to the Secretary, it is no violation of the Court's order should the agency wish to analyze the Mashpees' eligibility under the first definition of 'Indian' provided in Section 479, or to reassess the Mashpees' eligibility under the second definition consistent with the Court's ruling on the proper interpretation of that definition.")

It is a settled and central axiom of Federal Indian law that the "Constitution grants Congress broad general powers to legislate in respect to Indian tribes, powers that we have consistently described as 'plenary and exclusive.'" *United States v. Lara*, 541 U.S. 193, 200 (2004) (citations omitted); *see also id.* ("Congress' legislative authority would rest in part, not upon 'affirmative grants of the Constitution,' but upon the Constitution's adoption of preconstitutional powers necessarily inherent in any Federal Government, namely, powers that this Court has described as 'necessary concomitant of nationality.'" (quoting *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 315 (1936)); *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 192 (1989) ("[T]he central function of the Indian Commerce Clause is to provide Congress with plenary power to legislate in the field of Indian affairs."). Through this power, Congress in the first instance—not the Executive Branch—has the authority to acquire lands in trust for the benefit of Indian tribes. *See, e.g.*, *City of Roseville v. Norton*, 219 F. Supp.2d 130, 155 (D.D.C. 2002) ("The power to acquire land in trust for the Indians lies with Congress, and is not an executive power.").

It is true, of course, that Congress may delegate its authority to the Executive Branch, but the Constitution and its system of separated powers mandate that "Congress lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform." *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (citation omitted). Consequently, the Secretary may not exercise control over Indian affairs without such a delegation of authority from Congress. *See Alaska v. Native Village of Venetie Tribal Gov't*, 522 U.S. 520, 531 n.6 (1998) ("Because Congress has plenary power over Indian affairs, . . . some explicit action by Congress (or the Executive, *acting under delegated authority*) must be taken to create or to recognize Indian country." (emphasis added)); *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 59 (1974) (recognizing that where Congress has plenary authority, it may

delegate significant portions of this power to the Executive); *Sioux Tribe of Indians v. United States*, 316 U.S. 317, 326 (1942) ("Since the Constitution places the authority to dispose of public lands exclusively in Congress, the executive's power to convey any interest in these lands must be traced to Congressional delegation of its authority."). As we will discuss with more specificity below, Congress has not delegated the power to the Secretary to *remove* land from trust status. Put another way, by purporting to take the Mashpee Tribe's land out of trust, the Secretary has invaded the province of Congress to exercise its well-recognized *plenary* and *exclusive* authority.

> **B.    Congress has not delegated to the Secretary the authority to take tribal land out of trust status.**

Plainly, through 25 U.S.C. § 5108, Congress properly delegated its constitutionally derived power to acquire property in trust for Indian tribes to the Secretary. *Mich. Gambling Opposition v. Kempthorne*, 525 F.3d 23, 33 (D.C. Cir. 2008) ("We thus hold, relying upon the text, structure, and purpose of the IRA, as well as the context of its enactment, that section [5108] contains an intelligible principle and that it is not an unconstitutional delegation of legislative authority."). "This delegation allows the Secretary to choose which land is to be taken into trust but only within the guidelines expressed by Congress." *Confederated Tribes of Siletz Indians of Or. v. United States*, 110 F.3d 688, 694 (9th Cir. 1997). These guidelines—the "intelligible principle" required by the Supreme Court's precedents—include, but are not limited to, "promot[ing] economic development among American Indians, with a special emphasis on preventing and recouping losses of land caused by previous federal policies." *Mich. Gambling Opposition*, 525 F.3d at 33; *Norton*, 219 F. Supp.2d at 156 (recognizing that Congress' policy of advancing the economic development of tribes was sufficient guidance to limit the Secretary's authority for taking land into trust); *South Dakota v. U.S. Dept. of Interior*, 423 F.3d 790, 799 (8th Cir. 2005) ("[W]e conclude that an intelligible principle exists in the statutory phrase 'for the purpose of providing land for

Indians' when it is viewed in the statutory and historical context of the IRA."). Accordingly, because "Congress has given guidelines to the Secretary regarding when land can be taken in trust . . . the Secretary is *not empowered* to act outside of the guidelines expressed by Congress." *Norton*, 219 F. Supp.2d at 156 (emphasis added) (citation omitted).

What is equally clear is that nowhere in Section 5108—or elsewhere—does Congress delegate to the Secretary the power to take land out of trust status. Yet, that is precisely what the Secretary purports to do in this case. *See, e.g.*, Fed. Defs.' Mem. Opp. to Pl.'s Mot. Summ. J. 6, ECF No. 50 ("The Secretary instructed BIA to transfer the parcels out of trust."). But the Secretary has not identified any congressional delegation of power to *remove* the Tribe's land from trust.

Moreover, that the Secretary has the ability to exercise authority delegated by Congress to make a decision does not mean the Secretary has been delegated the authority to subsequently rescind that decision. The Supreme Court's decisions in *North Dakota v. United States*, 460 U.S. 300 (1983), and *Cochnower v. United States*, 248 U.S. 405 (1919), are particularly instructive. In *North Dakota*, Congress authorized the federal government to acquire land for use as migratory-bird sanctuaries, subject to state approval. *North Dakota*, 460 U.S. at 314. As required by federal statute, North Dakota approved the acquisition of 1.5 million acres of wetlands, but later attempted to revoke that consent. *Id*. Finding that nothing in the statute authorized North Dakota to withdraw previously-given approval, the Court concluded it could not. *Id*. Similarly, given that nothing in the IRA permits the Secretary to unilaterally "revoke his consent" to acquire land in trust, he is barred from doing so. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013) ("[I]t would be improper to conclude that what Congress omitted from the statute is nevertheless within its scope."); *League of Conservation Voters v. Trump*, 363 F. Supp.3d 1013, 1020-21 (D. Alaska 2019) (reasoning that, because statute "refers only to the withdrawal of land" and "does not

expressly authorize the President to revoke a prior withdrawal[,] Congress appears to have expressed one concept—withdrawal—and excluded the converse—revocation").

Similarly compelling, in *Cochnower*, the petitioner challenged the reduction of his pay under a statute that authorized the Secretary of Treasury to "increase and fix" compensation. *Cochnower*, 248 U.S. at 406. The Court reasoned that by "express[ing] clearly the power to 'increase'" compensation, Congress did not confer the "opposite power" to decrease compensation. *Id.* at 407-08, *modified by Cochnower v. United States*, 249 U.S. 588 (1919) (directing court to enter judgment for the difference). Consequently, if Congress had intended to grant the authority to take lands out of trust, "Congress would have spelled out such a rule instead of spelling out its opposite." *Sims v. Hous. Auth. of El Paso*, No. EP-10-CV-109-KC, 2010 WL 3221790, at *3 (W.D. Tex. Aug. 13, 2010); *see also Am. Bus Ass'n v. Slater*, 231 F.3d 1 (D.C. Cir. 2000) (Sentell, J., concurring) ("But Congress's failure to grant an agency a given power is not an ambiguity as to whether that power has, in fact, been granted. On the contrary, and as this Court persistently has recognized, a statutory silence on the granting of a power is a *denial* of that power to the agency." (collecting cases)).

Moreover, any ambiguity in the plain language of Congress' delegation of authority must be construed in favor of the Tribe. *See County of Yakima*, 502 U.S. at 269; *Bryan v. Itasca County*, 426 U.S. 373, 392 (1976). This is particularly so given that the Supreme Court has repeatedly held that, regarding matters affecting Indians, when faced with two possible constructions of law, the court's construction must be "construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *County of Yakima*, 502 U.S. at 269 (citation omitted).

Simply put, Congress did not authorize the Secretary through the IRA, or any other provision of federal law, to remove the Tribe's land from trust. Therefore, by purporting to take

Mashpee's land out of trust, the Secretary is brazenly invading the province of Congress and acting unlawfully.

> **C.    No court has ordered the Secretary to rescind his decision to take the Tribe's land into trust.**

This is also not an instance where the Secretary is required to treat land as non-trust land because a court has ordered that the order to take land into trust was *void ab initio*. While exceedingly rare, a few courts have invalidated a Secretary's acquisition of trust land. *See, e.g.*, *Carcieri v. Salazar*, 555 U.S. 379 (2009); *Crawford-Hall v. United States*, 394 F. Supp. 3d 1122 (C.D. Cal. 2019). But none of them have involved concurrent litigation over the validity of the Secretary's final determination. Although the First Circuit considered parts of the Secretary's decision here, it did not dispositively resolve the case.

To argue otherwise, the Secretary mischaracterizes the order of the First Circuit by claiming that it required him to remove the Tribe's land from trust. It did no such thing. The First Circuit, being *fully aware* of the Tribe's challenge in this Court, carefully limited its order to only address the Secretary's determination of the IRA's second definition of "Indian." *Littlefield II*, 951 F.3d at 36 ("The challenge in D. C. to the agency's 2018 decision does not involve the issue before us."). The First Circuit did not opine on the pending litigation in this Court—whether the Tribe meets the IRA's first definition—and did not order the Secretary to remove the Tribe's land from trust. Any other interpretation of the court's mandate would be impracticable and unjust because, in effect, the Tribe's land would be taken out of trust before this Court had an opportunity to determine whether the Secretary's initial decision was valid. *See, e.g.*, *Gibralter Sav. v. Ryan*, No. 8903297-OG, 1990 WL 484155, at *6 (D.D.C. July 10, 1990) (manifestly unjust to deny an individual a day in court); *Canning v. NLRB*, 823 F.3d 76, 80 (D.C. Cir. 2016) ("[A] mandate is to be interpreted reasonably and not in a manner to do injustice." (citation omitted)).

Finally, and perhaps most importantly, the *Littlefield* case is not at its end. The Tribe by right can seek certiorari until late July. Whatever the Supreme Court decides to do, there is plenty more to be litigated either there or before the district court. In short, nothing from the First Circuit requires or empowers the Secretary to remove the Tribe's land from trust status.

## II.   THE SECRETARY UNJUSTIFIABLY DISREGARDED CLEAR EVIDENCE OF CONGRESSIONAL RECOGNITION THAT THE TRIBE WAS UNDER FEDERAL JURISDICTION IN 1934.

### A.   The Secretary's authority to take land into trust is dictated by whether the federal government has responsibility for or authority over a tribe.

As discussed above, Congress' power over Indian affairs is plenary and exclusive, *see, e.g.*, *Lara*, 541 U.S. at 200, and the Supreme Court has held that Congress' plenary authority here is inherent in the constitutional structure and rests in part upon the Constitution's adoption of preconstitutional powers necessarily inherent in any national government. *Id*. at 201. The Secretary's authority to take land into trust under the IRA was granted by Congress pursuant to this plenary power.

The Secretary's ability to take land into trust for an Indian tribe turns on whether the tribe meets the definition of "Indian" as defined in Section 19. *See* 25 U.S.C. § 5108; *see also Carcieri*, 555 U.S. at 387-88. Section 19 provides three definitions of Indian, but, relevant here, states that "[t]he term 'Indian'. . . shall include all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction." 25 U.S.C. § 5129. *Carcieri* clarified that the phrase "now under Federal jurisdiction" means that a tribe must have been under federal jurisdiction in 1934, the year the IRA was passed, in order to qualify under the definition of "Indian." 555 U.S. at 395. But the Court did not address the meaning of the phrase "under Federal

jurisdiction." *Id.* at 382, 392.[9] In response, on March 12, 2014, the Solicitor for the Department issued Solicitor Opinion M37029 (the "M-Opinion"), outlining the Department's two-part procedure for determining whether a tribe was "under federal jurisdiction" in 1934 for purposes of the IRA.

Correctly noting that the meaning of "under federal jurisdiction" "should be understood against the backdrop of basic principles of Indian law," *see* M-Opinion at 12, the two-part procedure provides:

> The first question is to examine whether there is a sufficient showing in the tribe's history, at or before 1934, that it was under federal jurisdiction, i.e., whether the United States had, in 1934 or at some point in the tribe's history prior to 1934, taken an action or series of actions – through a course of dealings or other relevant acts for or on behalf of the tribe or in some instance tribal members – that are sufficient to establish, or that generally reflect federal obligations, duties, responsibility for or authority over the tribe by the Federal Government . . . .
>
> . . . .
>
> Once having identified that the tribe was under federal jurisdiction prior to 1934, the second question is to ascertain whether the tribe's jurisdictional status remained intact in 1934.

M-Opinion at 19. Thus, the Secretary's ability to exercise his authority to take land into trust on behalf of a tribe is appropriate where the United States has demonstrated acknowledgement that a tribe was under its jurisdiction, as evidenced by the preparation of reports or surveys including that Tribe. See M-Opinion at 16. This is particularly true where Congress has directed the preparation of such reports, because Congress holds ultimate power to determine which tribes are under federal

---

[9] However, Justice Breyer's concurrence did list examples of federal actions that would demonstrate that a tribe was under federal jurisdiction in 1934. *See Carcieri*, 555 U.S. at 399 (Breyer, J., concurring) (listing "a treaty with the United States (in effect in 1934), a (pre–1934) congressional appropriation, or enrollment (as of 1934) with the Indian Office" as indicating 1934 federal jurisdiction).

jurisdiction., Whereas here, congressional actions and indicia demonstrate recognition of the Tribe's jurisdictional status, it is the Secretary's duty to give full weight to Congress' will.

The M-Opinion makes clear that while "[s]ome federal actions may in and of themselves demonstrate that a tribe was, at some identifiable point or period in its history, under federal jurisdiction[, in] other cases, a variety of actions when viewed in concert may demonstrate that a tribe was under federal jurisdiction." *Id.* This rule has become the law of the Circuit. *See Confederated Tribes of Grand Ronde Cmty. v. Jewell*, 830 F.3d 552, 565 (D.C. Cir. 2016) ("[W]e can understand the existence of such [jurisdiction] sometimes from one federal action that in and of itself will be sufficient, and at other times from a 'variety of actions when viewed in concert.'") (citation omitted). The M-Opinion lists examples of actions which may demonstrate that a tribe was under federal jurisdiction for the purposes of the IRA, including the negotiation of or execution of treaties, the approval of contracts between a tribe and non-Indians, enforcement of the Trade and Intercourse Acts (Indian trader, liquor laws, and land transactions), the education of Indian students at BIA schools, the provision of health or social services to a tribe, or actions by the Office of Indian Affairs. *See* M-Opinion at 19. And regarding the second part of the inquiry, the M-Opinion makes clear that the absence of any probative evidence that a tribe's jurisdictional status was terminated or lost prior to 1934 is strong indication that such status was retained in 1934. *Id.* at 20.

The record here contains hundreds of pages of evidence, ranging from federal reports to BIA school enrollment data, demonstrating that Congress clearly exercised its plenary power and, thus, exercised jurisdiction over the Tribe in 1934 and the preceding years. But despite the record containing several forms of evidence specifically noted in the M-Opinion or by courts reviewing trust determinations as demonstrating federal jurisdiction sufficient to meet § 5108, the Secretary

unjustifiably disregarded these clear congressional actions in finding that record to be lacking. In doing so, the Secretary defied Congress' plenary and exclusive authority with respect to Indian Affairs.

**B.      The Secretary ignored or insufficiently weighed clear evidence demonstrating Congress' recognition that the Tribe was under Federal jurisdiction in 1934.**

Recognizing that this issue has already been fully briefed, *Amici* wish to draw the Court's attention to only a few specific examples of clear congressional action demonstrating Congress' repeated and sustained recognition that the Tribe was under federal jurisdiction in 1934 and the years prior.

First, the record contains numerous federal reports that specifically state that the Tribe was under federal jurisdiction or that otherwise demonstrate the federal government's power and authority over the Tribe. The M-Opinion explains that, in 1832, Congress established the Commissioner of Indian Affairs, who was responsible for the "direction and management of all Indian affairs, and of all matters arising out of Indian relations" and that the "Office of Indian Affairs," which became the BIA, together with the agents and superintendents of the Indian reservations "exercised virtually unfettered supervision over tribes and Indians" and that it exercised "administrative jurisdiction" by "produc[ing] annual reports, surveys, and census reports on many of the tribes and Indians under its jurisdiction." M-Opinion at 16 (citations omitted). In particular, the record shows that Congress directed the Secretary of War to commission the 1822 Morse Report, which was funded by federal appropriations, to examine the condition of certain Indians including the Tribe, as a precursor to their possible forced removal. AR0008519-AR0008531. The report specifically includes a table identifying the Tribe as "within the jurisdiction of the United States." Aside from this label, the Report demonstrates that Congress recognized it had the authority to remove the Tribe. *Id.* By commissioning this report, Congress'

exercised its jurisdiction over all Tribes in the report, including Mashpee…*Id.* This is unmistakable evidence that Congress considered the Tribe as remaining under federal jurisdiction. The Secretary unlawfully dismisses this congressional determination. *See* AR0005115 (2018 ROD at 28).

Similarly, the record contains the 1935 Tantaquidgeon Report, which was funded by congressional appropriations and prepared by a researcher hired by the Bureau of Indian Affairs to survey the New England tribes, including the Tribe, occurring nearly contemporaneously with the passage of the IRA. AR0008722-8785. The report provided a comprehensive overview of the Tribe, describing it as having a reservation. This report was included in a larger report to the Commissioner of Indian Affairs used to develop Indian education policy and, in particular, addressed the educational needs of the Mashpee Tribe and sought to secure funding for a new school for Mashpee children. *Id.*; *see also* AR0005111-5112. These are but a couple of examples; there is plenty of additional persuasive evidence in the record.

The Secretary's 2018 ROD brushes aside the many instances of Congress' clear expressions of federal jurisdiction over the Tribe. Instead, the Secretary states, in conclusory fashion, that, standing alone, the reports are inconclusive of whether the Tribe was under federal jurisdiction in 1934. *See* AR0005115 (2018 ROD at 28). The Secretary improperly weighed the evidentiary value of each of these reports in isolation to the others, contrary to the M-Opinion's guidance and binding Circuit law which requires that evidence should be viewed as a whole when determining whether a tribe was under federal jurisdiction, and ignoring the fact that in multiple cases tribes have been found to have been under federal jurisdiction for the purposes of the IRA, in part, due to their enumeration in federal reports. *See, e.g.*, *Grand Ronde*, 830 F.3d at 564 (confirming that the Cowlitz Tribe was under federal jurisdiction in 1934 based, in part, on enumeration of Cowlitz tribal members in federal reports); *County of Amador v. U.S. Dep't of the*

*Interior*, 136 F. Supp. 3d 1193, 1193, 1200, 1208, 1220 (E.D. Cal. 2015), *aff'd*, 872 F.3d 1012 (9th Cir. 2017), *cert. denied*, 139 S. Ct. 64 (2018) (upholding Department decision that the Ione Tribe was under federal jurisdiction based in part on two federal reports). Furthermore, the Secretary—by ignoring this evidence of congressional recognition that the Tribe was under federal jurisdiction—usurped Congress and its well-established plenary power to define the federal relationship with Indian tribes.

Second, the record demonstrates that Mashpee children attended the Carlisle Indian School between 1905 to 1918—a federally controlled school funded by Congressional appropriations. AR0008803-9030; R0009238-9321. The Carlisle Indian School was an Indian boarding school used as an instrument of federal Indian education policy. *See* AR0005114 (2018 ROD at 27). Yet, regarding this clear exercise of federal authority over the Tribe's members, the 2018 ROD states that "[w]hile such evidence clearly demonstrate exercises of Federal authority over Indians generally and individual Indians specifically, [it does not] suffice, in isolation, to show an exercise of federal authority over the Mashpee Tribe as distinct from some of its members." Under the M-Opinion's two-part test, standing alone, a single federal action need not establish that the Tribe was under federal jurisdiction in 1934. Rather, the Secretary should have taken the evidence that Mashpee children attended BIA schools, one of the specific examples of evidence listed in the M-Opinion as indicating federal jurisdiction, together with the abundance of other actions demonstrating federal recognition that the Tribe was under its jurisdiction, as supporting the Tribe's showing that it met the definition of "Indian" for purposes of the IRA. Yet, unreasonably, the Secretary did not do so.

Lastly, the record contains multiple census records evidencing that the Tribe was under federal jurisdiction for purposes of the IRA. The record contains two census rolls prepared by the

Office of Indian Affairs, which were generated by the BIA Superintendent for the Carlisle Indian School from 1911 and 1912. AR0008629-8636. These census rolls listing the Tribe were prepared under the 1884 Appropriations Act, in which Congress directed the Department to enumerate tribes and individual tribal members under their jurisdiction in Indian census rolls. AR0008671; AR0008629-8636. Yet another clear indication that Congress and the Executive Branch recognized the Tribe was under its jurisdiction. The record also contains multiple general federal censuses prepared by the U.S. Census Office, showing that Mashpee tribal members in the Town of Mashpee were enumerated on the general federal census from 1850 through 1930. AR0009684-9692. At least one of these records was prepared with direct assistance from the Indian Office, specifically, a statistical table showing tribes "within the jurisdiction" of the United States that was included in the 1850 general federal census. AR0008625; AR0008531. In the 2018 ROD, the Secretary stated, "the listing of Tribal members on a Federal census, though it may be probative of Federal jurisdiction over the Tribe, *in and of itself* is inconclusive." AR0005115 (2018 ROD at 28) (emphasis added). This represents yet another blatant example of the Secretary's disregard for Congress' authority with regard to Indian Affairs.

Time and time again, the Secretary has ignored Congress' clear recognition that the Tribe was under federal jurisdiction. The Secretary's actions overstepped his authority and are contrary to basic tenants of Federal Indian law providing for Congress' plenary and exclusive authority over tribal affairs.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment to the Plaintiff.

Respectfully submitted May 19, 2020.

/s/ Keith M. Harper
Keith M. Harper, DC Bar No. 451956
Adam H. Charnes, DC Bar No. 441697
Charles W. Galbraith,  DC Bar No. 1028083
Krystalyn Kinsel, DC Bar No. 1616364
Julian SpearChief-Morris, DC Bar No. 1618979
KILPATRICK TOWNSEND & STOCKTON LLP
607 14th Street, N.W., Suite 900
Washington, D.C. 20005
Telephone:  (202) 508-5800
Facsimile:  (202) 508-5888